**S. AMANDA MARSHALL, OSB # 95347**
United States Attorney
District of Oregon
**CHARLES F. GORDER, JR., OSB #91287**
charles.gorder@usdoj.gov
**DAVID L. ATKINSON, OSB # 75021**
david.atkinson@usdoj.gov
Assistant United States Attorneys
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
        Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | No. 05-CR-00413-KI-01 |
| v. | **UNITED STATES' SENTENCING MEMORANDUM** |
| **MEHRDAD YASREBI**, <br> a.k.a. Abu Torab, | Sentencing date: March 7, 2012 |
| Defendant. | _____ |

/ / /

/ / /

# **TABLE OF CONTENTS**

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Summary of Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Iranian Sanctions (Iranian Embargo) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IRS Oversight of Non-Profit Organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

The Charged Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Overview of Child Foundation US . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Obstructing IRS Oversight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CF US's Licensing History with OFAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

The Evasion of the Embargo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Scheme with the Lahijis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Efforts to Avoid Detection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Guideline Analysis and Sentencing Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Bob Jones University v. United States*, 461 U.S. 574 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Elashyi*, 554 F.3d 480 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Hanna*, 661 F.3d 271 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Klein*, 247 F.2d 908 (2d Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. McKeeve*, 131 F.3d 1 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

### FEDERAL STATUTES

18 U.S.C. § 1960 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

26 U.S.C. § 501(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Export Administration Act (50 U.S.C. App. 2405) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

### FEDERAL STATUTES, LAWS AND RULES

15 C.F.R. § 742.8(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

31 C.F.R. § 560.101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

31 C.F.R. § 560.203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

31 C.F.R. § 560.204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

31 C.F.R. § 560.205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

31 C.F.R. § 560.206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

31 C.F.R. § 560.207 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

31 C.F.R. § 560.208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

31 C.F.R. § 560.210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

31 C.F.R. § 560.530 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

USSG § 2M5.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

USSG § 3E1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## DOCKETED CASES

*United States v Lahiji, et al.*, 10-CR-00506-KI (D. Or.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

## MISCELLANEOUS

http://en.wikipedia.org/wiki/Islamic_Azad_University (last visited 12/12/2011) . . . . . . . . . . . 25

The United States of America, by S. Amanda Marshall, United States Attorney for the District of Oregon, through Charles F. Gorder, Jr. and David L. Atkinson, Assistant United States Attorneys, submits its memorandum in aid of sentencing scheduled for March 7, 2012, at 9:00 a.m.

## Summary of Recommendation

In 1994-95, defendant Mehrdad Yasrebi, a supporter of the "Hezbollah brothers," formed co-defendant Child Foundation ("CF US" ) as a non-profit Oregon corporation and obtained tax-exempt status for CF US  from the Internal Revenue Service.  The ostensible purpose of CF US was to raise money in the United States to support deserving children in Iran and to assist in the "holy duties to educate and prepare the children for the Islamic Republic [of Iran]."  Tab 1, pp. 3-4.[1]  The defendants' timing, however, could not have been worse.

From 1995 through 1997, just as CF US was getting off the ground, President Clinton imposed a series of financial prohibitions, culminating in what are called the Iranian "sanctions" or the Iranian "embargo"  which prohibit almost all trade and financial transactions with Iran or with persons in Iran.  Rather than seek out and find worthy objects of charity in other places in the world, defendant Yasrebi, and through him, co-defendant CF US, launched a more than decade-long campaign of obfuscation and deception to evade the Iranian embargo and hide what they were doing both from the U.S. Treasury's Office of Foreign Assets Control ("OFAC"), which administers the Iranian sanctions, and from the Internal Revenue Service ("IRS"), which conducts limited oversight of tax-exempt organizations.   Some of the money sent to Iran funded radical Grand Ayatollah Makarem Shirazi who is a member of the Iranian clerical establishment and a vocal Hezbollah

---

[1]  "Tab" refers to the tab number in the accompanying appendix; "p" refers to the page number within each tabbed document.

supporter.  Other funds were used to invest in certificates of deposit in Iranian banks, to purchase real estate, and to support various other activities in violation of the embargo.

Through mid-2008, CF US and Yasrebi sent approximately $10.8 million[2] to Iran, using three general schemes to evade the embargo.  From 1997 to 2002, they sent over $1.7 million to Iran using money transmitters outside traditional banking channels.  From 2001 through 2005, they laundered approximately $5.4 million to Iran through the Swiss bank account of a Swiss affiliate.  And beginning in 2005, they began to send funds to Iran through a sophisticated "trade-based" money laundering scheme based in the United Arab Emirates.

Throughout this period, defendant Yasrebi thumbed his nose at the Iranian sanctions.  He hid his overall activities by filing deceptive and false CF US tax returns and intimated to the public and prospective donors that he was complying with the sanctions while he and others were creating false documents to cover up the embargo violations.  Additionally, defendant Yasrebi allowed others to use CF US to launder funds to Iran for their own personal benefit, while simultaneously claiming fraudulent, and sometimes back-dated, "charitable contribution deductions" on their personal US income tax returns, resulting in tax losses of several hundred thousand dollars.

Because of this more than decade long criminal activity, the United States recommends that the Court sentence defendant Yasrebi to 30 months' imprisonment, followed by a term of three years' supervised release, and a $50,000.00 fine.

/ / /

---

[2]  This figure represents approximately 85 % of the over $12 million in revenue reported by CF US on its tax returns from 1995-2008.  Tab 44.

PAGE 2 - UNITED STATES' SENTENCING MEMORANDUM

**The Iranian Sanctions (Iranian Embargo)**

Beginning at least with the 1979 seizure of American Embassy personnel in Iran, the United States' recent relationship with Iran has been decidedly negative.  The Department of State designated the Islamic Republic of Iran to be a state sponsor of terrorism in 1984.  In March 1995, President Clinton declared a national emergency with respect to Iran, finding that the policies and actions of the Government of Iran constituted a threat to the national security, foreign policy and economy of the United States.  In May 1995, the President issued Executive Order 12959, which imposed sweeping restrictions on trade and financial transactions with Iran extending to goods, services, and technology and included restrictions on the financing, brokering, or facilitation of prohibited transactions.  In August 1997, the President issued Executive Order 13059, which clarified and consolidated the provisions of the previous executive orders imposing trade sanctions against Iran.  As a general rule a remittance of funds to be used to purchase any goods or services in Iran for an organization, to pay salaries, rent, or other administrative expenses for an organization, to purchase any real estate, or to invest in an interest-bearing bank account for anyone required a specific license in advance from OFAC.

