# Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview



| | | | |
|---|---|---|---|
| **In Re:** | **Child Foundation & Mehrdad Yasrebi** | **Location:** | **Offices of Gary Abbott** |
| **Investigation #:** | **930530224 & 930530171** | | **111 SW Fifth Avenue, Suite 2650** |
| **Date:** | **August 6, 2008** | | **Portland, OR  97204** |
| **Time:** | **1:05pm-3:45pm** | | |
| **Participant(s):** | **Jonathan Resnick, CPA** | | |
| | **Gary Abbott, Attorney** | | |
| | **Cindy Arndt, Revenue Agent** | | |
| | **Cynthia Robinson, Revenue Agent** | | |
| | **David Atkinson, AUSA** | | |
| | **Debra J. Meyer, Special Agent** | | |

On this date at approximately 1:05pm Assistant United States Attorney (AUSA) David Atkinson, Revenue Agent (RA) Cindy Arndt, Revenue Agent Cynthia Robinson and Special Agent (SA) Debra Meyer met with Jonathan Resnick, and his attorney, Gary Abbott at Abbott's office located at 111 SW Fifth Avenue, Suite 2650, Portland, Oregon 97204, telephone (503) 595-9510. This interview was previously arranged in response to grand jury subpoena #P-08-0784 served July 16, 2008. AUSA Atkinson and agents Meyer, Arndt and Robinson introduced themselves and showed their credentials. Pursuant to questioning Resnick answered substantially as follows:

1.  Resnick's full name is Jonathan Resnick.  Resnick's date of birth is November 25, 1960.

2.  Resnick's business is called Resnick CPA & Accountancy and is located at 2152 Dupont Drive, Suite 206, Irvine, California 92612, telephone number (949) 250-0852.  Resnick's business card states Jonathan Resnick, CPA, MBA, Proactive Advisor to Engineering Firms & Entrepreneurs. Resnick has a Masters Degree in accounting and has been a Certified Public Accountant since 1993.  Resnick has owned his accounting business for over twelve (12) years.

3.  Resnick has been preparing Form 990's, Return of Organization Exempt From Income Tax and financial statements for non-profit organizations for approximately fifteen (15) years.  At one time working with non profit organizations was a significant portion of Resnick's business. However, Resnick recently sold a portion of his business that conducted labor union chapter audits.  The non profit section of Resnick's business is dwindling and Resnick is concentrating more on preparing business tax returns.

4.  Resnick does not have a protocol (a prepared interview form) in regard to preparing Form 990 returns, but prepares a tailored protocol for each organization when he prepares their Form 990 returns.  Once he determines what information is needed, Resnick submits a document information request to the client.  When he receives the document information request back, Resnick prepares the Form 990 with the information received from the client.  Resnick also

U.S. Treasury Criminal Investigation

Tab 24

Page 1 of 9

CF291069

prepares an organization's financial statements if he determines they are necessary or if the client requests that financial statements be prepared.

5. When asked what he does if he does not receive all the required information, Resnick said that he keeps asking the client until he gets the information or he does not prepare the return.

6. Resnick does not know the exact date that he started working with Mehrdad Yasrebi and the Child Foundation. It was after year end, between May 31, 2003 and April of 2004. Resnick was hired by Mehrdad Yasrebi, President of Child Foundation, to prepare the Child Foundation 2003/05 (2002) Form 990, Return of Organization Exempt From Income Tax. At the time Resnick was hired, the Form 990 return was already due and Resnick had to submit a request to the Internal Revenue Service (IRS) to extend the due date.

7. Resnick has other clients that operate non profit organizations overseas, but he does not have any other clients that operate a non profit organization in Iran.

8. Child Foundation Form 990's were not filed electronically. Once the Form 990's were prepared Resnick mailed them to Yasrebi who was responsible for filing them with the IRS.

9. Mo Aminian, an Enrolled Agent from California referred Child Foundation to Resnick as a potential client. Aminian is Persian and well known amongst the Persian community in the Los Angeles area. At the time Aminian referred Child Foundation to Resnick, Aminian was doing some accounting work for the California branch of Child Foundation including preparing the general ledger. Aminian recommended to Mehrdad Yasrebi that he hire Resnick to prepare Child Foundation's Form 990 for 2003/05. Yasrebi had originally asked Aminian to prepare the Child Foundation 2003/05 Form 990, but Aminian felt the he did not have sufficient experience to prepare the return so he recommended Resnick, an expert in non profit accounting, to Yasrebi.

