**DAVID H. ANGELI**, OSB No. 020244
david@angelilaw.com
**KEVIN M. SALI**, OSB No. 044065
kevin@angelilaw.com
Angeli Law Group LLC
121 SW Morrison, Suite 400
Portland, OR  97204
Telephone:  (503) 954-2232
Facsimile:  (503) 227-0880

Attorneys for Defendant Mehrdad Yasrebi

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>MEHRDAD YASREBI, *et al*.,<br><br>        Defendants. | CASE NO. 05-CR-00413-KI<br><br>**DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM** |

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................ 1

II.  FACTUAL BACKGROUND .......................................................................................... 3

    A.  Dr. Yasrebi's History ............................................................................................. 3

    B.  Child Foundation's History .................................................................................... 5

    C.  Child Foundation's Dealings with OFAC ............................................................. 6

    D.  The Government's Investigation .......................................................................... 11

        1.  2000: The Government Begins its Investigation, Based on Information that CF, at Dr. Yasrebi's Direction, Voluntarily Provided to OFAC. ................................... 11

        2.  Late 2001: After the Events of September 11, the Government Shifts its Investigative Focus to Terrorism and Employs Dramatic and Intrusive Investigative Tools. ............................................................................................ 11

        3.  2006: Government Agents Detain Dr. Yasrebi Twice and Inquire About His Religious Beliefs. ............................................................................................. 13

        4.  At the Conclusion of Its Comprehensive Eight-Year Investigation, Using the Most Extensive and Intrusive Techniques Available, the Government Found Little More than What CF Had Voluntarily Disclosed in 2000. ............................... 14

    E.  The Charges and the Eventual Plea Agreement ................................................... 15

        1.  Initial Charges ................................................................................................. 15

III. DISCUSSION ............................................................................................................... 16

    A.  Legal Standard ..................................................................................................... 16

    B.  Application to Dr. Yasrebi's Case ....................................................................... 18

        1.  Dr. Yasrebi's Intentions Were Entirely Charitable. ........................................ 18

        2.  There Is No Evidence of Any Harm to National Security. ............................... 19

        3.  The Underlying Cash Transfers to Iran Were Legal. ...................................... 20

        4.  The Evidence Uncovered by the Government Is Relatively Insignificant in Light of the Extent and Intrusiveness of the Investigation. ...................................... 27

        5.  Dr. Yasrebi Poses No Risk of Recidivism or Need for Correctional Treatment. ... 28

        6.  The Advisory Guidelines, Which Are Only Marginally Useful in a Case Like This in Any Event, Suggest a Zone C Sentence. ...................................................... 29

        7.  This Court May Consider the Collateral Consequences of This Conviction on Dr. Yasrebi. ............................................................................................................ 31

        8.  Dr. Yasrebi Has Had an Enormously Positive Impact on His Family, His Coworkers, and the Children Who Have Benefited from His Work at Child Foundation. ...................................................................................................... 32

IV.  CONCLUSION ............................................................................................................. 38

# TABLE OF AUTHORITIES

**Cases**

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................ 24, 25
*Bassiri v. Xerox Corp.*, 463 F.3d 927 (9th Cir. 2006)........................................................ 24
*Doggett v. United States*, 505 U.S. 647 (1992)................................................................ 19
*Gall v. United States*, 552 U.S 38 (2007) ........................................................................ 32
*Kimbrough v. United States*, 552 U.S. 85 (2007) .............................................................. 30
*Koon v. United States*, 518 U.S. 81 (1996)....................................................................... 17
*Nelson v. United States*, 129 S. Ct. 890 (2009)........................................................... 17, 29
*Pepper v. United States*, 131 S. Ct. 1229 (2011) .................................................. 17, 28, 29
*United States v. Anderson*, 533 F.3d 623 (8th Cir. 2008)................................................... 32
*United States v. Anvari-Hamedani*, 378 F. Supp. 2d 821 (N.D. Ohio 2005)........................ 23
*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009)....................................................... 31
*United States v. Banki*, 660 F.3d 665 (2d Cir. 2011) ..................................... 20, 21, 24, 26
*United States v. Bucher*, 375 F.3d 929 (9th Cir. 2004)...................................................... 23
*United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*) ......................... 17, 29, 30
*United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) ............................................. 32
*United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008) .................................................. 30
*United States v. Sachsenmaier*, 491 F.3d 680 (7th Cir. 2007)............................................ 17

**Statutes, Regulations, and Sentencing Guidelines**

18 U.S.C. § 371........................................................................................................... 2,30
50 U.S.C. § 1702(b) ........................................................................................................ 23
18 U.S.C. § 1801(b) ........................................................................................................ 12
50 U.S.C. § 1804(a)(3)(A) .............................................................................................. 12
18 U.S.C. § 3553(a) ......................................................................................... 16, 17, 28, 29

31 C.F.R. § 560.204 ....................................................................................................... 25
31 C.F.R. § 560.206 ........................................................................................................ 22
31 C.F.R. § 560.210 ........................................................................................................ 23
31 C.F.R. § 560.516....................................................................................................... 23,24

U.S.S.G. § 1B1.1(a) ........................................................................................................ 29
U.S.S.G. § 2C1.1(b) ........................................................................................................ 31
U.S.S.G. § 3E1.1(a) ........................................................................................................ 31

## I.    INTRODUCTION

For decades, Mehrdad Yasrebi has been driven by a passion to help impoverished children in his native Iran.  In 1994, Dr. Yasrebi founded the Child Foundation ("CF") for this purpose.  For the next fourteen years, Dr. Yasrebi, a Ph.D. ceramics engineer at a Fortune 500 company, worked tirelessly in the evenings and during weekends to give support and hope to Iranian children who otherwise had neither.

The criminal investigation that spawned this case arose because, in the government's view, Dr. Yasrebi and CF were accomplishing this purpose through the wrong procedural mechanism.  For years, CF provided its support in the form of charitable cash transfers into Iran, a fact that CF disclosed openly to the United States government, on its own accord, more than ten years ago.  Certain government officials came to believe that such funding, despite its noncommercial and charitable character, violated regulations promulgated and enforced by the Office of Foreign Assets Control ("OFAC") as part of United States sanctions against Iran.  As discussed in greater detail below, this belief was incorrect, as has been recognized not only by courts but also in writing by multiple officials at OFAC.  Regardless, the contrary conclusion reached by the agents in this case sparked a criminal investigation.

Portland's Joint Terrorism Task Force took over that investigation shortly after September 11, 2001.  At the outset, agents were driven by concerns that Dr. Yasrebi and CF were funneling money into Iran to support terrorism.  As discussed more thoroughly below, the investigation was extraordinary—spanning more than eight years, with agents traveling around the world and using the most extensive and intrusive tools available to them, including Foreign Intelligence Surveillance Act ("FISA") wiretaps, a "sneak and peek" search, and other extraordinary techniques.  Despite agents' expectations, this massive investigation turned up no

PAGE 1 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

evidence of any connection to terrorist groups or the Iranian government.  To the contrary, the evidence confirmed that Dr. Yasrebi and CF had been doing exactly what they had always said they were doing—helping poor children in Iran—and that Dr. Yasrebi was conscientiously devoting his time and energy to CF's humanitarian mission.

The investigation did, however, reveal that during a period between mid-2006 and early 2007, Dr. Yasrebi engaged in certain conduct that he has admitted was unlawful, and for which he takes full responsibility.  Dr. Yasrebi and other CF personnel had come to believe that their method of providing humanitarian aid in fact violated OFAC regulations.  Again, as explained below, this belief was incorrect.  Regardless, it caused significant concern within CF, and CF personnel worked to change their procedures to comply with what they believed to be OFAC's requirements.

It was in the context of this transition period that the conduct underlying Dr. Yasrebi's guilty plea took place.  Specifically, Dr. Yasrebi has admitted to:  (1) failing to use his best efforts to stop all cash transfers during this period; and (2) "not disclos[ing] those transfers to the IRS, OFAC, or [CF's] auditors and encourag[ing] several individuals to refrain from volunteering any information suggesting that cash transfers had ever been made."  (*See* Plea Petition (Doc. No. 10) at 6, ¶ 24.)

This admission is the basis for Dr. Yasrebi's plea to a "*Klein* conspiracy"—a single count of violating 18 U.S.C. § 371 by agreeing to obstruct the lawful functions of the Internal Revenue Service and OFAC.  This Court must now determine the appropriate punishment for Dr. Yasrebi for that conduct.  In light of all of the factors discussed below—Dr. Yasrebi's and Child Foundation's history, the undisputed charitable intent of his actions, and the fact that most of the conduct of which the government complains is *not* illegal—we respectfully suggest that a period

PAGE 2 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

of probation, with whatever conditions the Court deems appropriate, would be the proper sentence in this case.

