
**DLA PIPER**

DLA Piper LLP (US)
500 8th Street, NW
Washington, DC 20004
www.dlapiper.com

Richard Newcomb
richard.newcomb@dlapiper.com
T 202.799.4434
F 202.799.5434

August 9, 2010

The Honorable John F. Keenan
U.S. District Court
Southern District of New York
500 Pearl Street
New York, NY

   Re:  Sentencing of Mahmoud Reza Banki

Dear Judge Keenan:

   This letter is submitted on behalf of Mahmoud Reza Banki whose sentencing is scheduled for August 16, 2010, following the jury's guilty verdicts on all counts in a five-count indictment in Case Number S1 10 Cr. 08 (JFK).

   As you know, I was retained by Mr. Banki's defense counsel, Mr. Baruch Weiss and Mr. Tai Park, to provide advice and consulting service for the defense team and to serve as an expert witness in Mr. Banki's trial. However, as it turned out, I was not called as a witness in the trial in a last-minute decision by defense counsel. I was retained in February 2010 to provide the services to the defense team at my standard hourly rate. This included consulting advice about practices of the Office of Foreign Assets Control ("OFAC") in the administration of economic sanctions and embargo programs, the Iranian Transaction Regulations ("ITR"), the review of materials, preparation to serve as an expert witness at Mr. Banki's trial and, as it turned out, for the preparation of this letter regarding the sentencing of Mahmoud Reza Banki, following his conviction.

   By way of background, I am a practicing attorney admitted to the Bar in Ohio and the District of Columbia, where I am a Partner and Chair of the International Trade Practice Group of the law firm DLA Piper, a position I have held since June, 2008. Prior to that time, from October 2004 to May 2008, I was a Partner and Chair of the International Practice Group resident in the DC office of the law firm Baker, Donelson, Berman, Caldwell and Berkowitz. From January 1987 through September 2004, I was the Director of the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury. In September 2004, I retired from the United States Government after 31 years of service, 25 of which were with the U.S. Treasury where, in addition to serving as OFAC Director, I held a number of other enforcement-related positions in the U.S. Treasury Department.

Exhibit 11
Page 1 of 9



I write to provide the Court with information relevant to a number of sentencing issues: the impact, if any, of Mr. Banki's conduct on U.S. foreign policy and national security goals. As I set forth below, Mr. Banki's conduct has caused little, if any, harm to the U.S. sanctions program objectives against Iran, and conduct such as his would traditionally have been handled as a civil penalty matter. Had a license been requested with a full recitation of the underlying facts and a complete description of the Banki family's situation, I believe it is more likely than not, following consultation with the State Department, that OFAC would have licensed these transactions, although they might well have added the proviso that the funds be routed through the banking system. Further, the U.S. government is aware, or should be aware, of the regular use of remittance forwarding services including hawalas by the Iranian-American community, especially in recent years, but has not typically brought enforcement actions in cases such as Mr. Banki's.

By way of relevant background, I was directly involved in the process of developing and then implementing economic sanctions policies regarding Iran. During the time I was Director of OFAC, I was responsible for administering and enforcing some 39 separate economic sanctions and embargo programs that targeted countries (including Iran), groups and persons that posed a threat to the national security, foreign policy or economy of the United States. Economic sanctions programs are promulgated under either of two primary statutes that confer extraordinary authority on the President to take action to meet these threats--the International Economic Powers Act ("IEEPA") and the Trading with the Enemy Act ("TWEA").

My responsibilities as Director of OFAC included participation in inter-agency strategy sessions that ultimately led to the decision by the President to declare a national emergency because of a threat from outside of the United States to the national security, foreign policy or economy. By so doing, with the issuance of an Executive Order, the President conferred upon himself the extraordinary authorities that Congress has made available at his discretion for use to regulate economic transactions by U.S. persons wherever in the world located.

Such economic sanction programs are tailored to meet the particular U.S. foreign policy concerns present at that time with regard to the particular country or group being targeted. As a result, no two economic sanctions programs, promulgated since the enactment of IEEPA in 1977, are the same. The requirements for each often vary widely as each program is developed usually with the participation of different people, at different times, to address different foreign policy goals.