To implement the embargo, OFAC  issued the Iranian Transactions Regulations codified at 31 C.F.R. § 560.101, *et seq*.  The regulations prohibit United States persons from engaging in any transaction related to the sale or supply of goods or services to Iran unless authorized by the issuance of a license by the Treasury Department through OFAC.  Unless a license is obtained, the regulations prohibit United States persons from (among other things):  (1) engaging in a transaction that evades or avoids, or has the purpose of evading or avoiding, the Iranian embargo (31 C.F.R. § 560.203);  (2) exporting or re-exporting goods or services to Iran (31 C.F.R. §§ 560.204 and

560.205); (3) engaging in or facilitating any transaction related to goods or services of Iranian origin (31 C.F.R. § 560.206); (4) making any new investment in Iran (31 C.F.R. § 560.207); (5) facilitating a transaction by a foreign person that would be illegal if performed by a United States person or in the United States (31 C.F.R. § 560.208); and, (6) trading in, exporting, or re-exporting bulk agricultural commodities for resale in Iran (31 C.F.R. § 560.530). The Iranian Transaction Regulations provide for limited exemptions for non-commercial donations by United States persons of articles, such as food, clothing and medicine, intended to relieve human suffering (31 C.F.R. § 560.210). Exempted "donations," however, do not include the provision of cash for acquisition of goods or services in Iran, or purchasing food or other articles in Iran, or selling donated food or other goods or exchanging them for other items inside Iran.

### IRS Oversight of Non-Profit Organizations

The Internal Revenue Service bears the responsibility for the oversight of ostensibly charitable organizations exempt from income taxation under Title 26, U.S.C. Section 501(c)(3). Tax-exempt organizations such as CF US file an informational annual tax return with the IRS when their revenues exceed certain specified minima. The return, known as the Form 990 *Return of Organization Exempt from Income Tax* ("Form 990 return") enables the IRS to exercise its oversight function. When a tax-exempt organization engages in behavior that is unlawful or contrary to public policy, it is the responsibility of the IRS to consider revocation of the organization's tax-exempt status. To be entitled to tax-exempt status, an institution, *inter alia,* "must serve a public purpose and not be contrary to established public policy." *Bob Jones University v. United States*, 461 U.S. 574, 586 (1983). The Iranian embargo is undeniably the "established public policy" of the United States. An organization that engages in wholesale embargo violations does not serve public policy,

PAGE 4 - UNITED STATES' SENTENCING MEMORANDUM

and therefore is at risk of losing its tax-exempt status.

## The Charged Offense

The defendant pled guilty to the Superseding Information which charged him with a multi-object *Klein* conspiracy to impede, impair and obstruct by deceitful or dishonest means the lawful functions of OFAC in the enforcement of the Iranian embargo and of the IRS in its oversight of charitable organizations exempt from income taxation. *See United States v. Klein*, 247 F.2d 908, 915 (2d Cir. 1957). In his plea, the defendant admitted that:

> From the middle of 2006 through early 2007, as the President of the Child Foundation, I was aware that Child Foundation funds were being used to facilitate cash transfers to Iran, for charitable purposes but nevertheless in violation of an embargo ordered by President Clinton. It was within my power to stop those transfers, but I failed to do so. Furthermore, I did not disclose those transfers to the IRS, OFAC, or Child Foundation's auditors, and encouraged several individuals to refrain from volunteering any information suggesting that cash transfers had ever been made.

Petition to Enter Plea of Guilty, 6 (CR 10). These admissions are limited to a time frame (the "middle of 2006 through early 2007") and range of conduct (failure to stop cash transfers to Iran; encouraging others to refrain from volunteering information about transfers) that is relatively narrow when compared to the allegations contained in the Information and the evidence available to the United States. While defendant's plea constitutes an unqualified admission of guilt to the conspiracy and acceptance of responsibility under the Sentencing Guidelines, in fashioning its sentence, the Court must consider the much broader context of the defendant's long term conduct which is clearly supported by the evidence.

/ / /

PAGE 5 - UNITED STATES' SENTENCING MEMORANDUM

**Overview of Child Foundation US**

Defendant Mehrdad Yasrebi, aka Abu Torab Yasrebi, aka Michael Yas, was born October 1, 1957 in Shiraz, Iran.  He arrived in the United States from Iran in 1976 to attend college, eventually earning a B.S. and M.S. from UCLA and a Ph.D. at the University of Washington in ceramic engineering in 1988.

The defendant's own writings show that he was a staunch supporter of the  Iranian regime. For example, defendant described his learning and research activities during the 1980s as "[p]articipating in several research groups outside of the country which were made of the brothers of Hizballah' [PH] regarding the fulfillment of the industrial needs of the Islamic country [Iran]" Tab 2, p. 2.

This support for the Iranian regime apparently motivated him to start CF US.  In a 1997 letter seeking support and funding from the "religious brothers, In charge of the office of education" in Iran, he wrote that "if the Hezb a . . .  brothers support the Child Foundation in Iran, in near future, God willing, we can easily support [help] thousands of children."   He continued that the Child Foundation "can assist you in your holy duties to educate and prepare the children for the Islamic Republic." Tab 1, pp. 3-4.

CF US was incorporated by defendant Yasrebi in 1994 and received  tax-exempt status from the IRS in 1995.  Defendant served until 2010 as the CEO of CF US and had a deciding voice in virtually all of CF US's relevant conduct.  CF US modeled itself along the lines of many charities in the United States which rely on the generosity of Americans to "sponsor a child in need" in a foreign land by providing a certain amount of money per month which is directed to the support of that child.  In order to control the distribution of CF US money in Iran, defendant established an

Iranian affiliate of CF US called Refah Kudak Charity Institute a.k.a. Child Foundation Iran (hereafter, "RK" or "CF Iran") with the assistance of his relatives in Iran – his cousin, Ahmad Iranshahi, and defendant's parents.[3]

While his cousin Iranshahi served as the director of CF Iran, defendant maintained a tight rein over the organization.  CF US supplied the overwhelming majority of CF Iran's revenue. Defendant CF US, defendant Yasrebi, CF Iran and Iranshahi entered into written agreements under which CF US retained an ownership interest in all funds sent from the United States to Iran, and in all income earned on U.S.-source funds deposited in Iranian banks.  *See* Tab 3.  Defendant Yasrebi used CF US funds raised in the United States to pay the salaries of CF Iran employees, and to pay its overhead and costs of operation, all without obtaining a required license from OFAC.  CF US financed $468,000 of CF Iran's payroll, brokerage fees, professional fees, building maintenance, rent and utilities during fiscal years 2004 - 2007.  *See*, e.g., Tab 4, p. 7.  According to CF Iran's financial statements, CF US also paid an additional $245,000 for capital projects, including the purchase of one or more buildings, office furniture and equipment, computer equipment and vehicles in Iran during fiscal years 2004 - 2005, pursuant to the same financing agreement.  *Id.*  CF US paid Iranshahi's salary through Iranshahi's sister, Razieh Iranshahi, aka Farifteh, in Sweden. Tab 5.  CF US routinely solicited sponsors to provide funds to purchase specific goods in Iran– items such as computers, televisions, refrigerators, heaters, bicycles, and building repair projects which were all supplied without a required license from OFAC.   A sample of some of these transactions are included in Tab 6, p. 4 (television) and Tab 7, p. 3 (refrigerator, television, and toys) – and there are literally dozens more available.