10. Resnick was assured by Mo Aminian, Child Foundation's accountant, that Child Foundation was a legitimate organization. Aminian sponsored an orphan in Iran and had visited the Child Foundation orphanage in Iran. Aminian also knew others from the Los Angeles area Persian community who had visited the orphanage in Iran and met their sponsored orphan.

11. Resnick never personally met with anyone from Child Foundation. Resnick either e-mailed or used the telephone to make contact with Child Foundation employees or Mehrdad Yasrebi, Child Foundation President. Resnick usually dealt with Mehrdad Yasrebi, Lee Bonaker, former office manager, David Kirkwood, former office manager, employees Hossein Salehi and Jennifer Knight, or another Child Foundation employee in California, Sepideh Nabikbash. However, Mehrdad (Abu) Yasrebi always had the final say on any decisions regarding Child Foundation.

12. Resnick obtained information about Child Foundation from Yasrebi using a document request form. Yasrebi was not interviewed.

13. Child Foundation California is a chapter of Child Foundation Oregon, not a separate entity. When Resnick started working with Child Foundation sometime between May of 2003 and April of 2004 the bulk of the activity for Child Foundation was in California. Child Foundation California held fundraising events, then volunteers deposited the donations into the Child Foundation Bank of America account in California. One of the leading Child Foundation volunteers, Sudabeh Shoja, had signatory authority over the California bank account, along with Mehrdad Yasrebi. Child Foundation Oregon, (Yasrebi) would then transfer the funds to Oregon. After Child Foundation California was closed, the book and records for Child Foundation California were sent to Oregon.

2

14. Resnick saw a copy of a resignation letter dated September 30, 2004 signed by the California volunteers who worked for Child Foundation. A few months later Child Foundation California was closed. The California chapter refused to turn over the books and records and finally Yasrebi had to go to court to obtain the records. Resnick believes that there were "issues on both sides."

15. Initially Resnick did not see any red flags or have concerns regarding the information he received to prepare the Child Foundation Form 990 for 2003/05. Resnick doesn't recall who from Child Foundation provided the information, but the request would have been sent to Yasrebi.

16. Resnick does not recall who kept the general ledger for Oregon. Resnick does not recall the name of the Child Foundation bookkeeper in Oregon..

17. When Resnick first prepared the Child Foundation Form 990 for 2003/05 Resnick was not aware of the sanctions against Iran, nor of the Office of Foreign Asset Control (OFAC) licensing requirements, so he was not concerned about how Child Foundation funds got to Iran. Sometime between July 2005 and January 2006 Child Foundation restructured their sponsorship program and the Child Foundation stopped sending grant money to Switzerland. Instead Child Foundation started purchasing humanitarian aid/food products to send to Iran. It was during this period of time that Resnick became aware of the sanctions against Iran because it was brought to his attention by David Kirkwood. Child Foundation's website attempted to explain about the change in the sponsorship program and how the money was getting to the orphans in Iran through the purchase of humanitarian aid and food purchases.

18. Resnick was aware that there were Memorandums of Understanding (MOUs) and the sharing of resources between Child Foundation and six other charities in Iran. Resnick does not recall the names of these charities. These MOUs alleviated some concerns that Child Foundation was not just purchasing humanitarian aid, but was sharing resources with these six charities.

19. When Resnick first started working with the Child Foundation the bulk of Child Foundation's donations went to Switzerland to Bonyad Kudak, a Swiss charity, then to Refahe Kudak, the charity in Iran. There were no U.S. programs distributing donations.

20. Resnick does not know if Child Foundation requested any licenses from OFAC. Yasrebi never told Resnick about Child Foundation applying for an OFAC license. Resnick's awareness of OFAC came from David Kirkwood, the accountant for Child Foundation after Child Foundation board members consulted with a D.C. attorney, (name unknown) sometime between July 2005 and January 2006. According to Kirkwood the consultation with the attorney in D.C. revealed the need for Child Foundation to obtain licenses from OFAC in order to send money to Iran. Kirkwood's emails to Resnick showed his concern about potential OFAC violations by Child Foundation.

21. David Kirkwood wanted Child Foundation to be in compliance with the OFAC regulations and he was trying to make changes to the way Child Foundation conducted business. Kirkwood discussed with Resnick the issues and concerns he had trying to document the purchase of relief aid from trading companies. Kirkwood wanted to track the purchasing, importing and distribution of humanitarian relief. Kirkwood was having a difficult time tracing the food transactions to their final destination and trying to obtain copies of the documentation.