## II.    FACTUAL BACKGROUND

### A.    Dr. Yasrebi's History[1]

Mehrdad Yasrebi was born on October 1, 1957 in Shiraz, Iran.  During the first six years of his life, his father, Ali Yasrebi, was a medical student.  Then, over the following six years, Ali practiced medicine in various rural areas of Iran.  During this time, Mehrdad frequently changed schools, and his classmates included many severely underprivileged Iranian children.  This experience with his less fortunate peers was to occupy a prominent place in his mind and spark many of his later humanitarian efforts, as detailed below.

When Mehrdad was about to enter the seventh grade, Ali moved the family back to Shiraz, where Mehrdad was to live for the next several years.  Upon completion of the tenth grade, Mehrdad passed the entrance examination to Pahlavi University High School in Shiraz, one of Iran's top high schools.  During his time there, he studied with high-achieving students from areas throughout Iran.

After graduating from high school, Mehrdad began studies at Pahlavi University, also in Shiraz.  After one semester there, he came to the United States to obtain what he and his parents believed would be a better education.  At first, he moved to Texas, where a cousin of his lived, and studied at Cisco Junior College.  After a semester at Cisco, Mehrdad transferred to UCLA, graduating in 1981 with a B.S. in Electrical Engineering.

During his senior year at UCLA, Mehrdad became interested in materials science.  After obtaining his undergraduate degree, he began graduate work in that department at UCLA,

---

[1] Dr. Yasrebi is referred to by his first name in this section to distinguish him from other family members.

PAGE 3 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

working under the world-renowned professor Ilhan Aksay.  As Mehrdad was completing his M.S. thesis, Professor Aksay accepted a position at the University of Washington.  Mehrdad ultimately followed his professor there, and in 1988 was awarded a Ph.D. in Ceramics.

In the summer of 1983, while in graduate school, Mehrdad returned to Iran to visit his parents.  While there, he met Fatemeh Sharif-Kazemi, who had also obtained her undergraduate degree (in Biomedical Engineering) in the United States.  Mehrdad and Fatemeh were married that same year, and began their life together in Seattle.  While Mehrdad completed his Ph.D. work, Fatemeh also attended graduate school, earning an M.S. in Engineering Management from Lacey College.

In 1991, Mehrdad accepted a position as a Research Ceramic Engineer with PCC Structurals (a division of Precision Castparts Corp.) and moved to the Portland area.  A few years later, Fatemeh accepted a position as a counselor with the Vocational Rehabilitation Office, an Oregon state agency; soon after, she returned to school and earned a second Master's degree, this time in counseling.  Mehrdad remained with PCC until late last year; Fatemeh is still employed at the VRO.  While at PCC, Mehrdad published many professional research articles.  He is listed as a named inventor on twelve patents (eleven from his time at PCC, and one from his time with Professor Aksay).

Mehrdad and Fatemeh have two children—their son Ali, born in 1987, and their daughter Ameneh, born in 1990.  They are proud of the family they have raised, and with good reason. Both children were awarded "Citizen of the Year" awards in middle school, in 2000 and 2003, respectively; this award is given to a small number of students found to have exhibited care towards their peers.  Both Ali and Ameneh hope eventually to attend medical school.  Ali is currently a research assistant at Rutgers University in New Jersey; Ameneh is a senior at

PAGE 4 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

Portland State University and also works as a scribe at PeaceHealth Southwest Medical Center in Vancouver.

As discussed below, for many years Mehrdad has been intensively involved in charitable activities. In 2011—during the pendency of this case—in recognition of these activities, he was awarded the President's Call to Service Award, which is the highest award for volunteer service given by the President's Council on Service and Civic Participation.[2]

## B.     Child Foundation's History

In its sentencing memorandum, filed contemporaneously herewith, Child Foundation has set forth a detailed history of the organization's mission and operations. For the sake of brevity, that history will not be repeated here; Dr. Yasrebi incorporates Child Foundation's discussion by reference. To summarize, ever since Dr. Yasrebi established Child Foundation in 1994, that organization has provided basic necessities to children living in poverty by enhancing their and their families' quality of life. CF currently provides aid to approximately 3,000 children world-wide, primarily through "sponsors" who donate money in the United States. Neither CF nor its sister NGO in Iran, Refah Kudak ("RK"), has any political, religious, ethnic or racial affiliations.

CF and RK use social workers and teachers to identify children who are gifted and talented and have the desire to succeed, but who lack the financial resources to attend and/or remain in school. CF raises money, primarily through individual sponsors, to assist those children. Generally, children sponsored through CF's programs are supported for their entire academic careers. The sponsors' donations provide relief to the children primarily in the form of food, clothing, medical assistance and educational materials. In countries other than Iran—

---

[2] A copy of the award is attached as Exhibit 1 to the Declaration of David Angeli in Support of Defendant Mehrdad Yasrebi's Sentencing Memorandum (referred to herein as the "Angeli Decl.").

PAGE 5 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

including Haiti, Pakistan, Japan, Afghanistan, and the United States—CF assists with shelter and provides emergency funding for children and their respective families.

### C.    Child Foundation's Dealings with OFAC

CF's cash transfers to Iran, which sparked the criminal investigation in this case, were not done covertly.  To the contrary, more than ten years ago, CF, through its counsel and at Dr. Yasrebi's direction, sent a voluntary, unsolicited submission to OFAC disclosing every major aspect of CF's operations.

The relevant record actually begins with a series of communications involving another charitable organization, the Kahrizak Foundation ("KF").  KF, like CF, was an organization whose mission focused on helping the underprivileged in Iran.  Specifically, KF supported an Iranian affiliate ("KF Tehran") that served the mentally and physically handicapped.  Also like CF, KF sought to deliver its aid in the form of direct cash transfers to the Iranian recipient entity.

In 1997, KF retained Shawn Khastoo—the same lawyer who would later represent CF—to contact OFAC and inquire about the legality of such transfers in light of the recently implemented Iran embargo.[3]  In a series of letters and telephone calls, Mr. Khastoo outlined KF's plans to OFAC and asked whether such cash transfers would come within the presumptive prohibitions of the Iranian Transfers Regulations ("ITRs"), such that an OFAC license would be required.

In response, then-OFAC Director R. Richard Newcomb confirmed that such transfers were outside the scope of the regulations:

> Section 560.16 of the Regulations, subject to the limitations and conditions set forth therein, authorizes persons in the United States and U.S. financial institutions to effect transfers of funds to or for

---

[3] On August 19, 1997, President Clinton issued Executive Order 13059, which clarified and consolidated earlier executive orders regarding trade sanctions against Iran.

PAGE 6 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

> the benefit of persons in Iran, provided that the transfer arises from an underlying transaction that is not prohibited or a transaction exempted from regulation under the Regulations, or the transfer is a non-commercial remittance to or from Iran, such as a family remittance not related to a family owned enterprise. . . .
>
> Based on the information provided in your [letters], *we find that the Regulations authorize [KF] and a U.S. financial institution that [KF] may designate, to transfer donated funds to [KF Tehran] for the purposes described in your letters.*

(Angeli Decl. Ex. 2.)

In other words, the Director of OFAC—the senior official at the agency that promulgated and enforces the ITRs—made absolutely clear, in writing, that the law permits organizations to send cash directly to Iran for charitable purposes.

A few years later, CF hired Mr. Khastoo, the attorney who had obtained the favorable OFAC opinion for KF. Mr. Khastoo's colleague, Fari Rezai, wrote to OFAC to say that, like KF, CF sent "donations in money and other personal property gifts" to its Iranian affiliate, RK. (*See* Angeli Decl. Ex. 3.) As Mr. Khastoo had in 1997, Mr. Rezai asked OFAC for a "determination with respect to the applicability of the prohibition of the Iranian Transactions Regulations" to CF's activities. To assist OFAC in its evaluation of his letter, Mr. Rezai included a comprehensive description—including 83 pages of detailed exhibits—of CF's activities. Among other things, Mr. Rezai's submission made clear that:

- "Child Foundation has been providing educational and medical help, food, and other support services for needy orphans including gifted indigent children within the U.S. and internationally over the years. In foreign countries, Child Foundation provides its support by organizing its affiliate local entities for the purpose of reaching local orphan children and then providing for such children in necessities including life support, medical and educational needs." (Angeli Decl. Ex. 2 at CF292348.)
- "One such target country has been Iran where the Child Foundation has been spending [the] major part of its efforts and capital to support and fund local projects to help the needy orphans and other gifted children." (*Id.* at CF292348.)

PAGE 7 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

- CF provided the following to children in Iran:  clinical and hospital care; school supplies, tuition for special schooling of gifted children, and supplemental classes; shoes and clothing; and food to the children and their families.  (*Id.* at CF292354.)

- Ninety-five percent of all of CF's funds were sent to Iran.  (*Id.* at CF292356.)

- The submission identified the specific amounts of money sent by CF to Iran, and the uses to which that money was put.  (*Id.* at CF292406.)