While Director of OFAC, I participated on four occasions in the interagency process led by the National Security Counsel along with the participation of the Departments of Justice and State that resulted in Presidential Orders targeting Iran for its actions inimical to the United States. They are:

Exhibit 11
Page 2 of 9


**DLA PIPER**

The Honorable John Keenan, Judge
August 9, 2010
Page 3

- In 1987, President Ronald Reagan used his authority under the International Security Development Cooperation Act to prohibit imports of goods from Iran to the United States by the issuance of Executive Order No. 12613. This action was taken because of the hostile threats Iran was posing to international shipping in the Persian Gulf, especially the shipment of oil.

- In March 1995, because of Iran's support for international terrorism, its disruption of the Middle East peace process and its efforts to develop weapons of mass destruction, President Bill Clinton used his authority under IEEPA by the issuance of Executive Order No. 12957 to prohibit U.S. persons' participation in the development of Iran's oil and gas sector.

- In May 1995, again because of Iran's support for international terrorism, its disruption of the Middle East peace process and its effort to develop weapons of mass destruction, President Bill Clinton again used his authority under IEEPA by the issuance of Executive Order No. 12959 to broaden existing restrictions to include the prohibition on exports of goods, services and technology to Iran, the prohibition of importation of goods and services from Iran, and certain other restrictions.

- In 1997, again because of Iran's support for international terrorism, its disruption of the Middle East peace process and proliferation of weapons of mass destruction, President Bill Clinton used his authority under IEEPA once again by the issuance of Executive Order No. 13059 to tighten and clarify certain aspects of the earlier Executive Orders.

It was my responsibility to implement, administer and oversee the enforcement of each of these Executive Orders. This included the development and promulgation of Regulations to define and interpret the various prohibitions contained in each Executive Order. The process called upon interagency consultation and coordination especially with the Department of State for foreign policy guidance on the intended scope, coverage and impact of this and all other such economic sanction programs administered by OFAC.

Based on that background, I ask that you consider that I am qualified to advise the Court on the purposes behind the U.S. economic sanctions policy toward Iran, and the impact that Mr. Banki's conduct had on those policy goals.

The underlying purpose for these multiple U.S. economic sanctions programs against Iran was to target the Government with the use of economic methods to change the behavior of the leadership in Iran toward the United States and the international community at large, and to thwart Iran's support for and funding of terrorism, its efforts to disrupt the Middle East Peace Process and its development of weapons of mass destruction. Central to the effort was to direct and focus the sanctions impact on the Government of Iran, its leadership, its various agencies,

Exhibit 11
Page 3 of 9



instrumentalities, controlled entities and support structure, including Iran's Revolutionary Guard Corps, and other such organizations necessary for the support and continuation of the current Governmental hierarchy.   The industrial and commercial sectors – oil and gas, financial, manufacturing and other sectors that contribute significantly to Iran's economy and the Government's ability to continue its threatening behavior were also of primary concern.

The program goal was never intended to target the Iranian people.  The Iranian Diaspora is large.  As many as 4 million or more Iranians live as expats around the world.  It is estimated that there are as many as 800,000 Iranian nationals currently resident in the United States as dual nationals, green card holders or with other visa status.  A very large percentage are supporters of U.S. policy toward Iran, and it is the goal of the U.S. government to continue cultivating that support while isolating the government of Iran.

In virtually all economic sanctions programs administered by OFAC (with the exception of the 1963 program against Cuba where Cuban nationals were also included as targets), including the Iran sanctions program, it was always understood that there was a dual goal and purpose – to bring as much economic pressure as possible to bear on the intended target without causing unintended hardship and suffering on the civilian population, the very people whose support and assistance the U.S. and the international community will need if and when a successor government emerges.

Even now, with the further tightening of sanctions against Iran, those policy goals remain in place — turn up the pressure on the Iranian government without harming the good relationships with the Iranian people, both in Iran and in the United States.  For example, in legislation that was recently enacted by the one hundred and eleventh Congress and signed into law by the President on July 1, 2010, entitled the Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, in Section 3, it was the sense of Congress that:

"(2)    the concerns of the United States regarding Iran are strictly the result of the action of the Government of Iran. . .