---

[3]  Iranshahi, currently a fugitive, is charged in this court along with co-defendants Hossein Lahiji and Najmeh Vahid in 10-CR-00506-KI.

PAGE 7 - UNITED STATES' SENTENCING MEMORANDUM

Some of the money sent to Iran by CF US was given to Grand Ayatollah Makarem Shirazi, a member of the Iranian clerical establishment and a representative of its government.  As noted in the affidavit for search warrant in this case:

> Grand Ayatollah Makarem Shirazi is one of Iran's leading conservative clerics  and one of  the founding fathers of the  Islamic Revolution  in Iran.  In a  Payvand (Iranian news source) article dated July 31, 2006, titled "Iranians  'Volunteer' To Help Hizballah," Shirazi is named as one of four leading Iranian  clerics who said they would allocate a percentage of the funds they received  to the Lebanese people. One of the clerics explained that the funds ". . . would  be permitted as a means of strengthening the oppressed people of Lebanon, the  Hizballah resistance front, as well as the oppressed Palestinians who are  engaged in Islamic jihad to defend themselves against the diabolical and  arrogant powers."  In addition, according to The Middle East Media Research  Institute website http://memri.org on August 7, 2006, a statement from Shirazi  concerning the outbreak of war between Israel and Hizballah in 2006, was  published in the Iranian weekly Sobh-e Sadeq.  The statement quotes Shirazi as saying, "If the oppression and isolation of the Lebanese people and of the  Palestinian people continue, in light of Israel's savage attacks, the senior clerics will consider declaring defensive jihad against Israel." Sobh-e-Sadeq, which published the statement, is described as the  mouthpiece of Iran's Supreme Leader Ali Khamenei and is affiliated with the  Revolutionary Guards.
>
> Recently, on his website, Ayatollah Shirazi expressed his condolences "for martyrdom of the great commander of Hezbollah, Haj Emad Moghnieh." Moghnieh was the Hezbollah leader believed responsible for a series of  terrorist acts, including the bombings of the US Marines and French barracks  in Beirut, Lebanon, in October 1983, which resulted in the death of 241 US  Marines and 57 French paratroopers. He was killed in an explosion in Damascus in February, 2008.

Affidavit for search warrant, pg. 27.

Intercepted  communications  demonstrate  that  defendant  unambiguously  discussed  with Iranshahi and others CF US's fund-sharing arrangement with Shirazi. For example, on October 8, 2006 Yasrebi confirmed that CF US had received $100,000 designated for Shirazi.  Defendant asked Iranshahi to persuade Shirazi to give them the money.  Iranshahi responded that Shirazi had agreed to give them 50% of the money, but that he insisted that he be allowed to designate who received the remainder. Tab 8, pp. 9-10.

PAGE 8 - UNITED STATES' SENTENCING MEMORANDUM

Defendant also asked Iranshahi to get a letter from Shirazi authorizing them to collect khoms (mandatory religious offerings in Muslim religion) on Shirazi's behalf from people in the United States. In a conference call on May 28, 2007, defendant told a prospective CF US board member that the Foundation indeed had a letter from Shirazi authorizing them to collect khoms on his behalf. Tab 9, p. 7. The defendant even provided charitable contribution receipts for khoms he collected for Shirazi, this allowing US taxpayers to deduct funds provided to this radical ayatollah from their US taxes. Tab 10, p. 4.

### Obstructing IRS Oversight

As noted above, the IRS has the responsibility for overseeing tax-exempt organizations to ensure that they operate with a public purpose. CF US's tax filings impaired the IRS's ability to do just that by failing to disclose its activity in Iran. In some tax years the Form 990 even cautioned that the:

> Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization . Therefore, *please make sure the return is complete and accurate, and fully describes . . . the organization's programs* and accomplishments.

Tab 11, pp. 1-3 (emphasis added). For *ten consecutive years* – 1998 to 2007 – defendant did not reveal on CF US's Form 990 returns that virtually all of its revenue was going to Iran. Tab 12. For example, CF US's 2003 Form 990 return reported revenues of over $1.5 million which it used in "support for over 5,000 children from 3,000 families in Afghanistan, Mexico, Indonesia, Turkey, Palestine and Bosnia." Conspicuously absent was any reference to Iran where almost all of its funds were sent. CF US's 2007 Form 990 return similarly claimed that it provided over $1.8 million in "international humanitarian aid . . . in Afghanistan, Indonesia and Turkey. Special assistance was provided this year for disaster relief in SE Asia." Again, there was no mention of Iran in the

PAGE 9 - UNITED STATES' SENTENCING MEMORANDUM

program description.[4]  As CF US's CEO, defendant signed each of the returns.  Tab 12, pp. 6, 14.

## CF US's Licensing History with OFAC

During the entire period in which CF US has operated, it has only once obtained a license from OFAC to send anything to Iran.  Tab 13.  Other applications made by CF US for licenses did not receive approval.  For example, in September 2000, a lawyer acting for CF US wrote OFAC seeking "permission and license to be exempted from the application of the Iranian Trade Embargo" for "donations in money and personal property gifts" for children in Iran.  Tab 14, p. 2.  OFAC's Licensing Division replied to CF US the following month, confirming receipt of the inquiry but advised that the filing of an application for a license or requesting information about transaction prohibitions did not suspend or excuse compliance with the prohibitions or requirements of the embargo.  OFAC did not correspond further with CF US in connection with the 2000 inquiry, and no license was issued at that time to CF US authorizing it to send funds to Iran (or, for that matter, to engage in any other conduct  prohibited by the embargo).  Tabs 13, 15.

Defendant was well aware at this early date of the need for a license and his lack thereof.  During the service of a search warrant on defendant's office at Precision Castparts in July 2008, investigators uncovered a handwritten document dated November 2001 entitled "Permission to send the Child Foundation's exchanged money."  The first of nine items listed in the document states "[t]he possibility of obtaining such permission – very low."  Tab 16.