22. Nastaran Zonozi, a former Child Foundation board member made accusations that Child Foundation was committing OFAC violations. Zonozi forwarded multiple emails from numerous donors to Child Foundation board members and employees showing that the donors were concerned that Child Foundation was committing OFAC violations by sending funds to Iran. Resnick does not remember the exact date, but it will show on the emails Resnick

3

CF291071

received from Yasrebi. Resnick was later told by Yasrebi that the e-mails were fictitious and did not originate from various donors, but were all sent from Zonozi's computer. A friend of Yasrebi's, (name unknown) who also worked for the same employer, Precision Cast Parts, analyzed and traced all the e-mails back to Zonozi's e-mail address. Resnick obtained an email from Yasrebi explaining the analysis. (This analysis is contained in a folder called email analysis and was previously provided to agents in response to a grand jury subpoena #P-08-0784 issued on July14, 2008 and served July 16, 2008.)

23. Resnick spoke with Nastaran Zonozi on the telephone a couple of times regarding the programs in the Washington D.C. area where Zonozi resides.

24. The e-mails that were traced back to Zonozi regarding potential OFAC violations, made Resnick uncomfortable. Resnick also had an additional concern that Child Foundation's board of directors was too small to govern Child Foundation properly. Resnick emphasized to Yasrebi that the board needed to add new board members. At the time Child Foundation's board of directors were all related and consisted of Mehrdad Yasrebi, Fatemeh Sharif-Kazemi and Asad Azemi. Sharif-Kazemi is Yasrebi's wife and Azemi is Yasrebi's cousin. Resnick explained to Yasrebi several times that Child Foundation needed a larger board of directors, and a non-related independent member, preferably an experienced treasurer. It is acceptable to have relatives as board members as long as the non profit abides by state laws. For a short period of time Nastaran Zonozi was on the Child Foundation board of directors, but she left in approximately December of 2006.

25. Resnick did not communicate with Fatemeh Sharif-Kazemi or Asad Azemi. Resnick does not know the extent of Sharif-Kazemi's involvement with Child Foundation. Azemi was the treasurer of Child Foundation, but did not fulfill a treasurer's duties.

26. Resnick said that it was not unusual for a charity to have only one board member who had signature authority over the bank accounts. It is also fairly common for the president of a charity to do all the accounting and sign the check, although it is not the preferred way to operate a charitable organization.

27. Resnick saw a list of the names of Refahe Kudak's Board of Directors included in their audit documents, but he does not recall their names.

28. Child Foundation was a separate charity from Refahe Kudak. There were no common board members. If Yasrebi had any control over Refahe Kudak, Resnick was not aware of it.

29. Refahe Kudak gets the bulk of their donations from outside Iran, mostly the U.S. The bulk of Child Foundation's funds were sent to Iran.

30. Resnick never spoke to anyone in Iran. If Resnick needed a Refahe Kudak document he would speak to someone at Child Foundation in Oregon.

31. Refahe Kudak was audited in Iran by Ernst & Young. Resnick reviewed the audit report to determine the legitimacy of Refahe Kudak. After reviewing the audit report, Resnick did not question the legitimacy of the organization. At that time Resnick was not aware of the U.S. sanctions against Iran. Refahe Kudak's audit corroborated that Child Foundation funds were sent to Switzerland to the bank accounts of Bonyad Kudak, also known as Emdad Kudak, the Swiss affiliate of Child Foundation. Bonyad Kudak is the name used throughout this memorandum. These funds were then wire transferred from Bonyad Kudak to Refahe Kudak in Iran. Resnick felt comfortable that Child Foundation funds were going to Refahe Kudak.

32. Resnick had no communication with the auditors in Iran. Resnick asked for and reviewed Refahe Kudak's audit report and did not have any concerns.

U.S. Treasury Criminal Investigation

Tab 24
Page 4 of 9

CF291072

33. Resnick asked Yasrebi why Child Foundation sent funds to Switzerland instead of directly to Iran. Yasrebi explained that Child Foundation had problems getting money into Iran, but did not have a problem getting funds out of the U.S. It was Resnick's understanding, that there were problems with U.S. banks sending money to Iran. Yasrebi was allegedly advised in the earlier years to set up a Swiss affiliate charity so he could wire transfer Child Foundation funds to the Swiss charity which in turn would wire transfer the funds to Refahe Kudak in Iran. Resnick does not know who advised Yasrebi to send money to Switzerland. Yasrebi told Resnick that it was legal to send funds to Iran through Switzerland.