- It also disclosed that more than 82 percent of RK's revenues came from CF.  (*Id.*)

This time, however, OFAC did not respond by either confirming or denying the legality of CF's actions.  Instead, it issued what appears to have been a standard form letter (Angeli Decl. Ex. 4) that acknowledged receipt of CF's letter and merely reminded CF that its inquiry did not "suspend or excuse compliance with [OFAC's] prohibitions or requirements."  The letter ended with:  "We look forward to serving you."

In August 2001, having received no substantive response from OFAC, CF wrote again to the agency, renewing its request for help and guidance; OFAC later claimed to have lost this second letter, although its records reflected that the agency had received it.[4]  Again, OFAC failed to respond.  Although at the time Dr. Yasrebi did not know the reason for OFAC's silence, that reason was recently revealed in documents produced in connection with this case.

Apparently, sometime after 1997, at least one OFAC enforcement official took a position contrary to that expressed by Director Newcomb in his 1997 letter to the Kahrizak Foundation, and concluded that cash transfers such as those described in CF's letter to OFAC were illegal. However, notwithstanding CF's requests for guidance, no one at OFAC bothered to tell Mr. Rezai, Dr. Yasrebi, or anyone else at CF about OFAC's change of heart.  Instead, according to an internal OFAC memorandum, "[CF's] correspondence was reassigned internally within OFAC to

---

[4] *See* Angeli Decl. Ex. 5 at CF292435 (June 17, 2002 internal OFAC memorandum recognizing that "OFACs central files record system indicates that a supplemental letter dated August 2001 was received at OFAC from [CF]" but that OFAC was "unsuccessful so far in locating that letter within OFAC").

PAGE 8 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

the Enforcement Division for review and possible investigation because of information contained in the [CF] letter which indicated that the organization may have sent money to Iran without a license." (Angeli Decl. Ex. 5.)

Under normal circumstances, CF would have learned immediately about OFAC's concerns because, according to OFAC's own internal documents, "the logical next step for the Enforcement Division in [CF's] case would have been the issuance of a demand for information to [CF]." (*Id.*) But no one informed CF that its file had been transferred to the Enforcement Division, and no one requested any additional information from CF. As of June 2002, OFAC had not issued such a demand letter, "in part because" it had lost CF's August 2001 follow-up letter. (*Id.*)

Critically, *had OFAC simply followed the "next logical step" in its normal process—informing CF of the agency's concerns—it is likely that this entire matter would have been put to rest in 2000.* But OFAC did not do that. Indeed, to this day, the agency has not responded to CF's 2000 or 2001 letters. Instead, the agency proceeded with the full-scale, eight-year criminal investigation described below, knowing all the while that CF was sending money to Iran but doing nothing to inform Dr. Yasrebi or CF that they should stop that activity, notwithstanding CF's two good-faith requests for guidance.

In the meantime, Dr. Yasrebi and CF continued with their work, including sending aid to Iran, as it had told OFAC it was doing. Over the years, as their understanding of the legal landscape evolved, so did the methods through which they sent that aid. For example, at one fairly early point they came to believe that sending monetary aid directly to Iran may be problematic, but that sending the money through an international intermediary was permissible. As a result, Dr. Yasrebi and CF began sending the aid through a Swiss entity. Then, several

PAGE 9 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

years later, they came to believe that this method too may be problematic, and began transitioning to a model through which CF would purchase food in the United Arab Emirates that would be shipped to Iran.[5]  However, as one would expect in an organization operating in multiple countries, that transition did not occur overnight; CF (and Dr. Yasrebi) struggled for some time to adopt all of the changes necessary to transition completely to the new business model.

It was during this transition period that the conduct to which Dr. Yasrebi pled guilty took place.  As the belief developed within CF that there may be legal issues with the cash-through-Switzerland model, that issue generated significant anxiety among Dr. Yasrebi and others.  They had solicited and obtained money from donors with particular understandings regarding how that money would be used.  The legality of some of those uses, however—for example, school tuition, "birthday money" or bicycles for sponsored children—were now in question in light of the evolving understanding of the ITRs.

These two forces—on one side, donor intent and the associated legal issues; on the other, the ITRs—gradually increased the pressure on Dr. Yasrebi and CF.  This tension came to a head when CF's auditors began asking probing questions regarding the manner in which aid was transferred to Iran and administered to the recipient children.  With CF's continued viability in jeopardy, Dr. Yasrebi worked with Farhad Iranshahi, his counterpart at RK, to patch over the legal and accounting issues raised during this transition period.  As evidenced by telephone calls intercepted by government wiretaps, their solution included discussions of generating documents

---

[5] The ITRs, which Dr. Yasrebi and CF had come to suspect forbade them from sending monetary aid directly to Iran, include an express exemption for the donation of "articles, such as food, clothing, and medicine, intended to be used to relieve human suffering."  31 C.F.R. § 560.210(b).

PAGE 10 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

retroactively that would show the funds and shipments moving in the way that was being represented to the auditor.

## D.    The Government's Investigation

### 1.    2000:  The Government Begins its Investigation, Based on Information that CF, at Dr. Yasrebi's Direction, Voluntarily Provided to OFAC.

The government's investigation of CF and Dr. Yasrebi appears to have been in place by the end of 2000, *i.e.*, shortly after OFAC received CF's 86-page submission in which CF fully and voluntarily described its activities.  (*See* Angeli Aff. Ex. 5 at CF292435 (suggesting that the investigation began in November 2000).)  Government agents interviewed various witnesses and obtained bank records and other documents reflecting CF's fund transfers to Iran and other activities.  As noted above, they did not contact CF or its attorney during this time.

### 2.    Late 2001:  After the Events of September 11, the Government Shifts its Investigative Focus to Terrorism and Employs Dramatic and Intrusive Investigative Tools.

Approximately one year after CF's counsel first wrote to OFAC on CF's behalf, the events of September 11, 2001 took place.  Shortly thereafter, the investigation of Dr. Yasrebi and CF was transferred to the Portland Joint Terrorism Task Force ("JTTF").  According to an internal government memorandum, "[t]he JTTF suspect[ed] that some or all of the donated funds [were] being sent to the Government of Iran possibly in support of various terrorist organizations supported by that government."  (Angeli Decl. Ex. 6.)  (To defense counsel's knowledge, there was no evidentiary basis for this suspicion.)

The terrorism focus appears to have dramatically enhanced the intensity of the investigation, which extended for approximately seven years thereafter.  All the while, CF's two letters to OFAC—making the simple and reasonable request for that agency's input regarding the legality of CF's operations—sat in OFAC's files, unanswered.

PAGE 11 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

For the first seven years of the government's investigation, the government operated without the knowledge of CF or Dr. Yasrebi. That period appears to have involved an extraordinary commitment of time and resources by the government. In 2002, for example, agents traveled to Italy to review records and interview a merchant who had played a role in one of CF's transfers to Iran. This trip was undertaken pursuant to a Mutual Legal Assistance Treaty request from federal prosecutors to Italian authorities. It involved one day of interviewing in an Italian courthouse under a judge's supervision, followed by a day of document review in a different Italian courthouse with a different judge. Again, during this time the government did not respond to CF's letters or otherwise contact CF.

The terrorism focus also enabled the government to invoke the extraordinary and controversial investigatory powers provided by the Foreign Intelligence Surveillance Act ("FISA"). In particular, the government used FISA wiretaps to listen in on a voluminous number of telephone calls involving Dr. Yasrebi and others.[6] On multiple occasions, the government also intercepted mail, faxes, and other communications to or from CF, Dr. Yasrebi, and others. And in the middle of the night on December 10, 2006, government agents covertly entered CF's offices, copied seven computer hard drives, rifled through CF's files, photographed numerous documents, and left without leaving a trace that they had ever been there.

---

[6] Defense counsel has not been permitted to see the FISA application materials, but given that the FISA order was issued, the government apparently claimed to a FISA court that the requirements for such an order—including, for example, that "the target of the electronic surveillance [was] a foreign power or an agent of a foreign power," and that "a significant purpose of the surveillance [was] to obtain foreign intelligence information" that "[could not] reasonably be obtained by normal investigative techniques," 50 U.S.C. § 1804(a)(3)(A), (6)(B)-(C)—were satisfied. Generally speaking, an "agent of a foreign power" is defined as a person who engages in intelligence-gathering or acts of terrorism on behalf of a foreign power. *See* 18 U.S.C. § 1801(b). Defense counsel is unaware of any evidence even suggesting that Dr. Yasrebi ever engaged in either of those activities.

The investigation culminated in July 2008, when agents executed search warrants at numerous locations in Oregon and Texas. During those searches, agents seized many more computers and hundreds of thousands of pages of documents.