(6)    the President should –

(A)    continue to urge the Government of Iran to respect the internationally recognized human rights . . . of its citizens.

(10)    the people of the United States –

(A)    have feelings of friendship for the people of Iran;

(B)    regret that developments in recent decades have created impediments to that friendship; and

Exhibit 11
Page 4 of 9



**DLA PIPER**

      (C)     hold the people of Iran, their culture, and their ancient and rich history in the highest esteem."

I cite these particular provisions of this new law because they are a current recitation by the Congress that reflects the longstanding attitude of the United States Government, including the Executive Branch, toward the Iranian people. Economic sanctions against Iran are now and have always been since the 1979 hostage crisis, when 52 U.S. nationals were taken hostage in Iran, targeted against the Government, not the Iranian people. However, economic sanctions can be and often are a very blunt instrument causing unforeseen hardship to unintended persons.

With these policy goals as a backdrop, I have reviewed many documents relating to Mr. Banki's trial including the vast majority of the trial transcript, Mr. Banki's bank account records, the various motions filed in support and opposition of my testimony as an expert witness and certain other materials. I have done so with the purpose of ascertaining how serious Mr. Banki's conduct is in terms of its impact on the enforcement goals of OFAC and with respect to the U.S. foreign policy goals relating to Iran.

On several occasions during the trial, it was emphasized that there were no allegations that this case involved terrorism. Nor were there allegations that this case involved money laundering or any other related or predicate offenses, other than certain alleged false statements. The transfers into the U.S. came from Mr. Banki's family. As I understand it, he was found guilty of aiding and abetting the matching transfers that went in the reverse direction, from the United States to Iran, each time he received money from his family. He was also found guilty of false statements to OFAC when he attributed the money that came from Iran to his cousin when it was really from his father, and when he denied facilitating the movement of any money to Iran. This letter does not relate to the guilt or innocence of Mr. Banki but to his sentencing.

As you may know, in addition to the criminal penalties that are at issue in this case, OFAC has authority to impose civil penalties. The majority of OFAC enforcement cases are handled civilly; a small percentage are referred for criminal prosecution. In contrast to criminal penalties, civil penalties can be imposed even when the individual is unaware of the embargo or the laws relating to the embargo. From my 18 years' experience as Director of OFAC, because this case did not involve terrorism or money laundering and because it does not involve the Iranian nuclear, defense or oil and gas sectors, or the Government of Iran, this is the type of case that would traditionally and more appropriately have been handled in the civil penalty context.

For many years OFAC has published Guidelines for use in civil penalty cases. The most recent version published on November 9, 2009, Federal Register Vol. 74, No. 215, p. 57593, utilizes several factors for mitigation purposes to arrive at a fair and appropriate civil penalty amount. These factors are particularly instructive on how OFAC may have handled this case had it been handled as a civil penalty matter and not referred as it was for criminal prosecution. Moreover, from the agency's perspective, there might have been greater opportunity to weigh

Exhibit 11
Page 5 of 9



competing foreign policy goals where on the one hand there is the need to demonstrate a strong enforcement stance regarding the export of services to Iran and on the other hand demonstrate a recognition that there is a need for families to have a realistic way to support one another by sending financial remittance for personal family issues.

A primary factor in the OFAC Guidelines in determining the appropriate size of the civil penalty is whether the behavior at issue involved egregious conduct. A determination in a case such as this that conduct is egregious is based primarily on several factors such as knowledge, willfulness and reason to know or awareness that the conduct at issue would be a violation of U.S. law; reckless disregard for sanctions requirements; whether there was an effort to hide, conceal or obfuscate in order to mislead OFAC; whether the behavior was a pattern or practice or an atypical, isolated event; and whether the conduct caused harm to the sanctions program objectives. This latter criteria looks to whether there was an economic or other benefit to the sanctioned country measured by the number, size and impact of the transactions, the length of time over which they occurred and the nature of the benefit conferred, the implications for U.S. policy and the effect that the circumstances of the violation had on the integrity of the U.S. sanctions program and the policy objectives involved, whether the conduct was in support of a humanitarian activity, and whether the conduct constituting the apparent violation likely would have been licensed under existing licensing policy to engage in such activity.