In March 2004, OFAC did issue CF US a license for the very limited purpose of sending backpacks filled with sundries to victims of a major earthquake centered in Bam, Iran.  The license clearly stated on its face that it expired on June 25, 2004.  Tab 17.  In May 2004 CF US applied for

---

[4]  CF US's 2008 return, filed after law enforcement executed a search warrant on its offices and the nature of this investigation became known to CF US, did reference funds going to Iran.

a second license to transfer $250,000 to Iran to be used "to distribute food packages, medical care, clothing, basic living essentials, housing, education and other humanitarian relief" to orphaned and homeless children in Bam.  Tab 18, p. 1.  OFAC denied the license application in a letter dated July 23, 2004, stating "Such transactions are prohibited unless authorized by [OFAC] . . . [Y]our application is therefore denied."  Tab 18, p. 7.

### The Evasion of the Embargo

Undeterred by the lack of licenses to conduct their operations in Iran, defendant Yasrebi and CF US began to operate and continued to operate through CF Iran (RK).  Defendant, acting through CF US and in concert with Iranshahi and others, engaged in three separate schemes to circumvent the embargo over discrete periods of time, described as follows:

(1)    From 1997 through 2002, defendant transferred over $1.7 million of CF US's funds to Iranshahi and CF Iran in Iran in approximately twenty-nine different transactions.  Tab 19.  The embargo prevented the U.S. banking industry from engaging in the unlicensed transfer of most funds to Iran, thus effectively foreclosing the use of direct wire transfers and other conventional banking services to transfer money to Iran.  During this phase of the conspiracy, defendant and Iranshahi evaded the embargo by using money transmitters to send funds to Iran outside traditional banking channels.  *Id.*[5]

(2)    From 2001 through 2005, defendant wire transferred about $5.4 million of CF US's funds in approximately thirty-four transactions to a bank account in Switzerland held by a Swiss affiliate known as Emdad Kudak or Bonyad Kudak.  The Swiss affiliate promptly and faithfully

---

[5]    One such money transmitter, Alex Eskandar Khamooshpour, was later convicted of Operating an Unlicensed Money Transmitting Business in the District of Arizona in violation of 18 U.S.C. § 1960.  Khamooshpour confirms defendant's use of his services to transfer funds to Iran. Tab 20, pp. 3-4.

transferred the funds into bank accounts in Iran of CF Iran or of defendant's family, including his cousin Iranshahi and defendant's parents.  Tab 21.

The purpose of wiring money to Iran through Switzerland was crystal clear.  In January 2004, defendant emailed Azar Djalili, the head of Emdad Kudak in Switzerland, stating "I just wired $220,000 to Switzerland this morning.  You should have it on Monday."  Djalili replied, in pertinent part, "[s]ure we transfer to Iran as soon as come."  Describing a new Swiss bank account opened by Emdad Kudak in Switzerland, Djalili further wrote to defendant, "With new acc we have more power againt (sic) all kind of enbargo (sic) even through UN, We are proid (sic) of it."  Tab 22, p.1.

Defendant Yasrebi took affirmative action to prevent the discovery of this evasion of the embargo, even from some of those who worked for CF US.  For example, CF US had hired an auditor, Jonathan Resnick, to produce an audit report to be shown to the public.  Resnick, who was unfamiliar with the Iranian embargo, initially listed Iran as the destination country for the funds in CF US's draft 2005 audit.  The draft, at note 5, originally read as follows:

> The Organization collects donations and child sponsorships in the United States  for program services that are provided in Iran and Afghanistan.  Funds collected in the United States are wired to Switzerland to Bonyad Kudak, a registered Swiss charity, which in turn transfers funds to the Iranian registered charity, Refahe Kudak.

Tab 23, p. 10.  On defendant's copy of the draft, the words "provided in Iran and Afghanistan" are circled and underlined with a handwritten note, "change."  The reference to the money being wire-transferred through Switzerland to Iran is similarly underlined.  Resnick indicated that defendant insisted that he remove the statement about CF US's funds passing through Switzerland to Iran.  Defendant explained to Resnick that he did not want to identify in the financial statements

PAGE 12 - UNITED STATES' SENTENCING MEMORANDUM

how CF US sent money to Iran.  Tab 24, p. 7, ¶ 56.[6]  The final audit report simply noted that a large

amount of CF funds were wired to the Swiss entity.  There was no mention that the same funds were

wired from Switzerland to Iran.  Tab 25, p 11, note 6.  A few years later, during the course of an

interview with federal investigators in July 2008, defendant was less than candid about these Swiss

transfers, claiming that he did not know how CF US's Swiss affiliate, Emdad Kudak, spent the funds

($5.4 million) provided to it by CF US.  Tab 26, pp. 1-2.

(3)    From 2005 through 2008, defendant and Iranshahi engaged in the trade-based money

laundering scheme to circumvent the embargo.  During that period, defendant wire-transferred at

least $3.6 million of CF US's funds to Iranian-based commodities brokers and traders operating in

satellite offices located in the United Arab Emirates ("U.A.E."), and, beginning in 2006, to the

brokers/traders through offshore bank accounts opened by defendant and CF US in Dubai, U.A.E.

This phase of the conspiracy involved over twenty transactions.  Tab 27.  Defendant and Iranshahi

tried to make it appear that CF US was engaging in purchasing bulk food commodities in Dubai and

then donating the food to children in Iran for humanitarian purposes, transactions which would be

exempt from the embargo.

In early 2007 CF US's website began carrying excerpts from an opinion letter from a law

firm stating that:

> U.S. sponsor donations are used by CF-USA to purchase items such as food,
> clothing, informational materials and medicine outside Iran.  Such items are then sent
> to [Refah Koudak] in Iran with instructions to distribute the items to needy children.
> CF-USA often purchases quantities of food and other items in bulk to provide the
> maximum quantity of donated food and other products possible. . . . [Refah Koudak]

---

[6]  Resnick, who says he was unfamiliar with the embargo at the time, stated that he had
discussions with defendant about deletion of the reference to Iran, eventually agreeing to remove
it because a subsequent note referenced the funds were going to Iran.  Tab 24, p. 8, ¶ 57.  It is
important to note that these financial statements were not filed with the IRS.

PAGE 13 - UNITED STATES' SENTENCING MEMORANDUM

has provided written assurances to CF USA that all donated items received will be used for humanitarian relief purposes. . . .