34. Bonyad Kudak is an independent registered charity in Switzerland that is affiliated with the Child Foundation. Bonyad Kudak has its own separate board of directors. Resnick does not know who is on Bonyad Kudak's board of directors, but the list may be in his audit documents provided to agents in response to grand jury subpoena #P-08-0784. Yasrebi and Child Foundation must have had some understanding and control over Bonyad Kudak to ensure that the money Bonyad Kudak received would be sent to Iran. Resnick believes there was an agreement in place between the Child Foundation and Bonyad Kudak. Resnick made a recommendation that they set up a "donor advised fund." (A donor advised fund is a separately identified fund or account that is maintained and operated by a 501(c)(3) organization, but the donor retains advisory privileges of how funds are spent or invested.)

35. It appeared to Resnick that the funds sent to Switzerland should have been categorized as grants rather than as program funds. Resnick was not comfortable with how the grants were reported on prior returns for the years 2000/05 through 2002/05 (grants/allocations, line 22) as prepared by the previous CPA Ronald Chatterton, or not disclosed at all. Either there were errors on these Form 990 returns or else Mehrdad Yasrebi did not provide the correct information to the former return preparer. The errors included: the cash balance was incorrect, there were missing items and numbers that didn't tie back to the prior returns.

36. Resnick never spoke or communicated with Child Foundation's prior accountant/return preparer who prepared the 2000/05 through 2002/05 Form 990's.

37. When asked if Yasrebi had made any OFAC licensing requests, Resnick said that if he had known about any prior licensing requests he would have asked to speak with Child Foundation's attorney, checked Child Foundation's website to determine if anything they were doing was illegal, and if he determined they were, he would have resigned. Resnick subsequently researched the OFAC laws and realized that there were sanctions against Iran.

38. Resnick didn't ask Yasrebi if he personally took any funds from Child Foundation because Resnick reviewed the general ledger and he did not see any payments to Yasrebi. It was Resnick's understanding, that Child Foundation operated using volunteer services from the board members, with the exception of a few employees.

39. Resnick prepared Child Foundation's initial audit for the year ending May 31, 2005 at Yasrebi's request. Yasrebi explained that Child Foundation donors were asking that Child Foundation be audited and Yasrebi wanted to be able to provide audited financial statements to donors. The audit of Child Foundation showed that the bulk of the foundation's money consisted of large expenditures. Materiality during the audit was approximately $20,000. During the audit Resnick did not review the actual checks, but reviewed the general ledger postings. If he had a question about an entry, Resnick would ask to review the actual check. During the audit Resnick reviewed only a sampling of Child Foundation's activity. Resnick did not have issues during the initial audit for 2005/05, except that he had to include a disclaimer on the audit report

5

CF291073

because Child Foundation did not have completed minutes of the board meetings. Eventually Child Foundation expanded and completed the minutes of Child Foundation's board meeting.

40. Resnick had issues with the Child Foundation's board of director's minutes because the minutes were written in Farsi and were not formal, but consisted of telephone conversations in Farsi that had to be translated. Unfortunately, when the translations were done they consisted of only summaries of conversations and not complete translations.

41. Resnick stated that is not unusual for non-profit organizations to not keep proper board minutes.

42. Child Foundation switched from the cash to accrual method as is shown on the Child Foundation 2005/05 Form 990, page 1, Item F. Resnick doesn't recall, but thinks it was because the Form 990 was prepared using the cash basis and the audit of the books and records was done on the accrual basis.

43. Resnick resigned as Child Foundation's auditor in a letter dated June 12, 2007. The letter stated that Resnick believes the Child Foundation will be better served by a firm that has more expertise in auditing non-U.S. activities. Resnick explained that the following reasons affected his decision to resign as Child Foundation's auditor: 1) The bulk of Child Foundation's activity was in Oregon and Resnick had been advising Yasrebi for awhile that Child Foundation needed a local auditor. 2) David Kirkwood resigned which made it very difficult for Resnick to obtain the records he needed to complete an audit. 3) Resnick was not sure how a specific child received the money when the Child Foundation was now buying food products. 4) Zonozi's emails raised Resnick's discomfort level. 5) Yasrebi did not add an unrelated board member to Child Foundation's board of directors or increase Child Foundation's board size as Resnick requested. 6) Yasrebi did not add an experienced treasurer to the Child Foundation's board as Resnick advised many times.