### 3.    2006: Government Agents Detain Dr. Yasrebi Twice and Inquire About His Religious Beliefs.

During the investigation, direct scrutiny of Dr. Yasrebi gradually intensified. On two occasions in 2006, he was detained and questioned upon arrival at Portland International Airport.[7] During these incidents, agents questioned him closely regarding his travel, his CF activities, his employment, and various other issues. On at least one occasion, agents noticed that Dr. Yasrebi was carrying what appeared to be religious literature and questioned him regarding his religious beliefs and practices. These "items of interest" were described as follows in the government's "incident log":

> The subject had a bound book that was written in Farsi. The subject described it as a masters thesis written by a theological student named AZAM, Zare an Iranian female student at the University of Karaj in Tehran. The subject stated that the book was written 20 years ago. The subject stated that he requested his uncl [*sic*] to find this specific book. The subject stated that he had found the text by Googling religious references online. He described it as a manuscript on the ability of man to find refuge in God.

---

[7] These were not the first times that Dr. Yasrebi was selected for enhanced "secondary inspection" while traveling by air. Dr. Yasrebi was also detained in this manner in 2003 (while traveling with his then-15-year-old son), in 2004 (with his then-13-year-old daughter), and in 2005. In addition, sometime in or around early 2005, government agents at the Los Angeles airport seized a shipment that had been sent from RK to CF. This shipment sat in a warehouse, untouched, for approximately eighteen months. In July 2006, after being prompted by a call from Dr. Yasrebi, the agents finally inspected the shipment and, finding nothing of concern, released it for shipment to CF.

PAGE 13 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

> The subject was asked if he was a devout practitioner of Islam as the subject had two prayer rugs, multiple set [*sic*] of prayer beads and had gone to such length to find this particular religious text.

(Angeli Decl. Ex. 7.)

### 4.    At the Conclusion of Its Comprehensive Eight-Year Investigation, Using the Most Extensive and Intrusive Techniques Available, the Government Found Little More than What CF Had Voluntarily Disclosed in 2000.

With respect to Dr. Yasrebi specifically, the government's investigation ultimately revealed the following:

- CF had sent significant sums of money to Iran for charitable purposes.  (Although agents at times referred to this as something learned as a result of the investigation, in fact, as noted above, CF expressly informed OFAC of this in its detailed submission in 2000.)

- At certain times, primarily in the transition period discussed above, Dr. Yasrebi and other CF personnel were operating under the belief that sending humanitarian aid to Iran in the form of cash may have violated the ITRs.

- As discussed above, during that same transition period, Dr. Yasrebi and Mr. Iranshahi engaged in conduct designed to avoid revealing certain facts relating to the manner in which aid was being sent to Iran.

It is noteworthy that, had OFAC simply responded to CF's good-faith requests for guidance in 2000 and 2001—rather than expressly deciding *not* to respond, choosing instead to launch a far-flung, expensive, eight-year investigation—each and every one of those problems would likely have been avoided.  Furthermore, in light of the scope and extent of that investigation, as well as the government's initial suspicions, it is also worth noting certain things that the investigation did *not* reveal.  In particular, there was no evidence that any of the money sent by CF to Iran was used for anything other than humanitarian purposes.  Nor was there any evidence that CF was any sort of "front group" used to gather intelligence for Iran or to funnel money to the Iranian government or any terrorist organization.

PAGE 14 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

E.        **The Charges and the Eventual Plea Agreement**

1.        **Initial Charges**

In February 2006, the government obtained a superseding indictment against Dr. Yasrebi. This indictment—and the original indictment, the date of which is unknown to defense counsel—were sealed, and to date defense counsel has not been provided with copies of either the original or the superseding indictment. According to an affidavit submitted by one of the case agents, it appears that the superseding indictment included charges of tax law violations, "willful" violations of OFAC regulations, and money laundering.

In 2008, in connection with the execution of the search warrants discussed above, agents interviewed Dr. Yasrebi but—almost certainly in violation of his Sixth Amendment right to counsel—did not inform him of the existing indictment prior to interviewing him. Eventually, Dr. Yasrebi retained counsel, and a period of discussions ensued between defense counsel and the prosecutors.

In December 2010, after much discussion, the parties reached a resolution. Pursuant to this resolution, Dr. Yasrebi did not admit to any of the alleged substantive violations—OFAC violations, tax fraud, money laundering, etc.—that had been the focus of the government's investigation. Dr. Yasrebi was not guilty of those violations. Dr. Yasrebi did agree, however, that his conduct in late 2006 into early 2007 constituted a "*Klein* conspiracy," *i.e.*, a conspiracy to obstruct the lawful functions of the IRS and OFAC. Specifically, in his plea petition Dr. Yasrebi stated as follows:

> From the middle of 2006 through early 2007, as the President of
> the Child Foundation, I was aware that Child Foundation funds
> were being used to facilitate cash transfers to Iran, for charitable
> purposes but nevertheless in violation of an embargo ordered by
> President Clinton. It was within my power to stop those transfers,
> but I failed to do so. Furthermore, I did not disclose those transfers
> to the IRS, OFAC, or Child Foundation's auditors, and encouraged

PAGE 15 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

several individuals to refrain from volunteering any information
suggesting that cash transfers had ever been made.

(Plea Petition (Doc. No. 10) at 6, ¶ 24.)

The maximum penalty for the offense to which Dr. Yasrebi pled guilty is five years imprisonment, a $250,000.00 fine, three years supervised release, and a $100 fee assessment. As part of the agreement, the government agreed to request a sentence of 24-30 months' imprisonment, with the defense free to advocate for any sentence it believed to be reasonable, including probation.

## III.    DISCUSSION

### A.    Legal Standard

"The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]."  18 U.S.C. § 3553(a).[8]

---

[8] Those factors are:

1.  [T]he nature and circumstances of the offense and the history and characteristics of the defendant;

2.  the need for the sentence imposed—

    a.    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b.    to afford adequate deterrence to criminal conduct;

    c.    to protect the public from further crimes of the defendant; and

    d.    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.  the kinds of sentences available;

4.  the kinds of sentences and the sentencing range established [by the Sentencing Guidelines];

5.  any pertinent policy statement . . . ;

PAGE 16 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

Particularly in the post-*Booker* regime, courts are instructed to take a broad view of what to consider in arriving at an appropriate sentence.  Sentencing courts are to treat the Guidelines only as "one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence," without giving them "more or less weight than any other" of those factors. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*); *see also United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007) (noting that courts are to consider all of the § 3553(a) factors "without any thumb on the scale favoring a guideline sentence").  "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."  *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (emphasis in original).

In short, a sentencing court's task is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996); *see also Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (quoting *Williams v. New York*, 337 U.S. 241 (1949), and *Wasman v. United States*, 468 U.S. 559 (1984); alterations in original; internal citation omitted):

> [W]e have emphasized that "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."  Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant."

---

6. the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

7. the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(2).

PAGE 17 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

**B.     Application to Dr. Yasrebi's Case**

Defense counsel respectfully submits that, for the reasons set forth below, a prison sentence would be a punishment far "greater than necessary" to achieve the goals articulated by 18 U.S.C. § 3553(a).  Those goals would be best served by a sentence of probation with appropriate conditions.

**1.     Dr. Yasrebi's Intentions Were Entirely Charitable.**

At the outset, defense counsel respectfully directs this Court's attention to a single overarching principle—the fact that *all* of the conduct at issue in this case took place in the context of Dr. Yasrebi's heartfelt and strenuous efforts to help poor children in his native country.  Dr. Yasrebi did not have to get involved in this cause.  A highly educated and professionally successful man, Dr. Yasrebi had a comfortable life in the United States.  It would have been perfectly understandable for him to make his native country no more than a mere memory, and assume—like most of us—that if there were people in need, someone else would take care of them.

Dr. Yasrebi did not choose that course.  Instead, he devoted a substantial portion of his life—and a huge percentage of his evening and weekend time—to the cause of these disadvantaged children.  For the better part of 14 years, CF was his mission and passion.  And it was remarkably successful—as described in the many letters accompanying this memorandum and in Child Foundation's sentencing memorandum, because of the efforts of Dr. Yasrebi and CF, thousands of Iranian children who would otherwise have been driven by circumstances into depressing futures are instead flourishing as educated, productive young adults, with good feelings toward the United States and its citizens who contributed to CF.

This is not to say that, because Dr. Yasrebi's motives were admirable, he should escape punishment.  Dr. Yasrebi has acknowledged that he broke the law, and stands before this Court

PAGE 18 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

remorseful for that conduct and ready to accept its sanction.  He should have been more candid with OFAC, the IRS, and CF's auditors.  Defense counsel respectfully requests, however, that when considering what would be an appropriate penalty for Dr. Yasrebi's conduct, this Court take into consideration the fact that Dr. Yasrebi did what he did in a genuine attempt to preserve a praiseworthy charity.

### 2.  There Is No Evidence of Any Harm to National Security.

As discussed above, the government has from nearly the outset cast this case as one with national security implications.  It is not difficult to understand how this impression may have arisen.  Defense counsel does not challenge the United States government's assessment of the national security threat posed by Iran, and recognizes that international fundraising efforts— including those cloaked in charitable or otherwise innocuous disguises—are key aspects of the overall activity against which the United States wants to keep vigilant watch.  Especially in light of the particular time in this nation's history during which CF came to the government's attention, one can imagine how agents might initially have been alerted to terrorism-related activities—as the agents in this case clearly were.