While I cannot speak with direct knowledge on many of these issues, I can speak to whether the conduct at issue caused harm to the sanctions program objective. I submit that notwithstanding the guilty verdict, Mr. Banki's conduct caused little, if any, harm to the U.S. sanctions program objectives against Iran. It did not confer an economic or other benefit on the Government of Iran or any party known or alleged to be connected to the government on any actions supporting terrorism, disruption of the Middle East peace process or proliferation of weapons of mass destruction. Nor did it provide a benefit to the industrial or commercial sectors of Iran or contribute in any apparent way to the Iranian economy.

The conduct involved a family caught up in what appears to be very tragic family circumstances. The underlying purpose for the transfers at issue was to move certain sums of money into the United States to fulfill the Banki family's particular need at that time, as presented by the defense at the trial – a family remittance to fulfill a specific family purpose, a permitted transaction under the ITR's 31 CFR 560.516 a(2). I recognize that the interpretation of this regulatory provision was a highly disputed issue at Mr. Banki's trial. As the Court knows, my view is that non-commercial transfers such as family remittances are exempt under the ITRs. The exempt status means that when the May 1995 E.O. was issued by President Clinton and the ITRs were promulgated by OFAC, these types of transactions were not included in the prohibitions nor was a specific method prescribed then or since then as to how to effectuate this category of transaction. I understand that the Court has ruled otherwise. But, regardless of how this is interpreted, there was no dispute that family remittances are exempt from the ITRs

Exhibit 11
Page 6 of 9



prohibition. The dispute related to how this type of authorized transaction could be transmitted to the United States.

It is my understanding that the Iranian-American community commonly and openly uses remittance forwarding service providers including hawalas to move family funds back and forth between the United States and Iran, typically with no penalty, civil or criminal. The reasons that the community resorts to these methods are as follows:

1.     There are no U.S. depository institutions in Iran, so there is no way directly to transfer funds to or from Iran by moving the money exclusively through U.S. depository institutions.

2.     Even using the banks of other countries, it is still extremely difficult to transfer money either way between Iran and the U.S. Direct transaction between U.S. banks and Iranian banks are a prohibited service under the ITRs. Moreover, most Iranian commercial banks that deal in international transactions are blocked by other OFAC regulatory action and thus completely off limits.

3.     Third-country international banks that have U.S. correspondent account relationships are reluctant to use their U.S. accounts on behalf of Iranian customers without certainty that it will not result in a rejected transfer and a possible violation of OFAC regulations or both. The process, when it works, is inefficient, deliberative and very time consuming.

4.     Even if the transfer is attempted through the banking system with reliance on the OFAC family remittance exemption found at 31 CFR 516(a)(2), the process is still very burdensome and the transaction is very difficult to execute. Of course, a third-country bank would have to be used because there are no U.S depository institutions in Iran. The third-country bank would have to take note of the bank used to transfer these funds from Iran, then it would have to reference the declared family remittance purpose to the U.S. correspondent bank who, for its part, as a "know your customer" compliance safeguard, would very likely, before processing the transaction, check first with OFAC, who would need to perform its own due diligence on the parties to the remittance – both the remitter and the remittee using information from outside sources.

Because of the many challenges to using the banking system, the alternatives are either to try and obtain a license from OFAC, and then use the license to move the money within the banking system or to use a remittance forwarding service provider such as a hawala[1]. Despite my view that Mr. Banki's transactions, including the incidental reverse transactions, were

---

[1]     While I recognize that the efficient alternative from the Iranian perspective would be to use a remittance service provider such as a hawala for this purpose, for prophylactic and pragmatic reasons I would always advise a client not to use this method for transfers both from Iran to U.S. and U.S. to Iran despite its efficiency and widespread use within the United States and around the world.