[Refah Koudak] has entered into Memoranda of Understanding with other Iranian NGOs to exchange excess donated commodities for other items of which the other NGOs have excess quantities.  The items for which the CF-USA donated food and other items will be exchanged will be limited to food, medicine, informational materials or clothing.  The other NGOs have also provided assurances in the Memoranda of Understanding that all excess items received from CF-USA will be used solely for humanitarian purposes.  [Refah Koudak] and other Iranian NGOs may provide additional support to CF-USA sponsored children using funds not collected through CF-USA.  CF-USA does not direct [Refah Koudak] as to how to spend such funds.

Tab 28, pp. 1-2.  Based upon this factual premise, the website said that CF US's attorneys concluded that the CF US's program fell under the limited exception provided for in the Iranian Sanctions because the donations "consist only of food, clothing, medicine, or informational materials" which are provided to poor children, and the donated items received in exchange from other NGOs can also reasonably be characterized as falling within those exempt categories.  *Id*., p. 3.

The factual basis for this legal opinion was starkly inaccurate.  Rather, defendant and Iranshahi engaged in a clever, and extremely complex, "trade-based money laundering" scheme designed to evade the embargo and fool everyone, including OFAC, the IRS, and CF US's own auditors and lawyers, as to what was really happening. There appear to have been approximately 60 transactions totaling over $7.3 million between 2005 and July 2009.[7]  These transactions generally shared the following components:

• Defendant would often wire transfer six-figure sums of CF US funds to Dubai to pay the face value of invoices for bulk food commodities (*e.g.* sugar, rice, cooking oil) ostensibly

---

[7]  Investigators have uncovered evidence that an additional $3.7 million in trade-based transactions occurred between July 2008 and July 2009 beyond the $3.6 million listed from 2005 to July 2008 as reported in Tab 27.

PAGE 14 - UNITED STATES' SENTENCING MEMORANDUM

"purchased" from Iranian commodities brokers with branch offices in Dubai who were
complicit in the scheme.

• Iranshahi would arrange for the shipment of substantially lesser quantities of food than
reflected in the initial invoices.

• While the commodities were in transit, Iranshahi would divert them *mid-shipment* to
third-party purchasers in Iran. In some instances, the food was diverted to a cooperative in
an area of northern Iran dominated by oil fields, with no connection to CF or RK. In other
instances, the food was diverted to specified individuals with no connection to CF or RK.
None of these recipients corresponded with another NGO as mentioned in the legal opinion.

• Iranshahi would arrange for CF Iran to receive in Iran the residual, unused CF US cash and
the proceeds of the commercial food sales by the complicit commodities brokers.

• For the purposes of CF US's books, and ultimately to disguise the scheme, Iranshahi would
confirm receipt of the larger quantities of commodities that had been reflected in the original
invoices when, in fact, the commodities had been largely diverted and sold to third parties.

We have selected just one of 60 complex transactions to illustrate the scheme in detail from
beginning to end. Tab 29, subtabs A - I. Here is how it worked.

The Armiti Group ("Armiti") was a shell corporation in Dubai, United Arab Emirates,
operated by one Behak Kangarloo, a CF agent in Dubai. Armiti shared the same address and fax
number as CF Dubai. Ramak General Trading ("Ramak") was an Iran-based company which had
an office in Dubai. Some of the trade-based money laundering involved money transfers through
Armiti and Ramak.

/ / /

PAGE 15 - UNITED STATES' SENTENCING MEMORANDUM

On May 6, 2006, Iranshahi sent Kangarloo an email with instructions on how to falsify shipping documents with Ramak "so that everything looks legit." Tab 29A, p. 1. On May 16, 2006, CF US wire transferred $275,000 from the United States to Armiti in Dubai. Tab 29B. Kangarloo, Armiti, and Ramak created documents purporting to show a purchase of 264 metric tons of Pakistani rice by Armiti on behalf of CF US from Ramak for 1,016,400 U.A.E. Dirhams (approximately $275,000 at the prevailing exchange rate). Tab 29C, pp. 2-3. A "Proforma Invoice" was created showing that the Ramak rice would be shipped to CF Iran in Tehran. *Id.*, p. 3. However, the actual recipient (consignee) for 234 metric tons of Ramak's rice was not CF Iran but an unrelated party in Iran, the Marneshinane Cooperative. Two manifests, one showing CF Iran as the recipient for the rice and one showing the Marneshinane Cooperative as the recipient for the rice, were created. In an email dated May 23, 2006, Kangarloo noted that this scheme would "not work for a long time since the port will be suspicious" and advised Iranshahi that they should concentrate on falsifying only the documents showing Child Foundation initially requesting the goods and then documents showing the ultimate receipt of the goods and to forget about creating other documents: "[p]rocess in the middle is not important because it is so different in each country, nobody cares or can prove anything." Tab 29D. Ramak shipped the rice to the third party in Iran. This diversion has been confirmed by Dubai Customs. Tab 29E.

Iranshahi instructed Ramak to send him two checks made out to RK (CF Iran) for just over 1,000,000 U.A.E. Dirhams, post-dated by approximately two months, thus giving Ramak time to receive funds from the third-party consignee for the diverted rice. Tab 29F. Iranshahi also instructed Ramak to create some invoices, making sure that the invoices and the manifests added up to the exact amount of money which Armiti had provided to Ramak so that "all of our hard work

will [not] go to waste." Tab 29G.   False invoices showing 234 tons of rice being delivered to Iran

on behalf of CF for about 900,000 U.A.E. Dirhams were created.  Tab 29H, pp. 1-3.  Iranshahi then

created  a false certificate attesting to the receipt by CF Iran of 264 tons of "foodstuffs" for

$275,000.00.  *Id*., p. 5.

The upshot of all these shenanigans was that CF US sent $275,000 to Dubai in May 2006

which was given to Ramak.  Ramak in turn gave Iranshahi checks for slightly less than that amount

which could be deposited in CF Iran's bank account in Iran two months later.  Ramak also gave CF

Iran false invoices showing CF US had purchased rice with this money to be shipped to CF Iran.

Most (if not all) of the rice was really shipped to someone else.  Iranshahi certified for the US

auditors that CF Iran had received the rice for $275,000 and CF had false invoices to back that story

up.

A late May 2006 communication starkly revealed defendant Yasrebi's complicity in these

trade-based money laundering schemes.  Iranshahi emailed a hand-written letter to defendant which

stated in part:

> as you know we had come to an agreement with [a Ramak representative] in regards
> to transferring money from the US to Dubai (To Ramak Company's account) which
> he did not keep his promise.  The agreement we had with him was for us to receive
> 50% of that transferred amount in merchandise and the rest as cash in Riyal (sic) was
> to be received in Iran.  Ultimately a receipt showing the entire amount should have
> been generated in the name of Bonyad Kudak in the U.S.  Nasiri is refusing to
> generate the receipt for the entire amount and has only generated a receipt for the
> merchandise portion of the total amount that was sent to Iran.