44. In regard to loans made to Soaring Eagle, Resnick saw the entry on the general ledger, but could not get much information from Yasrebi. The balance of the loan to Soaring Eagle, $8,000 was eventually paid off. Resnick does not recall anything else about Soaring Eagle or the loans.

45. When asked if it is normal for non profit organizations to make loans, Resnick said that he has seen it done, however it is not the preferred practice when operating a non profit.

46. When questioned about the prior period adjustment for the Child Foundation 2003/05 Form 990 shown on Federal Statements, page 1, Statement 3, Prior period adjustment, Resnick explained that Child Foundation's prior return preparer must not be very experienced with preparing Form 990 returns because the ending cash balance of $5,000 was wrong as shown on Part IV, Balance Sheet, page 3 on the 2002/05 Form 990. Resnick reviewed the Child Foundation bank statements ending 05/31/2002 and the actual bank balance should have been over $500,000. Mehrdad Yasrebi could not give an explanation about this huge discrepancy. It appeared as if the prior accountant plugged in the amount or Yasrebi gave the accountant the wrong number. Resnick reconciled the adjustment on the 2003/05 Form 990, Federal Statements, page 1, Statement 3, with a $562, 622 prior period adjustment. An explanation is required for audited financial statements, but Resnick did not provide an explanation for the Form 990 since he didn't know the reason for the wrong number and it is not required by the IRS.

47. When Resnick initially started working with the Child Foundation their books and records were disorganized.

48. Child Foundation's Form 990's for the years 2000/05 through 2002/05 prepared by their previous CPA, Ronald Chatterton, showed an asset of land and an office building in Tehran, Iran. This $245,000 office building is shown on the Form 990's for 2000/05 through 2002/05, Part IV, Balance Sheets as an asset under land, buildings & equipment. Federal Statements,

6

Statement 3 attached to these same returns, shows the building's basis is $245,000 with zero depreciation. These same Form 990 returns for 2000/05 through 2002/05 prepared by Chatterton also show under Federal Supplemental Information- Balance Sheet Buildings: Land/Bldg-Tehran, Iran, Total $245,000. Under Balance Sheet, Mortgages and other notes payable the returns show: N/P (note payable) - Dr. H. Lahiji-non interest $245,000. When Resnick was preparing the Child Foundation's 2005/05 Form 990, Yasrebi told him that Child Foundation didn't actually own the building and there was no loan made by Lahiji to Child Foundation. Resnick questioned Yasrebi about the loan and the building, but didn't get great answers and the issue was never really resolved. Yasrebi made the decision to remove the building and loan from the books and Resnick subsequently did not include the building/land or loan on the Form 990 for 2005/05. Resnick did not include a footnote for the disposition because it was not required by Generally Accepted Auditing Standards (GAAS). Resnick did not find this unusual to not include a footnote.

49. When questioned about the purchase of a building or making a loan to a charity in Iran being a possible OFAC violation, Resnick said that he was not aware of this transaction being an issue and he never did get an answer to who actually owned the building.

50. During Resnicks's audit of Child Foundation for 2005/05 there was no discussion or disclosure of the building/land in Iran.

51. Child Foundation's chief financial officer was Asad Azemi, however there was no evidence that he took care of Child Foundation's financial matters or conducted the business of a chief financial officer.

52. Resnick warned Yasrebi that there should be more than one person signing Child Foundation checks. However, Yasrebi did not authorize anyone else to sign Child Foundation checks.

53. David Kirkwood resigned from his job at the Child Foundation because of Child Foundation's issues with OFAC, i.e. Kirkwood did not believe Child Foundation was in compliance with the OFAC regulations.

54. Resnick does not know anything about Hossein Lahiji or his donations. Resnick would only be concerned about a donor if their donations were restricted. For example, was the donation given for a specific sponsorship such as Tsunami or cancer victims.

55. Resnick reviewed Refahe Kudak's financial statements to determine their legitimacy. When asked about a loan from Lahiji to Child Foundation for $600,000 payable over five years as shown on Refahe Kudak's financial statements, Resnick said that he did not notice any transaction on the statements that showed a payable to Lahiji of $600,000. Resnick said that if he had seen the item he was not sure as to what he would have done about it.