The fact remains, however, that after one of the most intensive investigations of which counsel is aware, and after the government spent nearly eight years and millions of taxpayer dollars using every investigative technique and tool at its disposal, it turns out that CF was exactly what it said it was—a charity helping children in Iran.  Indeed, the government has tacitly acknowledged the lack of any actual threat to United States interests.  The CF investigation began no later than 2000.  As of that time, the government knew that CF was sending large amounts of cash to Iran—not because of anything revealed by the government's investigation, but rather because CF had expressly *said so* in its unsolicited letter to OFAC. Knowing this, and knowing everything else they knew based on wiretaps and other constant

PAGE 19 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

monitoring, government agents waited until *eight years* had passed before surfacing and openly intervening to stop CF's practices.  It is reasonable to infer that, had there been any genuine national security threats or other real concerns about United States interests, the government would have stepped in much sooner than it did.  *Cf. Doggett v. United States*, 505 U.S. 647, 657 (1992) ("[P]ersistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it.").

Again, this is not to suggest that the government may only impose punishment when actual national security interests are implicated.  It is within the government's power to act prophylactically and proscribe or regulate a broader class of transactions than those that are actually harmful to United States national security.  It is similarly within the government's power to impose criminal punishments for violations that do not in fact implicate the interests underlying the regulations at issue.  Defense counsel respectfully submits, however, that the question of whether actual government interests were implicated *does* matter for sentencing purposes, and asks that Dr. Yasrebi be punished less severely than someone whose conduct in fact harmed United States national security interests.

### 3. The Underlying Cash Transfers to Iran Were Legal.

Although Dr. Yasrebi did not plead guilty to violating OFAC regulations, it is worth pointing out that CF's conduct in sending money to Iran—the conduct that launched this case nearly twelve years ago and apparently consumed most of the government's time during its investigation—was in fact entirely legal, whether or not Dr. Yasrebi believed otherwise at any particular point in time.

Over time, CF used a number of different methods to provide aid to Iranian children.  In the early years (between 1994 and early 2001), CF sent money to Iran primarily through

PAGE 20 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

something similar to the "hawala system," which the U.S. Court of Appeals for the Second

Circuit recently described in *United States v. Banki*, 660 F.3d 665 (2d Cir. 2011).[9]  Specifically,

CF accepted donations from U.S. donors, promising to deliver those amounts to CF's Iranian

affiliate, RK.  CF deposited those donations into its U.S. bank account, and then wrote checks to

certain individuals in the United States, with the promise that those individuals or their relatives

would deposit an equivalent amount into RK's account in Iran.  Through that process, CF was

effectively able to get the donors' money to RK, as promised.  In approximately early 2001, CF

adopted what it believed was a better way to accomplish its goals.  From that point through the

middle of 2005, CF sent funds to Iran primarily through a Swiss charity.  When concerns arose

in early 2005 about the propriety of that method, CF again changed course.  From mid-2005

forward, CF sent its aid to Iran primarily in the form of food.  However, for a portion of that

time, at least some of that food was sold or exchanged for other items before benefits reached the

children in Iran; the benefits reached the children, but not always in the form of food.

---

[9] The *Banki* court described that system as follows:

> The hawala system is widely used in Middle Eastern and South
> Asian countries, and is primarily used to make international funds
> transfers.  Though there are many forms of hawala, in the
> paradigmatic hawala system, funds are transferred from one
> country to another through a network of hawala brokers (i.e.,
> "hawaladars"), with one hawaladar located in the transferor's
> country and one in the transferee's country.  In this form, a hawala
> works as follows: If Person A in Country A wants to send $1,000
> to Person B in Country B, Person A contacts Hawaladar A in
> Country A and pays him $1,000. Hawaladar A then contacts
> Hawaladar B in Country B and asks Hawaladar B to pay $1,000 in
> Country B currency, minus any fees, to Person B. The effect of this
> transaction is that Person A has remitted $1,000 (minus any fees)
> to Person B, although no money has actually crossed the border
> between Country A and Country B.

*Banki*, 660 F.3d at 668 (footnote omitted).

PAGE 21 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

In these proceedings, the government may spend a great deal of time explaining the details of each of those transactions, some of which were complex. But it all boils down to the same point. Regardless of which period of time we consider, or the specific manner in which funds were transferred during those periods, the fundamental question remains the same: May a charitable institution legally send monetary aid to Iran for non-commercial, charitable purposes? If the answer to that question is "yes"—and it is—then the specific vehicle by which the monetary aid was sent is legally irrelevant.

The government's investigation was premised on the erroneous notion that each of CF's forms of sending aid was illegal—that is, that the regulations only permit the sending of certain types of in-kind aid, and not money. Admittedly, there were times when Dr. Yasrebi also suspected that this may be the case. But that is simply not an accurate view of the law—the conduct at issue was *not* illegal.

"To interpret a regulation, [courts] look first to its plain language." *United States v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004). The ITRs forbid "any transaction or dealing in or related to: (1) *Goods or services* of Iranian origin . . . or (2) *Goods, technology, or services* for exportation . . . or supply, directly or indirectly, to Iran." 31 C.F.R. § 560.206 (emphasis added).[10] However, they include a statutorily mandated *exception* for "donations by United States persons of articles, such as food, clothing, and medicine, *intended to be used to relieve*

_____

[10] Notably, the sanctions enacted during the 1979 Iranian hostage crisis (which were later revoked) specifically prohibited the "transfer of *funds*" to Iran, in addition to goods, technology, and services. Exec. Order No. 12,211, 45 Fed. Reg. 26,685 (Apr. 17, 1980) (emphasis added), *revoked by* Exec. Order No. 12,282, 46 Fed. Reg. 7925 (Jan. 19, 1981); Exec. Order No. 12,205, 45 Fed. Reg. 24,099 (Apr. 7, 1980), *revoked by* Exec. Order No. 12,282. The current regulations contain no such prohibition, instead prohibiting only the exportation of "goods, technology or services."

*human suffering*." 31 C.F.R. § 560.210 (emphasis added).[11]  Moreover, the regulations also expressly provide that they do *not* prohibit "*non-commercial remittance[s]* to or from Iran (e.g., a family remittance not related to a family-owned enterprise)."  31 C.F.R. § 560.516(a)(2) (emphasis added).

The government's position appears to have been that cash transfers, even if for charitable purposes, do not constitute "articles" for purposes of the exception provided by 50 U.S.C. § 1702(b) and 31 C.F.R § 560.210.  This is at least debatable.  Indeed, in *United States v. Anvari-Hamedani*, 378 F. Supp. 2d 821, 831 (N.D. Ohio 2005), the government "*ipso facto* agree[d]" that transfers for humanitarian purposes are covered by the exception.  *Id.* at 831.[12]  Ultimately, though, it does not matter—because non-commercial cash transfers are not covered by the regulations in the first place, they need not fit within the "humanitarian" exception to be permissible.

The Second Circuit was faced with this precise question last year in *Banki*.  Like Dr. Yasrebi, Mr. Banki was an Iranian-born individual residing in the United States, who allegedly

---

[11] *See also* 50 U.S.C. § 1702(b) (providing that, subject to certain exceptions not relevant here, the ITRs may not "regulate or prohibit, directly or indirectly . . . donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering").

[12] In *Anvari-Hamedani*, the defendant was charged, in part, with violating the ITRs by transferring funds to Iran for investment purposes.  *Id*. at 825, 831.  In moving to dismiss the indictment, the defendant argued that the ITRs are unconstitutionally vague and that, in any event, his conduct was permitted because he was merely sending funds to Iran for humanitarian purposes.  *Id*. at 831.  The government acknowledged the correctness of the defendant's legal argument, stating that the defendant "will have the opportunity to rebut [the government's evidence] by presenting evidence, as he contends in his motion, that the transfers of nearly $4 million were noncommercial transfers to family still living in Iran." Gov. Mem. in Opp. to Def.'s Mot. to Dismiss, *Anvari-Hamedani*, 2005 WL 5653417, at *13 (May 23, 2005) (internal quotation marks and footnote omitted).  Relying on this concession, the district court rejected the vagueness challenge, noting: "The prosecution *ipso facto* agrees that, if defendant was transferring funds for humanitarian purposes or to family, that he would not be in violation of [IEEPA]." *Anvari-Hamedani*, 378 F. Supp. 2d at 831.