Exhibit 11
Page 7 of 9


**DLA PIPER**

The Honorable John Keenan, Judge
August 9, 2010
Page 8

arguably exempt from the prohibition of the ITR, had Mr. Banki sought a prophylactic license from OFAC before making any such transfers, because the nature of the transactions that Mr. Banki engaged in did not trigger U.S. foreign policy concerns, it is my view that OFAC, after consultation with the U.S. State Dept., would more likely than not have granted a license, possibly with the proviso that funds must be routed through the banking system. Given the facts of the Banki family situation, a compelling case could have been made to OFAC that to transfer funds to the U.S. for this purpose would be a humanitarian family purpose and worthy of licensing. The likelihood of OFAC issuing such a license is an indication that the transaction Mr. Banki engaged in, albeit without a license, was not one that would have been deemed harmful to U.S. interests.

However, because of staffing constraints that have plagued the agency for decades, had such a license request been made, it likely would have taken OFAC some time to consider the request and to check out the parties--the Banki family members. Nonetheless, as they are a family who, for legitimate family reasons of a humanitarian nature, wish to make such transfers, and the parties to the transaction pass all of the name checks, it is reasonable to conclude that in this situation, and others like it, OFAC would have licensed the transfer of these remittances.

I should stress that were everyone inclined as I am to seek a license for such transfers, the system would break down and grind to a halt. OFAC could not process all such family remittance requests. But given (1) the very large Iranian expat community; (2) day-to-day family needs; (3) the non existence of direct U.S.-Iran banking relations; (4) the reluctance of third country banks to play a role in Iran-U.S. transfers; (5) the time it takes to process a transaction even when third country banks are willing to get involved in such transactions; as opposed to (6) the speed, efficiency and the open and widespread use of the hawala system for this exact purpose by the Iranian community, it is not surprising that this system has developed into such a prominent participant in this activity.

Indeed, this is a fact known to the U.S. Government who, if it should claim it didn't know, it should have known as it was, and still is, open and notorious throughout the Iranian-American community. The point is that if OFAC were to try to close down this avenue of family remittance, it would effectively cut off most such family remittances that were intended to be exempt from the prohibition of the Iran sanctions in the first place and thus run counter to the program goal – target the Iranian Government, not the Iranian people.

The implication of this case for U.S. policy is significant in that on the one hand the verdict does send a very strong message that the use of the hawala system to transfer monies between the U.S. and Iran will not be tolerated. But fairness would have dictated that this message should have been communicated fully to the Iranian community at large so that it would have been on fair notice that the hawala system is off limits to such transfers. It is now incumbent on OFAC to put the Iranian-American community on notice that the particular transfers of the sort that Mr. Banki engaged in would be violative of the ITR.

Exhibit 11
Page 8 of 9


**DLA PIPER**

The Honorable John Keenan, Judge
August 9, 2010
Page 9

If the message that you send in sentencing is too strong and not carefully calibrated to the U.S. foreign policy goals, it could have a very negative effect and send the wrong message to the Iranian-American community--that the U.S. has no sympathy and understanding for the plight of an Iranian family caught in the middle of an international political standoff between Iran and the United States and the need for the expat communities to provide financial support for family members by sending family remittances. At this time, it is extremely difficult to send such remittances by traditional bank methods as most banking channels are closed or very severely restricted.

The U.S. Government must recognize the serious dilemma and troubling conflict this causes for the Iranian-American community, the larger U.S. foreign policy goals toward Iran and the need to develop a realistic and workable system where law-abiding families can support one another. The "crippling sanctions" that Secretary of State Clinton spoke about recently in referencing what Iran would face were it not to give up its pursuit for weapons of mass destruction was directed at the Government of Iran and its leader, Mahmoud Ahmadinejad, not Reza Banki, the Iranian people or the Iranian expat community in the U.S.

With the greatest respect for the task you have and the decision you must make as you consider the sentence to be given to Mr. Banki, I urge that you consider a sentence that is proportionate to the nature of his conduct and its family-related purpose in the context of the Iran sanctions program objective of targeting the Government of Iran, not the Iranian people and Iranian families.

Respectfully submitted,

DLA Piper LLP (US)

R. Richard Newcomb

EAST\43088105.5

Exhibit 11
Page 9 of 9