Tab 29I, p. 1.  Iranshahi went on to clarify that the food commodities that were being delivered in

Iran were not going to aid recipients in Iran at all.  Rather, the two had rigged a scheme under which

the "merchandise sent from [Ramak] to Iran are guaranteed to be sold. . . . . Rice and butter is

guaranteed to sell in Iran in a month or so by Ramak representatives."  *Id*., pp. 1-2.  Thus, what

PAGE 17 - UNITED STATES' SENTENCING MEMORANDUM

appeared on paper to be humanitarian food donations, exempt from the embargo, were in reality a sham. At least half of the funds forwarded by CF US to "purchase food" were being passed through the commodities broker as cash into Iran. The food that *was* delivered was diverted and "guaranteed to be sold" commercially in Iran, never reaching its purported beneficiaries, in violation of the embargo.

This trade-based money laundering scheme required an extensive coverup. CF US's auditor Jonathan Resnick, who was questioning expenditures in Iran, had to be fooled. Documents purportedly showing humanitarian donations consistent with the false story given to the lawyers had to be created. Electronic surveillance captured the defendant and Iranshahi doing just that.

On October 17, 2006, defendant called Iranshahi, discussing accounting documents that Iranshahi was preparing for Resnick, CF US's auditor. Tab 30. Having CF US's funds routed into Iran, and the food shipments being diverted, defendant instructed Iranshahi:

> Defendant:    . . . pay a little attention to how you write it. We want to say that the Foundation is a chain. We deal with these charities frequently; we don't want him to think that the Foundation is one Foundation only. We will say that we are many, that all the food supplies we bring to Iran is distributed, and we also have capabilities to give other things to our children. You have to say something like this.
>
> Iranshahi:    Well how do we prove this?
>
> Defendant:    The same thing. The same thing I wrote. You have to find some documents; you know it better; so that person becomes quiet. It means whatever we say, we show him a document for it. . . . Now since we cannot give money to our children, I don't think saying we have contract to give them food and they give us money works; but if we say that we are a chain of charities, we cooperate with many other charities in Iran, we bring food supplies . . . it does not matter if it is for us or them. We are one, we distribute and take advantage of other possibilities and give our children other things to fulfill our commitment to our sponsors. I believe this is very tangible and correct and no one can say anything about it.

PAGE 18 - UNITED STATES' SENTENCING MEMORANDUM

*Id.*, p. 5.

Three days later, defendant and Iranshahi discussed the need to "get rid of this auditor." Tab 31, p. 12. Yasrebi instructed Iranshahi that "You have to somehow get a document that such and such charity gave you 200 thousand dollars as gift. We gave you food, and you gave them food and they gave you gift. Can you do this?" *Id.*, p. 14. As defendant and Iranshahi discussed the creation of phony documents to provide the auditor, Iranshahi stated that he could make up financial records, and the auditor would not be able to come to Iran to check on their accuracy. *Id.,* pp. 15-17.

Iranshahi revealed more details of his agreements with the commodities brokers he was using as a cash "pass through" into Iran. He stated that two of the purported commodities brokers in Dubai – "Ramak" and "Damavand"– simply put cash in CF Iran's accounts. He only received about ten percent of the food that was documented in the commodities invoices. *Id.*, p. 25. Iranshahi stated, "we received 10 percent of it, we definitely received food and distributed it, the same thing you said; *but the rest of it was money came into our account and we recorded as cash.*" *Id.* (emphasis added). Defendant expressed concern that by creating receipts from fictional, unreal foundations to help with the CF US audit, someone might "check[], and he/she finds out that it is unreal and we made it up" *Id.*, p. 7. Defendant then suggested they go to foundations in Iran, and claim that they supply food to them in a cooperative effort, but the foundation will not share its books with CF Iran.

> Defendant:     Even better! That is even better; we say that they don't have books [financial report] and they won't give it to us, but we work with them. . . .
>
> Iranshahi:     How many foundations should be our partners?

| Defendant | Look, dear Farhad, it depends.. for example, if you get one like Hazrat-e-Zahra, it will be enough, no, not that 2, 3 of them, if the ones that have 20 thousand dollars income, it does not help, they need to be big charities, two, three is enough if they agree. |
|---|---|

*Id.*, pp. 8, 10.  Later in the conversation, Yasrebi instructed Iranshahi,  "then this will be our scenario . . . that you are a chain in Iran, we give food to you and food is distributed and you gave thing that we promised, to our children, and other charities are giving things that children are promised to receive."  *Id.* 27.  Near the end of the conversation, Iranshahi clarified his marching orders:  "I have to say to Ramak Company . . . or the other company Damavand . . . that in the matter of goods . . . when you actually send the goods, we will contact them and get receipt from them . . . merchandise receipt . . . *we get the receipt for goods and then, we ask them to deposit money into our account.*"  *Id.,* p. 35 (emphasis added).

### Scheme with the Lahijis

From 1999-2007, defendant assisted two wealthy individuals from Texas – co-conspirators Hossein Lahiji and his wife Najmeh Vahid (the "Lahijis")[8] – in claiming fraudulent charitable tax deductions by (1) transferring approximately $1.8 million of ostensibly "donated" funds to Iran to be invested in such a way that the Lahijis retained an interest in the funds while still claiming charitable income tax deductions, and (2) back-dating tax-deductible donation receipts in multiple tax years to make it appear that their contributions were made in an earlier year.  These transactions are detailed in Tab 32.

The Lahijis carried "special accounts" with CF Iran under which they retained ownership of a major portion of the funds they "donated" to CF US.  For example, Iranshahi and CF Iran

---

[8] Defendants in the related case, *United States v Lahiji, et al.*, 10-CR-00506-KI.

invested Lahiji funds in Iranian banks for a term of years at a 20% interest rate.  At the conclusion

of the term, the principal was supposed to be used for construction projects under the auspices of

CF Iran, in violation of the embargo, and the Lahijis retained the earned interest.

RK's 2007 financial statement shows a "consigned long term investment" at Bank Karafarin

in Iran, consistent with its previous financial statements.  The 2007 statement shows that the Lahijis

"donations" to CF US were used in part to establish an account with RK, followed by a note of

explanation which reads as follows:

> Based on the agreement between the Institute and Dr. Lahiji (one of the overseas
> supporters), the donation made by Dr. Lahiji amounting to IRR 5,268 million (USD
> $632,000) has been deposited with Bank Karafarin.  The deposit is for a term of five
> years earning 20% interest per annum.  Upon maturity date, the principle will be
> used for construction of health care and education complexes under the supervision
> of the Institute.