56. Resnick was shown a draft copy of Child Foundation financial statements for the period ending 2005/05 which included the statement, "The Organization collects donations and child sponsorships in the United States for program services that are provided in Iran and Afghanistan. Funds collected in the United States are wired to Switzerland to Bonyad Kudak, a registered Swiss charity, which in turn transfers funds to the Iranian registered charity, Refahe Kudak. For the year ended May 31, 2005, $1,311,000 was wired to Bonyad Kudak and reported as a grant on the statement of functional expenses, that shows Child Foundation wire transfers funds to Switzerland and then to Iran." Resnick explained that Yasrebi asked him to remove this statement and that is why it is not on the final copy of the financial statements for 2005/05. Yasrebi explained to Resnick that he did not want to identify in the financial statements how Child Foundation sent the money to Iran. This discussion with Yasrebi occurred before Resnick was aware of the OFAC regulations. According to Yasrebi, the system of sending the funds to Switzerland, then to Iran was set up not to circumvent OFAC rules, but

U.S. Treasury Criminal Investigation

Tab 24
Page 7 of 9

CF291075

to get money legally to Iran. Resnick's focus was the usage of the funds and trying to trace it, not the source of the funds.

57. Resnick had discussions with Yasrebi about removing the statement about sending funds to Iran, but Resnick eventually removed it because he felt that the disclosures were still there since a subsequent note showed that the funds were going to Iran. Because of this note Resnick believed that adequate disclosure was made regarding Child Foundation funds going to Iran. Also Child Foundation's website indicated that monies were going to Iran so Resnick felt that this disclosure was enough information for him to remove the statement about sending funds to Iran from Child Foundation's 2005/05 financial statements.

58. Regarding Part III, Statement of Program and Service Accomplishments, on the Child Foundation Form 990 for the period ending 2003/05 which says, "Provided support for over 5,000 children from 3,000 families in Afghanistan, Mexico, Indonesia, Turkey, Palestine and Bosnia." When asked why Iran was not included in this statement, Resnick stated "Yasrebi probably requested that he not say Iran."

59. The Ghazvin Earthquake Fund which occurred on June 22, 2002, was set up for earthquake victims. The donations for the Ghazvin earthquake victims were wired to Switzerland. David Kirkwood was concerned because the collected money for Ghazvin victims was restricted. However, the money was mingled and wired to Switzerland along with other unrestricted funds. Kirkwood was also concerned because there was no documentation or supporting schedules showing the restricted funds were forwarded for their stated relief purpose.

60. International Network for Cancer Treatment and Research (INCTR) is a cancer research foundation that accepted $150,000 from Child Foundation during fiscal year 2005/05 to develop a cancer treatment program in Bam, Iran. However, INCTR found that the project wasn't feasible because of Bam's small population and it would be better to expand the facilities in a nearby town. INCTR felt the there would not be enough cancer patients in Bam to justify the expense of the program. The original payment made to INCTR was classified as a grant, then re-booked as a receivable once they knew the funds were going to be returned. Later Resnick saw the deposit showing that INCTR sent the $150,000 back to Child Foundation.

61. As per an email in provided by Resnick a donation was received from Vahid Seyed Hosseini on July 13, 2004. The transaction for $106,000 was refunded to the donor by Child Foundation because the donation was for a specific purpose, school construction. The school construction project never materialized so the $106,000 was returned to Hosseini. Child Foundation kept the money in the bank in the U.S. The funds never went overseas.

62. Resnick has not talked to or communicated with Yasrebi since he resigned during June 2007. Yasrebi has not attempted to contact Resnick.

63. AUSA Atkinson, SA Meyer, RA's Robinson and Arndt thanked Jonathan Resnick and his attorney, Gary Abbott for their time and ended the interview. We also agreed that when we wanted to question Resnick further we would contact Mr. Abbott to make the arrangements.

U.S. Treasury Criminal Investigation
Tab 24
Page 8 of 9

CF291076

Cindy Arnett
Revenue Agent


Debra J. Meyer
Special Agent


I prepared this memorandum on August 8, 2008 after refreshing my memory from notes made during and immediately after the interview with Ronald Chatterton.


Debra J. Meyer
Special Agent

U.S. Treasury Criminal Investigation
Tab 24
Page 9 of 9

CF291077