PAGE 23 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

facilitated the transfer of several million dollars to Iran.  Reversing his conviction for conspiring

to violate the ITRs, the Second Circuit held unequivocally that, "While there are provisions

prohibiting the remitting of funds for certain purposes, ***there is no general bar to the remissions***

***of funds [to Iran]***, see 31 C.F.R. pt. 560, ***and § 560.516(a)(2) expressly provides that non-***

***commercial remittances are not prohibited***."  *Banki*, 660 F.3d at 676-77 (emphasis added;

footnote omitted).[13]

This recent holding by the Second Circuit is in full accord with the understanding

expressed by the then-Chief of OFAC's Enforcement Division in early 2002:

> The regulations prohibit most *commercial* transactions by U.S.
> persons, or within the United States (see EO 13059), with
> Government [*sic*] of Iran and persons in Iran, unless authorized
> under OFAC regulations, an OFAC license, or exempt by
> statute. . . .
>
> . . . .
>
> . . . *Financial transfers between U.S. persons and Iran are not*
> *prohibited by the Regulations unless the financial transfer is*
> *connected to an underlying transaction that is otherwise prohibited*
> *by the Regulations.*

(Angeli Decl. Ex. 9 at CF374787 (emphasis added).)  And as noted *supra*, the then-Director of

OFAC, R. Richard Newcomb, similarly made clear in 1997 to the Kahrizak Foundation that "the

Regulations authorize" direct cash transfers from the United States to Iran for charitable

purposes.  (Angeli Decl. Ex. 2.)

To the extent that the Court finds any ambiguity in the ITRs, OFAC's contemporaneous

interpretation of those regulations—which made abundantly clear that non-commercial cash

remittances to Iran were legal—"is *controlling* unless plainly erroneous or inconsistent with the

regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (emphasis added); *see also Bassiri v.*

---

[13] A copy of the *Banki* opinion is attached to the Angeli Declaration as Exhibit 8.

PAGE 24 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

*Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) ("[W]here an agency interprets its own regulation, even if through an informal process, its interpretation of an ambiguous regulation is controlling under *Auer* unless plainly erroneous or inconsistent with the regulation.") (internal quotation omitted).[14]

OFAC's contemporaneous interpretations of the ITRs, making clear that non-commercial remittances to Iran are legal, are entirely consistent with the purposes underlying the regulations. To affect the Government of Iran, including its agencies and support structure, the ITRs prohibit the exportation of goods, services, and technology to Iran. 31 C.F.R. § 560.204. The 1995 Iran Trade Embargo, however, does not target the Iranian people or Iranian émigrés, and the ITRs thus do not forbid all transactions across the Iranian border. As President Obama has recognized, "even as we continue to have differences with the Iranian Government, we will sustain our commitment to a more hopeful future for the Iranian people." (2010 Daily Comp. Pres. Doc. 190 (Mar. 20, 2010), available at http://www.gpoaccess.gov/presdocs/2010/DCPD-201000190.pdf.)

On this issue, Mr. R. Richard Newcomb—who served as the Director of OFAC from 1987 to 2004, oversaw the promulgation and enforcement of the ITRs, and authored the 1997 letter to the Kahrizak Foundation—wrote in support of Mr. Banki's position in the District Court

---

[14] On November 2, 2010, undersigned counsel met with the prosecutors handling this matter. Among other things, counsel disclosed to the government its knowledge of OFAC's 1997 letter to the Kahrizak Foundation making clear that charitable cash transfers to Iran were not prohibited by the applicable regulations. Counsel asked how the government could justify its threats to prosecute Dr. Yasrebi criminally for conduct that OFAC had previously determined to be legal. Just one week later, on November 18, 2010, OFAC wrote to advise the Kahrizak Foundation that "the guidance issued under [the 1997 letter] is no longer valid and is hereby withdrawn." (Angeli Decl. Ex. 10.) One wonders whether the timing of that letter, dramatically changing OFAC's position on such an important issue—with no explanation or analysis provided—was entirely coincidental. In any event, regardless of the position that OFAC took in late 2010, the pertinent point is that, throughout the entirety of the period at issue in this case, OFAC's clearly stated public view was that charitable cash transfers to Iran were *legal*.

PAGE 25 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

proceedings in that case.  (*See* Angeli Decl. Ex. 11 (Letter from R. Newcomb to the Hon. John F.

Keenan (Aug. 9, 2010).)  In his letter, Mr. Newcomb recognized that "[t]he program goal was

never intended to target the Iranian people."  (*Id.* at 4.)  Specifically, Mr. Newcomb explained:

> In virtually all economic sanctions programs administered by
> OFAC (with the exception of the 1963 program against Cuba
> where Cuban nationals were also included as targets), including the
> Iran sanctions program, it was always understood that there was a
> dual goal and purpose—to bring as much economic pressure as
> possible to bear on the intended target without causing unintended
> hardship and suffering on the civilian population, the very people
> whose support and assistance the U.S. and the international
> community will need if and when a successor government
> emerges.

(*Id.*)  For those reasons, Mr. Newcomb made clear that non-commercial remittances—as a class

of transactions—are exempt under the ITRs.  (*Id.* at 6.)  A unanimous Second Circuit panel

unequivocally adopted Mr. Newcomb's analysis in *Banki*.

In short, because CF's remittances to Iran were for non-commercial purposes, they were

simply not encompassed by the regulations in the first place—whether or not the "relief of

human suffering" exception would have applied if they had been presumptively covered.

Accordingly, CF's charitable cash transfers to Iran were entirely legal, regardless of whether the

agents in this case, or Dr. Yasrebi himself, may have believed otherwise at any particular point in

time.

Again, to be clear, this does not alter the illegality of the specific conduct to which Dr.

Yasrebi pled guilty.  However, as this Court considers how severely Dr. Yasrebi should be

punished, we respectfully request the Court to consider that the original conduct he was seeking

to keep hidden—the conduct upon which the government's investigation primarily focused—was

legal all along.

PAGE 26 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

**4.      The Evidence Uncovered by the Government Is Relatively Insignificant in Light of the Extent and Intrusiveness of the Investigation.**

More than seventy years ago, former U.S. Attorney General and U.S. Supreme Court Justice Robert Jackson commented on the dangers of providing the government with virtually limitless time and resources to investigate a particular individual:

> Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than cases that need to be prosecuted.  With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone.  In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.  It is in this realm, in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies.  It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself.

R. Jackson, *The Federal Prosecutor*, Address Delivered at the Second Annual Conference of United States Attorneys (April 1, 1940).

Again, Dr. Yasrebi fully admits his guilt for the specific offense to which he pled guilty. And he understands the concerns that initially motivated this investigation.  However, as this Court considers the sum total of the evidence that the government has been able to marshal in this case, defense counsel respectfully asks that it consider the relative seriousness of that evidence in light of how extraordinarily lengthy, thorough, extensive and intrusive this investigation was.

PAGE 27 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

The government has spent twelve years building its case. Its agents have quite literally traversed the globe. They have searched through years' worth of documents, e-mails and other communications. They went to secret FISA courts to obtain permission to tap phones and intercept other communications. They covertly entered CF's offices in the middle of the night and imaged the foundation's computers without leaving any trace that they had been there. They collected and reviewed hundreds of thousands of pages of documents and hundreds of hours of audio recordings. They involved numerous government agencies in the investigation and incurred thousands upon thousands of agent man-hours. The investigation undoubtedly cost U.S. taxpayers millions of dollars.

It is chilling to imagine how any of us might fare if subjected to an investigation with the intensity of this one. As Justice Jackson recognized, it is the rare subject who could emerge from such a process without the government having found *something* that could meet the legal elements of a federal criminal statute. In any event, the government found what it found, and it is of course entitled to use it. Defense counsel asks only that when this Court considers the quantum of evidence that has been developed against Dr. Yasrebi, it view that evidence in light of the immense and focused effort expended to unearth it.

**5.    Dr. Yasrebi Poses No Risk of Recidivism or Need for Correctional Treatment.**

As noted above, one of the factors this Court must consider is the extent to which there is a need "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The Supreme Court recently emphasized that "the likelihood that [a defendant] will engage in future conduct" is "a central factor that district courts must assess when imposing sentence," and this "central factor" can weigh in the direction of leniency as well as severity. *Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011). In light of the unique factors of this case—the background

PAGE 28 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

of Dr. Yasrebi and CF, Dr. Yasrebi's age (54), his good intentions in carrying out CF's mission, the particular context in which the illegal conduct took place, and the fact that Dr. Yasrebi is no longer associated with CF—defense counsel respectfully submits that the risk of recidivism here is about as minuscule as it will ever be in the context of a sentencing proceeding.

Similarly, nothing about Dr. Yasrebi's background or the facts of this case suggests that "educational or vocational training . . . or other correctional treatment" is likely to be a necessary or useful aspect of any sentence.  *Accord Pepper*, 131 S. Ct. at 1242 (quoting 18 U.S.C. § 3553(a)(2)(D)).  Dr. Yasrebi holds a Ph.D. in ceramics engineering and has a 20-year plus track record of contribution to the workplace, the community, and his family.

**6.      The Advisory Guidelines, Which Are Only Marginally Useful in a Case Like This in Any Event, Suggest a Zone C Sentence.**

Of course, as part of its sentencing analysis, the Court must consider the applicable Guidelines range.  However, as noted above, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."  *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (emphasis in original); *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*) ("The district court may not presume that the Guidelines range is reasonable.")  "Nor should the Guidelines factor be given more or less weight than any other[;] . . . they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence."  *Carty,* 520 F.3d at 991.