Tab 33, p. 12, note 10-1.  RK's financial statements during the relevant time period consistently

show "accounts payable" to "Mr. Lahiji" growing at 20% per year.  *Id.*, p. 14; Tab 4, pp. 11-13.  For

example, RK's 2007 financial statement reflects a category for the "increase (decrease) in

distributable Mr. Lahiji funds," and a category for "[b]ank deposit for Mr. Lahiji's fund."  Tab 33,

p. 1

Defendant Yasrebi was fully aware of the arrangement for the disposition of the Lahiji funds

in Iran.  On September 25, 2006, Iranshahi faxed a letter to defendant providing a "summary of the

latest financial statement for the Child Foundation in Iran."  The statement confirmed that the Lahijis

had approximately $675,200 on account with RK as a "deposit in bank." Tab 34, p. 1.  On

November 27, 2006 defendant personally conversed with Vahid, explaining that CF Iran had

"borrowed" some of the Lahijis' money without their permission:

> this account of yours Mrs. Lahiji . . . we . . . last year we had shortage in budget . .

PAGE 21 - UNITED STATES' SENTENCING MEMORANDUM

. 50 thousand Tomans . . . or I think 50 million Tomans or 50 thousand dollars something like this . . . we borrowed from you [sic] CD account.  We borrowed and then put it back.  It means your account did not change, but since this has been taken and put back . . . the accountants want you or someone who owns the account to okay it.

Tab 10, p. 3.

The following day, defendant told Vahid, "your money . . . there is a contract they sign with Doctor [Lahiji] and the Child Foundation in Iran that they leave this money in the account for 4-5 years . . . okay, this is a certificate of deposit and you are legally the owner of the account . . . now the Child Foundation is not authorized to touch this money unless you grant permission." Tab 35, p. 4.

The Lahijis themselves faxed a letter to defendant and Iranshahi on November 27, 2006, providing their *own* accounting of funds they had provided as "donations" to CF US.  The accounting included reference to a $250,000 house purchased in Tehran "due back" in 2010, "$350,000 placed in a joint account for a period of five years" ("due back" in 2008), and a request to "please show bank statements for the joint account."  Tab 36, p 3.

The defendant also provided the Lahijis with backdated written receipts documenting the Lahijis' purported "donations" on at least three occasions in order to allow the Lahijis to claim their false or exaggerated claims of charitable deductions a year earlier than actually made.  The pattern for each of these donations was the same:  Lahiji donation checks in each instance were back dated to late December of the preceding year.  However, the checks were not deposited into a CF US account until much later in the following year.

For example, in March 2006, CF US received a Lahiji "donation" check dated December 31, 2005.  Tab 37, p.1.   In an email dated March 7, 2006, a CF US employee wrote to another:

PAGE 22 - UNITED STATES' SENTENCING MEMORANDUM

> We're going to be receiving $200,000 as a one-time donation into the General Fund today. . . .   Do NOT send out a receipt for this item.   Let me have a copy of the check and I will do a thank you letter and do a manual receipt.   Although we're receiving it today, it is a "2005" donation for tax purposes.   The check should be dated December 31, 2005.

Tab 37,  p. 3.  Defendant was copied on the email, and then signed the receipt evidencing that the donation was made in 2005 rather than 2006.  *Id*., p. 4.

### Efforts to Avoid Detection

The investigation also uncovered a wealth of evidence indicating that defendant came under significant pressure from CF US's accountant to produce records substantiating what defendant falsely claimed were CF' US's embargo-exempt activities.   On multiple occasions, defendant instructed Iranshahi to produce counterfeit records and reports in order to deceive the auditor and, ultimately, to guard against an audit or enforcement action by the IRS or OFAC.   Intercepted communications provide a window of damning evidence illustrating the willfulness of defendant's conduct.

For example, on September 26, 2006, defendant engaged in an intercepted phone discussion with Iranshahi illustrating his appreciation of the provisions of the embargo.   While defendant and Iranshahi conversed about the use of funds in Iran provided by CF US, and after they had arranged for CF US funds to be passed although commodities brokers and diverted into commercial food transactions, the following conversation occurred:

| | |
|---|---|
| Defendant: | [W]e sent you 150 160 thousand dollars that is for Bam, you can not touch that money, what did you do to it? |
| Iranshahi: | We have not done anything on Bam yet.  Can we make a building in Bam? |
| Defendant: | Well, look dear Farhad I say . . . this money that I |

PAGE 23 - UNITED STATES' SENTENCING MEMORANDUM

> send you is 170 thousand dollars . . . how much [money]. . . I don't know . . . you have to look for yourself. This is for Bam and you cannot do anything at all except for Bam, go and do as you wish with it.

Iranshahi:    Can we make a building?

Defendant:    Of course, but we brought that as food supply. If you can give us document that you bought food and distributed food, do as you wish with it, but even if one penny of it is not for food it cannot be done.

Iranshahi:    Okay, tell me how I can . . . by the way, I have the Bam receipt for food but it is not that much.

Defendant:    Okay.

Iranshahi:    It is not 150 thousand dollars, it is less–

Defendant:    Well, dear Farhad, nothing can be done.

Iranshahi:    –they won't come and ask us . . . so what . . . then I say that the receipts are available; the picture is also available.

             . . . .

Iranshahi:    If I say in the receipt that I spent 150 thousand dollars in Bam and send you receipt in English, is that acceptable?  Then thank the Child Foundation in America.

Defendant:    –no, nothing . . . look . . . I said it this way . . . I said dear sir . . . we send food with all the funds we have. We give some food to children and will give the rest to charities and they give us cash and things.  Other than this, if you cannot provide document for anything, we are doomed.

Tab 38, pp. 7-8.

On October 8, 2006, defendant and Iranshahi exchanged emails about CF US circumventing

the embargo to fund college tuition at the "Islamic Open University" under a program in which "the

PAGE 24 - UNITED STATES' SENTENCING MEMORANDUM

tuition of the students in Iran would be reduced as much as the amount of money [CF] would deposit in the University's account overseas." Defendant warned Iranshahi "I had made a request from you not to discuss these topics with everyone. Announcing of these topics [openly] could place all of us in jail in America." Tab 39, p. 1.