In calculating the applicable Guidelines range, the first step is to determine the appropriate offense guideline from Chapter Two of the Guidelines.  See U.S.S.G. § 1B1.1(a). Dr. Yasrebi pled guilty to one count of violating 18 U.S.C. § 371, by conspiring to interfere with the lawful functions of OFAC and the Internal Revenue Service, *i.e.*, a "*Klein*" conspiracy.

PAGE 29 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

Guideline section 2C1.1 applies to *Klein* conspiracies. But neither that guideline nor any other is particularly useful in the specific circumstances of this case. That is because in determining the weight to be given to the Guidelines in a particular case, a court may consider whether the guidelines at issue are the product of the type of empirical process that underlies most of the Sentencing Commission's work and that justifies the degree of deference typically given to that work. *See, e.g.*, *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (discussing this in the context of "[t]he crack cocaine Guidelines," which "do not exemplify the Commission's exercise of its characteristic institutional role"). Where the Commission has not employed its usual empirical approach—*i.e.,* where the Commission "did not take account of empirical data and national experience," *Kimbrough*, 552 U.S. at 109—"guidelines and policy statements embodying [the resulting] judgments deserve less deference than the sentencing guidelines normally attract." *United States v. Rodriguez*, 527 F.3d 221, 227 (1st Cir. 2008) (citing *Kimbrough*).

To counsel's knowledge, there has *never* been a conviction based on the specific conduct at issue here: a *Klein* conspiracy involving the head of a charitable organization engaged in lawful activity, taking steps that may result in certain information being kept out of the hands of federal agencies. To the extent that such cases exist, the sample size is almost certainly not large enough to permit the development of the type of "empirical data and national experience" discussed in *Kimbrough*.[15] As a result, the Court should afford even less deference to the Guidelines in this matter than it ordinarily would under the *Carty* analysis.

---

[15] There are additional reasons, beyond limited sample size, to question the Guidelines' usefulness in *Klein* conspiracy cases. Section 2C1.1 in general is of suspect lineage. As of 1995, the Commission acknowledged that the Guidelines in Part 2C "provide[d] for sentences that [were] considerably higher than average pre-guidelines practice," apparently because of a generalized belief that "pre-guidelines sentencing practice did not adequately reflect the

PAGE 30 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

To the extent the Guidelines are useful in this matter at all, the base offense level under section 2C1.1 is 12. No adjustments under that section apply.[16] Pursuant to U.S.S.G. § 3E1.1(a), Dr. Yasrebi is entitled to a 2-level reduction for acceptance of responsibility, resulting in a total offense level of 10. For a criminal history category I, the resulting Guidelines range is 10-16 months (with eligibility for home detention because that range is within Zone C).

7.      **This Court May Consider the Collateral Consequences of This Conviction on Dr. Yasrebi.**

Defense counsel recognizes that factors such as "reflect[ing] the seriousness of the offense," "promot[ing] respect for the law," "provid[ing] just punishment for the offense," and "afford[ing] adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2), are often pursued through prison sentences. Courts have recognized, however, that other available sanctions are far from trivial and in appropriate cases can—especially in combination with the collateral consequences of conviction—meet the goals of sentencing. *See, e.g.*, *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (affirming probationary sentence in a case with Guidelines calling for 41-51 months' imprisonment; rejecting the government's argument that this sentence did not

---

seriousness of public corruption offenses." U.S.S.G. ch. 2, pt. C (1995), *available at* http://www.ussc.gov/Guidelines/1995_guidelines/Manual/CH2PTC.htm. In 2004, § 2C1.1 was amended to increase substantially that Guideline's offense levels, again based apparently on a generalized belief that sentences had been too lenient. U.S.S.G. app. C sup., amdt. 666, at 82 (Nov. 1, 2004), *available at* http://www.ussc.gov/Guidelines/2010_guidelines/Manual_PDF/ Appendix_C_Supplement.pdf. Notably, *Klein* conspiracies were not originally within the class of offenses covered by § 2C1.1 at all. They were added to § 2C1.1 in 2004 to "simplify guideline application," apparently with little or no analysis of whether the (now harsher) § 2C1.1 was an appropriate fit for this type of offense. *Id.*

[16] Section 2C1.1 provides that the base offense level may be increased if the offense involved bribery, extortion, or the involvement of a public official. *See* U.S.S.G. § 2C1.1(b). This case does not involve any of those issues. An adjustment is also appropriate if the offense was committed to facilitate, conceal, or obstruct justice in respect to some other criminal offense. *Id.* § 2C1.1(c)(1) & (2). As noted above, even if it could be said that Dr. Yasrebi's conduct was designed to cover up the fact that CF made cash transfers to Iran, such transfers were *not* illegal. Accordingly, no adjustment is appropriate under § 2C1.1(c)(1) or (2).

PAGE 31 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

"adequately reflect the seriousness of the offense, . . . promote respect for the law, [or] provide just punishment for the offense") (internal quotation marks omitted); *United States v. Gardellini*, 545 F.3d 1089, 1091-96 (D.C. Cir. 2008) (affirming probationary sentence where Guidelines called for 10-16 months imprisonment; sentence based in part on sentencing court's conclusion that defendant had "already suffered substantially due to the criminal investigation into his wrongful actions"); *see also United States v. Anderson*, 533 F.3d 623, 633-34 (8th Cir. 2008) (affirming sentence where decision to impose short prison term was based in part on sentencing judge's recognition of effect of collateral consequences).

Should Dr. Yasrebi be sentenced to a term of probation, with whatever conditions the Court deems appropriate, he  would be "subject to several standard conditions that substantially restrict [his] liberty," *Gall v. United States*, 552 U.S 38, 48 n.4 (2007) (listing examples).  He will be forever branded as a convicted felon—particularly meaningful in light of his exemplary professional and philanthropic history.  Perhaps most significantly, Dr. Yasrebi was recently informed that his application for citizenship—which had been pending for approximately twelve years—was being denied as a result of this case.  Defense counsel respectfully submits that given all of these consequences, a term of incarceration is not necessary to avoid the conclusion that Dr. Yasrebi "got off easy" in light of the actual conduct of which he is guilty.

**8.      Dr. Yasrebi Has Had an Enormously Positive Impact on His Family, His Coworkers, and the Children Who Have Benefited from His Work at Child Foundation.**

Dr. Yasrebi is not perfect, and nothing in this submission is intended to suggest otherwise.  He has made mistakes in his life, as we all have.  But Dr. Yasrebi's tireless efforts to provide for, instill values in and set a positive example for his family, provide assistance to thousands of underprivileged children, and otherwise to contribute to those around him, have

PAGE 32 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

made an enormous impact on those whose lives he has touched.  Numerous letters attesting to that are attached to the Angeli Declaration as Exhibit 12.

Many individuals who have had first-hand experience with Child Foundation have written about those experiences.  For example, Massoud Jourabchi, the manager of economic analysis at the Northwest Power and Conservation Council in Portland, has known Dr. Yasrebi for more than 11 years.  He said this about his experience as a Child Foundation sponsor:

> To be frank, I was suspicious at first. I had heard of other charities that do a good marketing job, show you pictures of needy children but then take large portions of the sponsor's donation for administration costs and very little actually gets to the children.  I started looking into the Child Foundation. I visited Dr. Yasrebi's house, met his wife and kids.  I visited their office here in Portland. I visited their office in Iran a number of times. I met the social workers in Iran. I did not find fancy offices, fancy furniture and decorations. The more I saw, the more impressed I became at the level of dedication, whole hearted dedication that the people working at Child Foundation exhibited. I found the organization to be precise in their book and record keeping, expense documentation, children's progress reports and following their criteria for sponsored children.  Over the past ten years I came to know Mehrdad better. I found him a man of serious intentions, for helping all the children. Mehrdad was given a chance to make a difference in the lives of a section of population that is most neglected, unheard and unsupported. Today, thousands of the sponsored children who would have had a life of living in the streets, are educated, large numbers are college educated, some are even lawyers.

Carolyne Haycraft is now the Coordinator for the "GirlStrength Program," a violence prevention program operated through the Portland Police Bureau.  Ms. Haycraft, who still volunteers five hours per week for Child Foundation, said this about the two years that she worked fulltime for the foundation:

> My first project was a fund raising project or letter campaign to raise money for two adolescent boys diagnosed with cancer, Nima and Mohammad. Although both boys died within a year, I worked closely with Dr. Yasrebi and the father of Mohammad, who had travelled from Jordan to help his son. This man could not speak

PAGE 33 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

English but was determined to give his son the best possible treatment available. He had collected money from family and friends and used all of his resources to try and save Mohammad's life. Through a letter and internet campaign, Child Foundation collected funds to help Mohammad's father purchase medication and receive appropriate treatment. It was Dr. Yasrebi that initiated this project, giving me permission to work directly with Mohammad's father, his doctor and the administrator of the hospital. Under his leadership, Child Foundation has helped over 3,000 children gain access to food and education, improving their lives and the lives of their families. Many children who have been sponsored by Child Foundation have not only graduated from high school, but many have graduated from universities and colleges and gone on to have successful careers and lives.