A few months later, on January 16, 2007, defendant spoke with Iranshahi about deleting an email that Iranshahi had written to a CF US employee regarding the funding of the university tuition. Defendant inquired about the date that Iranshahi sent the email so that he could "secretly [sneakingly] go to [the employee's] computer and delete it." Tab 40, p. 2. Defendant stated, "if they find out, we are ruined. . . . I don't know when you sent it, but I know if they go in, and confiscate [take away] our computers, they will find it." *Id*. Defendant told Iranshahi that he was concerned about a letter in which an Islamic Azad University official "wrote that we accept that you pay Oxford, . . . we don't charge tuition in Iran . . . and we don't charge tuition here."[9] *Id.* Defendant asked Iranshahi to be "very careful not to say by mistake that [we] get money, and also not to send a letter saying we give money to you." *Id.*, p 3.

On November 13, 2006, defendant Yasrebi spoke with Iranshahi, complaining that documents Iranshahi had sent for Resnick – false Memoranda of Understanding (MOU's) between CF Iran and other Iranian charities – started in the middle of the fiscal year, and that would cause a problem. Tab 41, pp. 1-3. The following exchange occurred:

Iranshahi:    Well, you can change the dates.

---

[9] Islamic Open (Azad) University is a private chain of universities in Iran headquartered in Tehran. It has an enrollment of about 1.5 million students, making it the world's third largest. It has over 400 branches across the country and also in other countries, including the United Kingdom. http://en.wikipedia.org/wiki/Islamic_Azad_University (last visited 12/12/2011).

PAGE 25 - UNITED STATES' SENTENCING MEMORANDUM

| Defendant: | Can't you make another one now and send it to me, one or two more? |
| Iranshahi: | Yes (UI) did you give those to anyone? |
| Yasrebi: | No not yet. |
| Iranshahi: | Well, you delete them . . . I send you a new one, then dear Mehrdad, if I want receipts for you again . . . I sent you those as the examples receipts, do you hear me? . . .  If you want receipts now, I have to go and get some . . . otherwise these are only samples. |

*Id.* 3.  Defendant then solicited Iranshahi to produce agreements dating back to 2003, 2004, and 2005.  Iranshahi agreed to do so within a day or two.  *Id.*, pp. 4-5.

On January 10, 2007, defendant left a phone message for a CF US database manager to "get rid of" a portion of CF US's records relating to international matters, "A.S.A.P., hopefully maybe today."  Defendant Yasrebi stated "Just want to totally delete it just as you did with Swiss."  Later, in the same message, he re-emphasized "Please, if you could, just get rid of it today.  And, uh, if you can tell me maybe, let me know by email or phone that, if that's a possibility, it would be great."  Tab 42, p. 2.

In February 2008 defendant continued in his efforts to obscure CF US's conduct in Iran.  Iranshahi had earlier emailed a draft letter for defendant's approval before it became public.  Defendant told Iranshahi not to disclose "to anyone at all" a portion of the draft, which defendant highlighted in red.  The highlighted portion revealed that the recipients of food commodities sent to Iran were routinely reselling them commercially for cash back to the supplier, without ever taking delivery of any food.  Tab 43, p. 1.

/ / /

PAGE 26 - UNITED STATES' SENTENCING MEMORANDUM

**Guideline Analysis and Sentencing Recommendation**

The guideline provision applicable to defendant's conduct is USSG § 2M5.1, "Evasion of Export Controls; Financial Transactions with Countries Supporting Terrorism." The base offense level is 26 for two reasons. First, a "national security control" (the Iranian sanctions) was evaded. *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (holding that the President's declaration of an emergency is controlling on the question of national security control); *United States v. Elashyi*, 554 F.3d 480, 508-09 (5th Cir. 2008) (accord). *See also United States v. Hanna*, 661 F.3d 271, 293-94 (6th Cir. 2011). The offense level is also 26 because "the offense involved a financial transaction with a country supporting international terrorism." USSG § 2M5.1(a)(1). Section 2M5.1 defines "a country supporting international terrorism" as "a country designated under section 6(j) of the Export Administration Act (50 U.S.C. App. 2405)." USSG § 2M5.1 cmt. n.4. "In support of U.S. foreign policy applicable to terrorism-supporting countries, the EAR imposes anti-terrorism license requirements on exports and reexports to Iran pursuant to sections 6(j) and 6(a) of the Export Administration Act." 15 C.F.R. § 742.8(3) (effective to January 14, 2009).

Pursuant to the plea agreement, defendant is entitled to a three-point reduction for acceptance of responsibility pursuant to USSG § 3E1.1. The defendant's Criminal History Category is I, producing an advisory guideline range of 46-57 months' imprisonment and a $10,000 to $100,000 fine.

> In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning and sophistication, and whether there were multiple occurrences.

/ / /

PAGE 27 - UNITED STATES' SENTENCING MEMORANDUM

USSG 2M5.1 cmt. n.1.  Here, the volume of commerce was relatively large – $10.8 million.  The extent of planning and sophistication ranged from relatively low during the earliest periods of relevant conduct to extreme sophistication during the "trade-based money laundering" phase. Moreover, there were indeed repeated, wilful "multiple occurrences" of illegal conduct, a factor that counsels in favor of aggravation.  While defendant's conduct admittedly did not violate the security interests of the United States to the same degree as, for example, a case directly implicating Iranian production of weapons of mass destruction, the resources provided by defendant and CF US in Iran help to strengthen and perpetuate the current regime, a designated State Sponsor of Terrorism. Resources that relieved the Iranian government from its responsibilities to care for its people freed it to marshal its resources toward more nefarious pursuits.

We anticipate that defendant will seek a sentence of home confinement or probation, arguing that he was motivated by genuine charitable concerns and did not personally profit from the relevant conduct.  In response, the United States has uncovered evidence of defendant's wilfulness and attempts to cover up his misconduct of a quantity and quality that the court rarely sees.  Part of the underlying rationale for the embargo is the impenetrability and inscrutability of Iranian society, particularly its economy and government.  The Court should not accept at face value claims by defendant about what happened to resources that he arranged to be made available in Iran.  Given defendant's and his co-conspirators' repeated misrepresentations about their activities in Iran, the Court should formulate its sentencing decision based upon their obvious misconduct.  On balance, recognizing all of the factors set forth in 18 U.S.C. § 3553(a), the United States recommends a sentence of 30 months' imprisonment followed by a term of three years supervised release and a $50,000 fine.  This is a significant and generous variance from the applicable guideline range.  We

PAGE 28 - UNITED STATES' SENTENCING MEMORANDUM

respectfully request that the court not vary or depart further.

     Dated this 25th day of January 2012.

                        Respectfully submitted,

                        S. AMANDA MARSHALL
                        United States Attorney
                        District of Oregon

                        /s/ David L. Atkinson
                        David L. Atkinson, OSB # 75021

                        /s/ Charles F. Gorder, Jr.
                        Charles F. Gorder, Jr., OSB # 91287
                        Assistant United States Attorneys
                        Telephone #503-727-1000