Afsaneh Khajavi, who has known Dr. Yasrebi for more than 28 years, said this about Dr.

Yasrebi and the work that he did at Child Foundation:

Years ago when he started his charity with helping a few boys and girls in Iran, I joined him with adopting two of the children, a brother and sister, age 10 and 8 then. I visited them in one of my trips to Iran (picture attached) and was very saddened by seeing their poor living condition. They were living in the worst condition in one of the most underprivileged areas of Shiraz. They were a family of 6 all living in one room on the bare floor. Even though they were both gifted children, they did not have any school supplies or even shoes to walk to school. It was because of Dr. Yasrebi and his charity that those children are now college graduates and living a good quality life. And it is because of Dr. Yasrebi and Child Foundation that instead of a few, thousands of gifted children around the world receive support and are on their way to a better future.

Saeed Kazemi Sharif, Dr. Yasrebi's brother-in-law, who has closely observed Dr.

Yasrebi's involvement with Child Foundation from the very beginning, said this:

The most touching incident I can recall was when my 84-year old mother (who lives in Iran) told me about her volunteer work with Child Foundation. She traveled to countless schools and homes to check on the children and to ensure that the funds were being distributed appropriately. My mother told me that nothing made her happier than when some of these children who are now doctors and lawyers would come and visit her. At times Mehrdad was unable to be a father the way he wanted to be for his children because of the time he spent working on Child Foundation. I know

PAGE 34 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

this because my niece and nephew once told me, "Dad is not only our father but the father to almost 10,000 other children."

And Dr. Yasrebi's 29-year-old niece, Solmaz Sharif Kazemi, recalled a childhood trip to Iran where she saw first-hand the good work that her uncle was doing:

> When I was 13, I visited Iran for the first time.  While there, I visited a young brother and sister who my family was supporting through the efforts of Dr. Yasrebi's Child Foundation.  My grandmother, who helped support these children as well, took my mother and me to this family's house in the south of Shiraz.  The son was a boy of 10 who was, like myself at the time, deemed gifted.  Unlike myself, he did not have money for school supplies or shoes or a pending college career. He did not have the physical resources to nurture his promise and intellect. Through the efforts of the Child Foundation, these barriers were removed.  My uncle showed me, through this boy, a life both distant and not distant from mine. Uncle Mehrdad taught me, through this boy, a tremendous lesson in empathy and the value of self-initiation, generosity, and vision.

Dr. Yasrebi's immediate family—his wife and two young-adult children—have written of their pride in him, the values that he instilled in the family, his undying commitment to improving the lot of impoverished children, and the enormous stress that this case has wrought on the family.  Dr. Yasrebi's son, Ali, recalls the pride he always felt from his father's work:

> As other kids bragged about their fathers' strength or other physical attributes I would brag about the X number of children's lives saved due to my father's intervention and oversight.  I could have easily argued that my father contained exaggerated super human strength, or even brought up the nearly dozen or so engineering patent plaques he had hanging from his office wall, but I never did.  Not because I didn't want to "one up" the other children but because that is how my parents raised me; they instilled their ideals of honesty, modesty, and self achievement by means of altruism into both my sister and I. . . . From memories of doing homework in the car as my father drove from gas station to gas station asking for permission to leave behind "coin donation boxes" [for CF] to memories of my father moving all the furniture out of his office conference room in order for me to practice my Karate Katas while he worked on whatever project he had ongoing at the time, nearly all of my childhood memories are somehow involved/intertwined with my father somehow working on CF. . . .

PAGE 35 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

> Even though working 40+ hours a week at his career job, then close to an additional 30-40 hours a weeks at developing his CF project, Mehrdad always tried his damndest to find time for his family.

In a moving letter, Dr. Yasrebi's daughter, Ameneh, describes the profoundly positive impact that Dr. Yasrebi has had on her life, by instilling core values such as honesty, integrity, and the duty to reach out to help others. Ameneh also describes in vivid detail the devastating impact that this investigation and case have had on her personally and on the family generally.

Dr. Yasrebi's wife of 27 years, Saideh, describes the extraordinary lengths to which Dr. Yasrebi has gone to support and encourage his family and those around him:

> Mehrdad is an honorable man who has spent his life giving to others. When my husband first heard about Save the Children Foundation, he began contributing to this noble American organization. His love for children and commitment to education, justice, freedom and charity compelled him to reach out to the less fortunate children orphans in Afghanistan, Indonesia and Iran, and thus he founded the Child Foundation. His commitment and passion for helping educate orphans drove him to spend thousands of hours and efforts to help orphans in these countries. Mehrdad is an honorable man who has spent his life giving. He believes that every child deserves the best life possible, and I believe having such good intention for humanity is the best gift Mehrdad can give to society and our children.

Many other accomplished individuals who have known Dr. Yasrebi well for decades have attested to his outstanding character, tireless work ethic, and boundless energy for helping underprivileged children to obtain an education and reasonable quality of life. These include, among others: Professor Farid Mesghali, who has known Dr. Yasrebi since the 1980s and is now a professor of engineering at UCLA; Dr. Jobin Nash, an anesthesiologist who has known Dr. Yasrebi for more than 36 years; Dr. Ahmed E. Souaiaia, Associate Professor of International Programs at the University of Iowa, who has known Dr. Yasrebi since the early 1990s and was

PAGE 36 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

close with him during the time that he was founding the Child Foundation; and Dr. Sophia

Bunker, a physician in Los Angles who has known Dr. Yasrebi well since the 1980s.

Finally, some of the children who have benefited from CF's assistance, and who are now

young adults with bright futures, have written to express their support for Dr. Yasrebi and their

appreciation for what he and CF have done for them.  These letters vividly illustrate the plight of

the Iranian children whom CF was created to help, the life-changing effects of CF's work, and

the profound gratitude that beneficiaries feel towards CF and Dr. Yasrebi.  The letter from Shiva

Yazdanbakhsh, quoted in full here, is typical:

> Hello,
>
> I, Shiva Yazdanbakhsh, was a 12-year-old girl who had lost my
> father at the age of 8 and my mother at the age of 9.  My mother
> died because of diabetes and my father became a fugitive and we
> later  heard that he had passed away.  Imagine.  How could a
> lonely 12-year-old girl continue her life with 3 married sisters.  For
> a long time, life was meaningless for me, it was horrible.  I thought
> I was no longer able to continue to live, especially because after
> my mother's death, I, as the youngest child in the family, felt a
> vacuum. Perhaps, understanding this issue would be very difficult
> for someone who is not stricken by this calamity.  But for me, who
> had lost my father and mother at the same time, continuing life was
> truly difficult.  Until I entered another world on the day that the
> school principal gave me this institute's form.  I shall never forget
> that the Child Foundation was the first glimmer of hope that
> revived life in me.  Now I can understand and feel what life is all
> about.
>
> Now I am a senior student of Chemistry at Shiraz University,
> which is the first and the best university in Chemistry and I am
> truly proud of myself because I know well that the sole reason for
> my success is having entered this institution. And I am truly
> indebted to this organization because hope and motivation are the
> best elements for life, and this is what the foundation gave me as a
> gift.
>
> I should say that I find it my duty to express my gratitude to the
> founder of this organization, Dr. Mehrdad Yasrebi, who resides in
> America, and say that my prayers and those of thousands of
> innocent children shall be with him.   With his efforts, not only I,

PAGE 37 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM

but also thousands of orphans who had never had any feelings in life, were given a chance to appreciate and enjoy their lives.  I wish to say that not many people can be found who have done such a great deed of charity!

I and all the children of the Foundation are greatly indebted to the founders of this foundation, especially Dr. Yasrebi who resides in the USA. I just hope that God support and protect him, and his beautiful garden of wishes be forever green and fruitful.

With thanks!

Shiva Yazdanbakhsh

As these many letters make clear, Dr. Yasrebi is one of the extraordinary few who not only recognize social injustice and inequality in the world, but devote real time and resources—in Dr. Yasrebi's case, nearly 15 years and countless hours—to addressing it.  Thousands of lives have benefited as a result.  Again, Dr. Yasrebi does not ask this Court to excuse his conduct because of his motives, but only to consider, in determining an appropriate sentence, that what he did was done with this larger mission as his driving force.

## IV.    CONCLUSION

For the foregoing reasons, defense counsel respectfully requests this Court to impose a sentence of probation with appropriate conditions.

Respectfully submitted,

s/ David H. Angeli
DAVID ANGELI, OSB No. 020244
KEVIN SALI, OSB No. 044065

PAGE 38 —DEFENDANT MEHRDAD YASREBI'S SENTENCING MEMORANDUM