IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) |
| v. | ) 3:05-CR-00413-KI |
| | ) |
| | ) March 6, 2012 |
| MEHRDAD YASREBI AND CHILD | ) |
| FOUNDATION, | ) Portland, Oregon |
| | ) |
| Defendants. | ) |
| _____ | ) |


SENTENCING

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE GARR M. KING

UNITED STATES DISTRICT COURT JUDGE

1                              APPEARANCES

2    FOR THE PLAINTIFF:          Charles F. Gorder, Jr.
                                 David L. Atkinson
3                                UNITED STATES ATTORNEY'S OFFICE
                                 1000 SW Third Avenue
4                                Room 600
                                 Portland, OR 97204
5
     FOR DEFENDANT YASREBI:      David H. Angeli
6                                Kevin M. Sali
                                 ANGELI LAW GROUP LLC
7                                121 SW Morrison Street
                                 Suite 400
8                                Portland, OR 97205

9    FOR DEFENDANT CHILD         Robert R. Calo
     FOUNDATION:                 Erin M. Wilson
10                               LANE POWELL, PC
                                 601 SW Second Avenue
11                               Suite 2100
                                 Portland, OR 97204
12
     COURT REPORTER:             Jill L. Erwin, CSR, RPR, CRR
13                               United States District Courthouse
14                               1000 SW Third Avenue, Room 301
                                 Portland, OR 97204
15                               (503)326-8191

16                                   *   *   *

17

18

19

20

21

22

23

24

25

```
 1                  TRANSCRIPT OF PROCEEDINGS
 2                    (In open court:)
 3           THE CLERK:  All rise.  The United States
 4  District Court for the District of Oregon is now in
 5  session.  The Honorable Garr M. King presiding.
 6           THE COURT:  Good morning.  All right.  First,
 7  I'm going to take a look at the list of attorneys, so I
 8  make sure I know who's who.  I'll have you introduce
 9  yourselves.  And let's go a little bit slow so I can put
10  a name to the faces here.
11       Mr. Gorder, for the Government?
12           MR. GORDER:  Yes.  Yes, Your Honor,
13  Charles Gorder for the United States, with David Atkinson
14  from our office.  Just so you know, this is
15  Kimberly Price, with the FBI, and Rena Rallis, who's our
16  computer guru in the attorney's office.
17           THE COURT:  All right.  Now, I will ask that
18  you bring the microphones close to you.  I have real-time
19  here, and I can follow that, but I want to make sure that
20  I hear you.
21           MR. ANGELI:  Good morning, Your Honor.
22  David Angeli, representing Mehrdad Yasrebi, who's here at
23  counsel table with me, along with my paralegal,
24  Cheryl Oakley, and we're also joined by Kevin Sali, who's
25  another attorney in my office.
```

4

Proceedings - 3/6/12

1          THE COURT:  Thank you, Mr. Angeli.  I want to

2  make sure I pronounce the defendant's name correctly.

3          MR. ANGELI:  It's Mehrdad Yasrebi, Your Honor.

4          THE COURT:  Yasrebi.  All right.  Thank you.

5      All right, Mr. Yasrebi.

6          MR. CALO:  Good morning, Your Honor.

7  Robert Calo.

8          THE COURT:  Mr. Calo.

9          MR. CALO:  Good to see you again.  On behalf of

10 the Foundation.

11         MS. WILSON:  Good morning, Your Honor.

12 Erin Wilson on behalf of the Foundation.

13         THE COURT:  All right.  I have a lot of papers

14 up here, so give me a minute to kind of get them laid

15 out.

16     All right.  This is the time set for sentencing.

17 I've read a number of submissions, memos from the

18 attorneys, and the presentence reports.  I take it that

19 I've been given everything that you want me to read at

20 this point in time, so we'll proceed at this point with

21 argument and testimony, if there is going to be

22 testimony.

23     Now, just so that I'm confident that I understand

24 the respective positions of the parties, first, with

25 regard to the advisory guideline calculations, the

Proceedings - 3/6/12

1    Government and probation has calculated an offense level

2    of 26.  The defendant argues that the appropriate offense

3    level is 12.  Using 26, the range is 46 to 57 months;

4    using 12, the defendant's proposed range is six to 12

5    months.

6          As to Yasrebi, Yasrebi -- I'm sorry -- the

7    Government and probation recommends a sentence of 30

8    months in prison and a fine of $50,000.

9          As to Child Foundation, probation recommends four

10   years probation and a fine of $60,000.  The Government

11   recommends a fine of 125,000 and four years probation.

12         As to Yasrebi, the defense recommends a probationary

13   sentence with a fine of $10,000; as to Child, it

14   recommends a fine of $10,000 and no probation.

15         Now, the parties have submitted over 200 pages of

16   briefing and many exhibits.  These all set forth their

17   objections, their positions, their arguments to the

18   Court.  I assure you I have read and I considered all of

19   the submissions and objections.  I will not be making

20   specific rulings on each dispute, but I will be making

21   rulings, obviously, where findings are required or

22   necessary.

23         Now, I'm going to consider all of the arguments that

24   have been made in the submissions in arriving at the

25   findings that I feel are necessary and in determining a

1    just and reasonable sentence.

2        Now, I'm going to give you an opportunity to both

3    present testimony and argue, but I have come to a number

4    of conclusions, and I'm going to tell you at this point

5    what conclusions I have made.  I think that might reduce

6    the argument somewhat.  I don't want to cut you off

7    completely, because there may be something you want to

8    bring to the Court's attention that is not in your

9    submissions or that you feel is worthy of sufficient --

10   it's worthy of further argument.

11       Just a second here.  I'm going to find -- well, with

12   regard to the advisory guidelines, there is a dispute as

13   to the offense level which should be used, which makes a

14   substantial difference on the advisory guidelines range.

15   I've talked -- I looked at this, my law clerk has done a

16   lot of work on it, I've spent time with probation, and

17   I've come to the conclusion that the base offense level

18   which should be used in this case is 26, under guideline

19   2M5.1(a)(1), which covers evasion of expert -- export

20   controls.

21       I'm not going to go into all the pros and cons of

22   the arguments, but I will say that I think the advisory

23   guidelines are not much help in this case because it is

24   so confusing, for one thing, and there are a number of

25   other factors, too.

Proceedings - 3/6/12

1      But I think, on balance, that is the appropriate --

2   technically, the appropriate guideline to use in this

3   case.

4      And I'm going to go into it a little more in my

5   findings before sentencing, but I just want to tell you

6   that that is the guideline that I'm going to go with.

7   But I will be looking very heavily at 3553 factors to

8   arrive at an appropriate sentence in this case.

9      Now, again, with respect to the issue that is in the

10  case as to whether or not the Iran embargo prohibits the

11  transfer of cash, there is dispute over that, and there

12  was dispute in the past.  There's still, apparently, some

13  dispute.

14     In looking at this, though, I've come to the

15  conclusion -- and, again, I will give you more reasons

16  when we get to that point -- that the embargo in this

17  case -- and I'm going to be specific as to this case --

18  taking into consideration the plea that Mr. Yasrebi

19  entered, that the -- that the embargo prohibits the

20  transfer of cash.

21     As I say, there are a lot of factors that I'll

22  discuss at that time, and I'll discuss them under 3553,

23  as well as the legal issues.

24     Again, there are serious legal issues on that

25  subject.

Proceedings - 3/6/12

1    But those are the rulings that I intend to make at

2    this time.  If you feel there's something you want to put

3    on the record beyond your objections to that, you can do

4    so.

5    Okay.

6         MR. CALO:  Excuse me, Your Honor?

7         THE COURT:  I believe that the sentence -- that

8    a sentence below the advisory guideline range for both

9    Defendant Yasrebi and Defendant Child Foundation is

10   appropriate under all the circumstances of this case.

11   I do note that the recommendation of the Government

12   and probation are both below the advisory guideline

13   range, but they do differ substantially from defendants'

14   position.

15   So at this point I'm giving you -- not an idea, but

16   I'm telling you how I'm going to rule on those two

17   subjects, but we're a long way from arriving at the

18   sentence in this case because of all the 3553 factors,

19   which the Court has considered and will discuss later.

20   Now, the Government -- does the Government have any

21   testimony you wish to put on?

22        MR. GORDER:  No, Your Honor.  We're going to

23   rely on the exhibits that have been proffered before you.

24   We have a few others that we're going to reference today

25   that we'll be talking about.

Proceedings - 3/6/12

1              THE COURT:  Are you ready to make your

2   argument, then?

3              MR. GORDER:  Yes, we are.

4              THE COURT:  Okay.  Let me ask the defense,

5   would you prefer to put on testimony before argument, or

6   do you wish to hear the Government's argument before you

7   put on your testimony and argue, to the extent you're

8   going to argue?

9              MR. ANGELI:  Your Honor, we're not going to be

10  putting on testimony.  Dr. Yasrebi does want to allocute

11  at the end of the proceedings, but there won't be any

12  testimony.  We'll be proceeding directly to argument,

13  too.

14       I've heard what the Court has said on those issues.

15  It is my intent, Your Honor, because I do believe it's an

16  absolutely critical issue for what you have to decide

17  today, to address this question of legality in a little

18  bit more detail.  I hope -- I understand where the Court

19  is inclined to go.

20             THE COURT:  I'm prepared to listen to it.  If

21  you feel it's important to address, I'll listen to it.

22             MR. ANGELI:  If Your Honor would like, I can

23  spend some time discussing that right now before we get

24  into talking about what the evidence is in the case.

25             THE COURT:  Well, I usually let the Government

Proceedings - 3/6/12

1     argue first, unless the parties -- I don't care.

2         What do you think, Mr. Gorder?

3             MR. GORDER:  Well, Your Honor, I was going to

4     start off talking about the issue involving the embargo.

5     In light of the Court's preliminary ruling, I'll probably

6     reserve and wait until Mr. Angeli talks about it.

7             THE COURT:  Mr. Angeli, you can argue if you

8     wish.

9             MR. ANGELI:  Your Honor, we do have a

10    PowerPoint presentation.  There are two, and I'll direct

11    Your Honor's attention as appropriate to that.

12            THE COURT:  Okay.  I have it here.

13            MR. ANGELI:  Judge, I think this issue of the

14    legality in the underlying transfers is important for a

15    number of reasons in this case.  Obviously, as Your Honor

16    has pointed out, it goes to the guidelines issue, which,

17    of course, is the core part of what Your Honor is going

18    to be deciding today, albeit not a dispositive part.

19        In our view, 2C1.1 applies here, and I think the

20    Government has come around to the point where they've

21    even agreed 2C1.1 is the starting point.

22        If you stay in 2C1.1, then you've got a guideline

23    range of six to 12 months.  I think it's important here,

24    Your Honor, to recognize Dr. Yasrebi did not plead guilty

25    to a violation of the OFAC regulations.  He's pled guilty

Proceedings - 3/6/12

1    to a conspiracy under 18 U.S.C. § 371, which is what is

2    covered by § 2C1.1.

3         And, critically, the cross-references apply.  And

4    this is really the issue today, at least in this part of

5    the presentation.  The cross-references that the

6    Government applies to get to the higher guideline range

7    apply only if there is some other crime, some other

8    criminal activity that was either facilitated or covered

9    up by the conspiracy.  So that question of whether

10   there's an underlying crime is critical to the issue of

11   the guidelines.

12        It's also important, Your Honor, because, as you

13   know, Dr. Yasrebi is a permanent resident in the United

14   States, but he's not a citizen.  And what happens here

15   today in this courtroom may very well have important

16   immigration consequences for him.  And if Your Honor were

17   to make a finding that he violated a regulation that

18   implicates national security, that could potentially have

19   devastating consequences to him from an immigration

20   perspective, as well.

21        And, finally, Your Honor, I think this issue of the

22   legality of the underlying transactions just affects the

23   overall feel of this case.

24        In our view, Dr. Yasrebi is a man who tried his best

25   for a period of ten years to guide this charity in a way

1   that he thought was legal.  He wasn't perfect, but he did

2   his best.

3        In late 2006 and early 2007 there's an aberrational

4   period of conduct, and that's what he pled guilty to.

5        The Government's view is that there was a

6   decade-long period of illegality here that was capped off

7   in late 2006 and early 2007.  I think, Your Honor, that

8   that question of the legality of the underlying transfers

9   just changes the feel of the case.  Those are two very

10  different world views about what happened here.

11       So I think digging into this question is important.

12       There is, Your Honor, a very specific way and

13  logical way to go about answering this question of

14  legality.  And as the slide shows here, Judge, the very

15  first question that somebody needs to ask:  The ITRs do

16  not prohibit all transactions between the United States

17  and Iran.

18       So the first question you have to ask, Judge, is,

19  "Are these transactions covered by the regulations at

20  all?  Are they presumptively prohibited?"

21       If the answer to that question is no, that the

22  regulations don't cover the transactions, that's the end

23  of the analysis.  We don't have to talk about whether an

24  exemption applies or whether OFAC issued a license.  You

25  don't even have to get there.  The transaction is not

Proceedings - 3/6/12

1    presumptively prohibited.

2         If it is presumptively prohibited, the next question

3    is, "Does an exemption, nevertheless, apply?"

4         If this transaction is part of a larger class of

5    transactions that are prohibited, does it, nevertheless,

6    fall within a specific exception provided by the

7    regulations?  And if the answer to that question is yes,

8    again, the transaction is legal.

9         Finally, if the transaction is presumptively

10   prohibited and if it doesn't fall under an exemption,

11   then it's illegal, unless OFAC has issued a license.

12        Now, in its papers, Your Honor, the Government spent

13   all of its time on questions 2 and 3.  Mostly they talk

14   about question 3.  They say over and over again,

15   "Child Foundation transferred money without a license,"

16   and we obviously concede that.

17        They did.  And they spent a little bit of time on

18   question 2, and they point to the fact -- and they're

19   right -- that the regulations contain a specific

20   exemption saying that you can donate articles intended to

21   relieve human suffering.  They say funds are not

22   articles, and, therefore, that exemption doesn't apply.

23        I think that point is at least arguable.

24        But where we spent all of our time and where I think

25   the real question is in this case is up on question one,

1    and they don't answer that question at all.

2         And that question is, "Are charitable transactions,

3    charitable remissions, presumptively prohibited by the

4    ITRs at all?"

5         Because if the answer to that question is no, we

6    don't have to talk about exemptions, and we don't have to

7    talk about licenses.

8         And the answer is charitable transactions are not

9    presumptively prohibited by the ITRs.  How do we get to

10   that answer?  Your Honor knows we relied on the *Banki*

11   case, which the Second Circuit decided earlier this year.

12        And *Banki* involved millions of dollars worth of

13   transactions in the United States and Iran relating to

14   Mr. Banki's family.  In that case the Second Circuit was

15   presented with the question that we have here today:

16   Were those transfers presumptively covered by the ITRs?

17        As Your Honor will see on the screen, in responding

18   to that question, the Second Circuit told us a number of

19   things.  They started out by saying:  While there are

20   provisions prohibiting the remitting of funds for certain

21   purposes, there is no general bar to the remission of

22   funds.

23        And let's stop right there for a moment.

24        What the Second Circuit is recognizing, Your Honor,

25   is that the regulations prohibit transactions involving

Proceedings - 3/6/12

1   the exportation or supply of three things:  Goods,

2   technology, and services.

3       Funds are not among the things that are specifically

4   prohibited by the regs.

5       As the Second Circuit recognized in *Banki*, when the

6   Government wants to do an overall bar on the transfer of

7   funds, it knows how to do that.

8       The 1979 embargo says you can't transfer funds,

9   goods, technology, or services.  But in the current

10  regime there is no general bar to the remission of funds,

11  and that's what the *Banki* court was recognizing.

12      Even more importantly, Judge, is the last part about

13  what the Second Circuit said there.  560.516(a)(2)

14  expressly provides that noncommercial remissions are not

15  prohibited.

16      Now, of course, to some extent, that begs the

17  question in this case:  What is a noncommercial

18  remittance?

19      And in *Banki* the Court reversed Mr. Banki's

20  conviction, finding that the millions of dollars worth of

21  transactions in that case were not commercial remissions.

22      So the question that we have to answer here today,

23  Your Honor, is "What other types of remittances fall

24  within that general category of noncommercial

25  remittances," and, specifically, "Do charitable donations

Proceedings - 3/6/12

1   fall within that overall category?"  And the answer is

2   yes.  And how do we get there?

3        In our letter to Mr. Eisenbrandt, the presentence

4   report writer, we cited several cases that help us get to

5   the answer to that question.

6        But before we go there, look at the regulation

7   itself, Your Honor.  We've quoted it here.  The

8   regulation says that they do not prohibit noncommercial

9   remittances to or from Iran; for example, a family

10  remittence not related to a family-owned enterprise.

11       So the regulation tells us two things:  One, it

12  tells us there is this large class of transactions called

13  noncommercial remittances; and, two, that a subset of

14  that larger class are family remittances.  And I think

15  the question for the Court is, "Do charitable remittances

16  also fall within that larger circle?"  And the answer is

17  yes.

18       And, to my knowledge, this issue has not

19  specifically been T'd up in the context with the ITRs

20  with the Court.  But in the other contexts the Courts

21  have answered this question in the affirmative.  And,

22  specifically, in the *Drake* case that we cite -- it was a

23  Sherman Act case -- relating to the donation of public

24  service advertisement time.  And the quote, Your Honor,

25  from the *Drake* case is, Provision of free air time for

1    public service announcements is not commercial activity

2    and, thus, not the sort of activity which the Sherman Act

3    was intended to address.  It is charitable activity.  And

4    the Drake court calls that, quote, the polar opposite of

5    commerce, and, hence, not within the scope of the Sherman

6    Act.

7        So the *Drake* court says not only is charitable

8    activity not commercial activity, it's the polar opposite

9    of it.

10       Similarly, Judge, in the Second Circuit case that we

11   cited, arising out of 9/11, some plaintiffs sued Saudi

12   Arabia.  And the question the Court was faced with in

13   that case was whether the Foreign Sovereign Immunities

14   Act applied.  And the law says you don't get immunity, if

15   you're a foreign country, if you were engaged in

16   commercial activity in the United States.

17       And, Your Honor, similarly, the Court said donations

18   to charities from Saudi Arabia, even though the donors

19   knew that that money was ultimately going to be used to

20   pay for goods and services, is not commercial activity,

21   because the Court said giving away money is not a

22   commercial activity.

23       Really, Judge, the thread that runs through both of

24   those cases, the distinguishing factor about what makes

25   something a commercial transaction is a mutual exchange

Proceedings - 3/6/12

1   of consideration.  That's what the courts are saying.

2       I give you something.  You give me something in

3   return.  If I give you something and get nothing in

4   return, it is not a commercial transaction.

5       And, Judge, that -- that distinction is consistent

6   with the way the term is used in other contexts.

7       For example, the Uniform Commercial Code itself,

8   which we've put up on the screen, recognizes that a

9   commercial transaction is a single subject.  Every phase

10  of commerce involved is part of one transaction; namely

11  the sale of and payment for goods.

12      So, again, it's a two-way transaction; not a

13  donation.

14      We've cited other authority, Your Honor.  The

15  Encyclopedia Britannica tells us all commercial

16  transactions have one thing in common, and that is this

17  mutual exchange.  We cited Black's Law Dictionary on and

18  on.  The core point, Judge, is that a commercial

19  transaction, which are the only type -- commercial

20  remittances of money are the only type covered by the

21  regulations have to involve a mutual exchange of

22  consideration.  And that is not what happened here.

23      So we think, Your Honor, that charitable remittances

24  fall neatly within that larger class.  And, critically,

25  Your Honor, you don't even have to make that finding,

Proceedings - 3/6/12

1    because this is a criminal case.  And if there's even any

2    ambiguity on that question, that ambiguity has to be

3    resolved in Dr. Yasrebi's favor.

4         The rule of lenity, which the Supreme Court has told

5    us over and over again applies in criminal cases,

6    requires ambiguous criminal laws to be resolved in the

7    defendant's favor.

8         And in light of all this, Judge, the way the courts

9    have defined what commercial activity is, the way the

10   Uniform Commercial Code defines what it is, the

11   Government cannot stand up here with a straight face and

12   say the statutes and the rules unambiguously prohibit the

13   transfer of charitable donations.  They don't.

14        And I think that that is particularly true in light

15   of this letter that's up on the screen now, Judge.

16        You know, we've spent a lot of time talking about

17   this letter in our papers.  And this is the letter that

18   the then director of OFAC sent to the Kahrizak Foundation

19   in 1997.  And the Kahrizak Foundation was asking OFAC

20   about the very same thing that's at issue here:  Do the

21   regulations apply to the transfer of funds to Iran?

22        The Government complains about our use of this

23   letter, and they say, "That's a different charity.

24   That's not the Child Foundation, and, therefore, it's

25   irrelevant."

Proceedings - 3/6/12

1          But, Judge, to our knowledge, this letter is the
2    only time, outside of these proceedings, that this
3    specific issue of whether charitable remissions fall
4    within the scope of the ITRs was presented for a decision
5    by any forum.  And the Government has never explained
6    what the legally relevant distinctions are between the
7    Child Foundation situation and the situation this charity
8    was facing in 1997; a U.S. charity sending money to its
9    Iranian affiliate for charitable purposes.
10          And I challenge them, if there is a legally relevant
11    distinction between the two situations, to tell the Court
12    today what that distinction is.
13          We've asked.  We've sent multiple FOIA requests to
14    OFAC.  We've sent multiple discovery letters to the
15    Government, seeking documents that might tell us whether
16    there is a distinction between the two situations,
17    seeking documents that might tell us whether any other
18    charity has ever asked OFAC whether the regulations
19    prohibited charitable transactions and been told they do
20    prohibit it, and we haven't gotten anything.  So, to our
21    knowledge, no such document exists.
22          The Government, Judge, also says -- they've referred
23    to this letter as a license.  And they've said, well,
24    this is like the Government giving a driver's license to
25    one party and then another party saying, "I get to drive,

Proceedings - 3/6/12

1    too."

2         This is not a license.  And, Your Honor, we've blown

3    up the relevant parts of this letter.  And in the letter

4    OFAC recognizes that what Kahrizak Foundation was asking

5    was that first layer of our analysis.  Not for a license.

6    They were asking, "Do the regulations apply at all to our

7    transfer of funds to our sister charity in Iran?"

8         And the director of OFAC, in the next part that

9    we've called out, echoes the Court's language in *Banki*

10   and says, "The regulations do not prohibit transfers that

11   are noncommercial in nature."  And goes on to say, "Yes,

12   the regulations permit you to send money for charitable

13   purposes to Iran."

14        In light of all that, Judge -- in light of the *Drake*

15   opinion, the Second Circuit's case in the 9/11 case, the

16   UCC definition, all of the common use definitions, and

17   the ruling of OFAC itself in this matter, the agency

18   responsible for interpreting these regulations, I can't

19   imagine how we can conclude here today that the

20   regulations unambiguously prohibit the transfer of

21   charitable funds.

22        And if there's any ambiguity in that, those

23   issues -- and they are important issues, both from a

24   guidelines perspective and an immigration perspective,

25   for Dr. Yasrebi -- I can't imagine that we can conclude

1    there's no ambiguity there.  And that ambiguity has to be

2    resolved in his favor, Your Honor.

3         So, for that reason, I hope the Court will

4    reconsider its conclusion about the legality of these

5    underlying transactions, or, at the very least, recognize

6    that the rule of lenity compels that those issues be

7    resolved in Dr. Yasrebi's favor.

8              THE COURT:  Let me ask you about the plea, the

9    plea petition that was made to the Court regarding the

10   charges.

11        The statement made by Defendant Yasrebi is as

12   follows:  From the middle of 2006 to early 2007, as the

13   president of the Child Foundation, I was aware that Child

14   Foundation funds were being used to facilitate cash

15   transfers to Iran for charitable purposes; but,

16   nevertheless, in violation of an embargo ordered by

17   President Clinton.

18             MR. ANGELI:  Yes.

19             THE COURT:  Now, isn't that an admission on his

20   part of the violation for the purpose of this case?

21             MR. ANGELI:  Absolutely not, Your Honor.

22        What Dr. Yasrebi pled to is a conspiracy to impede

23   the lawful functions of OFAC and the IRS.  And,

24   specifically, the conduct that he engaged in at that

25   period of time -- and we admit to this -- was creating

1    documents to cover up certain transactions that had

2    happened.  And the reason he did that, and that's what

3    this factual assertion is talking about, is, "Why did I

4    do that?"

5        And the answer is that people brought to his

6    attention in late 2006 -- there was a guy gamed

7    David Kirkwood at the Child Foundation, and we submitted

8    a memorandum that Mr. Kirkwood wrote.  He made

9    Dr. Yasrebi aware of that.  And it was that awareness

10   that caused him to engage in actual conduct underlying

11   the plea.  That doesn't mean Dr. Yasrebi agrees today

12   that, in fact, the conduct was illegal.  That's what was

13   brought to his attention at the time, and it's what,

14   unfortunately, motivated him to engage in the conduct for

15   which he pled guilty.

16       But I don't think there's anything there,

17   Your Honor, that's any admission of the illegality of the

18   underlying transactions.  And perhaps more importantly,

19   the transactions are either legal or they're not, Judge.

20   And I think for the reasons we just talked about, we've

21   got the better of the argument, and, in a criminal case,

22   that's all that matters.

23       To my knowledge, there is no authority, zero, out

24   there for the proposition that an entity sending

25   charitable remissions to Iran has violated the law.  I'm

Proceedings - 3/6/12

 1  not aware of any entity who's ever had even a civil

 2  enforcement action brought against it for that, much less

 3  a criminal prosecution.

 4       This is a unique case.  This theory that the

 5  Government is presenting in this case has never been

 6  presented before, and it's contrary to the guidance that

 7  OFAC itself was issuing at the time.

 8       And, you know, when I first looked at this case,

 9  Your Honor -- and I said this to the Government -- "How

10  is it that you can give one charity permission to do this

11  and prosecute, criminally, another entity and its

12  director?"  I mean, there's a fundamental unfairness

13  there.

14       And to stand here in a criminal case and say

15  unambiguously the statute prohibits that conduct, it's

16  unfair, Judge.  There's nothing out there to support that

17  notion, civilly, much less criminally.

18            THE COURT:  All right.  I'll hear from

19  Mr. Gorder.

20            MR. GORDER:  Your Honor, with your permission,

21  I'd like to stand over by the podium, too.

22            THE COURT:  Okay.

23            MR. GORDER:  Your Honor, today I'm going to

24  address the issue of the scope of the embargo and also

25  the defendant's knowledge about the violations of the

Proceedings - 3/6/12

1  embargo that were going on at the Child Foundation under

2  his direction.  And I also want to address briefly the

3  national security implications of the case.  Mr. Atkinson

4  is going to talk further on the question of the continued

5  illegality that was going on over a long period of time,

6  which I think impacts on what the appropriate sentence --

7          THE COURT:  Well, be sure to respond to the

8  arguments that were just made.

9          MR. GORDER:  I will.

10          THE COURT:  Particularly, the questions that

11  Mr. Angeli asked of you generally at this point.

12          MR. GORDER:  Your Honor, the Foundation clearly

13  violated the sanctions in a number of ways.  You have to

14  just look at the text of the regulations in three

15  different respects.  31 CFR 560.206 prohibits the

16  purchase of goods and services of Iranian origin.  And

17  that would include food, clothing, medicine, or anything

18  else that you bought in Iran or paying for the salaries

19  of the services of Iranian employees.

20      And when you look at the actual text of the statute

21  in 560.206, note what is prohibited.  Engaging in any

22  transaction, which is defined as purchasing, selling,

23  transporting, swapping, brokering, approving, financing,

24  facilitating or guaranteeing.  That's in 560.206(b).

25      560.207 prohibits any new investment in Iran.

Proceedings - 3/6/12

1    Defined as a commitment or contribution of funds or other

2    assets or a loan.  And that would certainly include

3    establishing of a bank account, earning interest, like a

4    certificate of deposit, which the Child Foundation did

5    for the Lahiji couple; buying rental real estate, buying

6    other properties like that.

7        And, finally, 560.204 prohibits -- excuse me, I've

8    been fighting a cold for two weeks, Your Honor.

9            THE COURT:  As you go through these, are these

10   transactions that occurred during the middle of 2006

11   through early 2007, which was the period set forth in the

12   charge?

13           MR. GORDER:  Some are and some aren't,

14   Your Honor.  And we'll go through some of those facts a

15   little bit.

16           THE COURT:  Shouldn't you be talking about the

17   ones that occurred during this period of time if that's

18   the charge?

19           MR. GORDER:  Well, Your Honor, the charge

20   covers a longer period of time.  We know the defendant in

21   his guilty plea tried to limit the time frame.  But, I

22   think in terms of relevant conduct in the case, you've

23   got to look at what happened over the period of ten

24   years.

25       Now, to get into the specifics of cash transfers by

Proceedings - 3/6/12

1    charities, the Iranian sanctions or the embargo track

2    exactly the statute, the International Emergency Economic

3    Powers Act, which is 50 -- 50 U.S.C. § 1702(b)(2), and

4    they contain a limited exemption from the sanctions for

5    donations of articles, such as food, clothing, and

6    medicine, intended to relieve human suffering.

7         Now, the donated articles themselves, they've got to

8    cross the border; in other words, they've got to come

9    from outside Iran in this particular case.  You can't

10   send cash in to purchase them.

11        And the case law interpreting the International

12   Emergency Economic Powers Act has been clear on that.

13   There is case law interpreting that particular part of

14   the statute.  The *Veterans Peace Convoy* case from the

15   1980s, the *Holy Land* case in 2001, and there's a recent

16   unpublished opinion involving another charity in 2009,

17   *Islamic American Relief*.

18        If you accept the argument that Mr. Angeli is

19   proposing, that there was an exemption or the -- you

20   know, for the transfer of cash or anything else to Iran,

21   if you had a charitable intent, there would be no reason

22   to put into the regulations a specific exemption for

23   donated articles.  It would be simply surplusage.

24        So what is a charity to do in this situation,

25   Your Honor?  Get a license.  It's not impossible to do.

1          In fact, the Child Foundation got one once, for a

2     very limited purpose, that was good for three months.

3     And we've cited some examples in our brief of other

4     Iranian-type charities that have received licenses from

5     OFAC, too.

6          Now, we're all aware that in any complex regulatory

7     scheme, you know, good lawyers can find ways to argue

8     that the words aren't clear.  That's why the

9     International Emergency Economic Powers Act requires that

10    someone act willfully in order to be charged with a

11    crime.

12         I think that's what deals with the rule of lenity in

13    this case, is that the evidence is clear that Mr. Yasrebi

14    and the Child Foundation, through him, were acting

15    willfully.  They knew what they were doing was illegal.

16         The *Banki* case, I think, supports the Government's

17    position here.  Note 7 said, in the case, that in

18    determining whether or not transfer of funds to Iran is

19    prohibited by the sanctions, you've got to look at the

20    underlying purpose of the transfer, which fits just

21    perfectly into prohibiting any transaction with an

22    underlying purpose of buying and selling, and that sort

23    of thing, in Iran.

24         I just don't accept the proposition that whatever a

25    charity does is noncommercial.  Charities engage in

1    commercial transactions all the time.

2        If the Red Cross goes out and buys a van to haul

3    blood supplies around, that's a commercial transaction.

4        And, even further, in the *Banki* case, even if you

5    accept the premise that, well, if somebody is donating

6    something they have a charitable intent and that's a

7    noncommercial transaction, the *Banki* case clearly says

8    that what the Child Foundation did, which was providing a

9    service for its donors of taking their donation and

10    getting it to a particular person in Iran, was the

11    processing of a noncommercial remittance, and that would

12    be barred, according to the *Banki* case, at page 9 in the

13    West Law version, under the more general ban about

14    exporting a service.

15        Now, counsel talks about this letter involving the

16    Kahrizak Foundation in 1997.

17        First of all, there is no evidence, that I'm aware

18    of, in the record, or anywhere else, that the defendant

19    ever saw that letter.  It wasn't found.  And I checked in

20    the evidence seized pursuant to the search warrant

21    executed in this case.  It comes in May of 1997, early on

22    in the sanctions regime, and before, actually, the final

23    executive order finalizing the sanctions came out in

24    1997.  It involves, Your Honor, a discreet sanitarium in

25    Tehran that had been operating for 25 years with 1,500

Proceedings - 3/6/12

1    elderly and handicap patients.

2        As Mr. Angeli knows, because we got him the file

3    from OFAC pursuant to his discovery request, there's

4    correspondence going back and forth between OFAC and the

5    Kahrizak Foundation.  They asked for the identities of

6    the directors of the Foundation; minutes of the board

7    meetings of the Foundation.

8        Now, if any transfer of funds by a charity was legal

9    under the sanctions, why would they be asking for that

10   kind of information?

11       I mean, in effect, what this letter is, is a de

12   facto license to the Kahrizak Foundation.  And if this

13   was the United States v. Kahrizak, counsel would have a

14   point.  Of course we wouldn't be here if this was

15   United States v. Kahrizak, because of that letter.

16       But as applied to what the Child Foundation did and

17   as applied to what Defendant Yasrebi knew about this

18   case, the regulations were absolutely clear.

19       I want to go through a little bit of the evidence to

20   make that point.  And it stretches over this entire

21   period, Your Honor.

22           THE COURT:  I think I've heard -- seen all of

23   the arguments you're going to make.  You can have a few

24   minutes on this, but --

25           MR. GORDER:  Okay.  Well, to speed things up,

Proceedings - 3/6/12

1   let me just remind the Court that in the year 2000,

2   September 2000, the Child Foundation applied for a

3   license.

4           THE COURT:  What response did they get?

5           MR. GORDER:  They got a response that said, "We

6   got your application."

7           THE COURT:  "We got your application."

8       Did they get any advice?

9           MR. GORDER:  They didn't get any advice.

10          THE COURT:  The Government didn't give them any

11  advise, as requested?

12          MR. GORDER:  No.  The Government dropped the

13  ball.

14          THE COURT:  The Government referred the matter

15  for investigation?

16          MR. GORDER:  Right.  What they did, and this is

17  actually in some of the exhibits that the defense

18  provided you, is referred it to their enforcement

19  section, because it appeared to be a violation of the

20  sanction.

21      But what I want to point out, Your Honor, is what

22  was not in that letter.

23      What was not in that letter was:  In the next three

24  weeks we're going to transfer $400,000 to Iran to buy

25  real estate for the Lahijis and rent it rent free for ten

Proceedings - 3/6/12

1    years.

2                 THE COURT:  What was in the letter that was

3    sent in 2001 that the Government lost?

4                 MR. GORDER:  I don't know.  I've never seen it.

5                 THE COURT:  But they received it?

6                 MR. GORDER:  They have a --

7                 THE COURT:  They were asking the same

8    questions?

9                 MR. GORDER:  They have some kind of computer

10   entry that it was received.  We've never seen it, and we

11   didn't find it.  So unless defense counsel has it, I

12   don't know what was in it.

13                THE COURT:  Okay.  So they were asking

14   questions about what they could or couldn't do; is that

15   correct?

16                MR. GORDER:  They were asking for a license.

17   Permission to -- you know, to send the license.

18        But what they did immediately -- I mean, they turned

19   around, before you could expect the Government to get

20   back to them anyway, and sent $400,000 to buy real estate

21   in Tehran.

22        A couple of months later they tried to transfer

23   $30,000 through the Bank of America to a bank in Dubai,

24   and it was stopped and rejected.  And three days later

25   they sent it through a hawala system to Iran.  They

1    purchased formica.  They sent money to Italy in February

2    of --

3              THE COURT:  That charge has been -- will be

4    dismissed, isn't it?

5              MR. GORDER:  Yes.  But I think it's important

6    to note that while this license application was pending,

7    they were continuing to send funds to Iran.

8              THE COURT:  Their purpose was to continue their

9    humanitarian work with children.  Do you agree with that?

10             MR. GORDER:  In part, yes.

11             THE COURT:  In part.

12             MR. GORDER:  In part, yes.

13             THE COURT:  Okay.

14             MR. GORDER:  Your Honor, now even the defense

15   concedes that after September 11th it was reasonable for

16   people to interpret the regulations as controlling the

17   transfer of funds to the Middle East.  And we know that

18   that's what the defendant felt, because we have his notes

19   dated November 3rd of 2001.  That's in tab 16 of our

20   exhibits.  And maybe we can have that on the board.

21        You can see the translation is on the left.

22   Permission to send the Child Foundation's exchanged

23   money, the possibility of obtaining such permission, very

24   low.

25        So there's no question at that point that they were

1    aware of the effect of the law.

2        Then, Your Honor, I want to direct your attention

3    to, again, some exhibits of the defense, because I think

4    they're important.

5        And this would be Mr. Angeli's second declaration.

6    His Exhibit 13.  There was a terrible earthquake in Bam,

7    Iran, in the latter part of 2003.  And because of that --

8    and this is his Exhibit 13, page 1 -- OFAC, issued a

9    general license saying for a 90-day period U.S. persons

10   are allowed to make funds to nongovernmental

11   organizations to be used in support of humanitarian

12   relief in response to the earthquake in Bam.

13       That period of time expired.  And on the next page,

14   page 2, you can see that OFAC issued another license for

15   another 90 days, saying if you want to send money to Iran

16   for the Bam earthquake, you can do it through -- and they

17   gave a list of about ten charities.

18       Now, there's no reason -- if the position of

19   Mr. Newcomb, who signed these licenses, was that you can

20   send funds to Iran any time you were a charity, there was

21   no reason to issue these licenses.  It's clear the

22   Child Foundation was aware of it, because a couple months

23   later, in May of 2004 -- and this is tab 18, page 1 --

24   and, again, the first paragraph, they made an application

25   for a license to send $250,000 to Iran for the Bam

1    earthquake relief.  Because they weren't on the list of

2    approved charities, that application was denied by OFAC,

3    in writing.  They got an answer that time.

4        So it's certainly clear that by 2004 there's just no

5    question in their minds.

6        Now, in the papers that have been filed before you

7    and kind of fitting in with this limited scope of time

8    during the plea, they claim that somehow there was an

9    epiphany at the Child Foundation in the fall of 2006, and

10   that's when they discovered that there was a question

11   about sending cash to Iran.

12       I'd like to point out for you tab 58.  Now, this is

13   an email, and we'll be looking at page 4, where

14   Mr. Yasrebi was responding to an inquiry from a potential

15   donor, and the date on this email is February of 2006.

16   So it's six or seven or eight months before this limited

17   time in the plea, but it's interesting to see what he

18   says.

19       As I stated, in an email:  Child Foundation USA only

20   sends food, clothing, and medicine to Iran.  No cash

21   transfer is ever made by the Child Foundation except when

22   specifically permitted by the Office of Foreign Affairs.

23       Now, that was just false.

24       I want to briefly talk a little bit about the

25   reliance on professional advice defense that has been

Proceedings - 3/6/12

1    suggested in the papers.

2        There's a suggestion that what the Child Foundation

3    did was approved by their lawyers and by their

4    accountants.

5        Well, to claim, you know, reliance on advice of

6    counsel, you've got to waive the attorney-client

7    privilege, which they've refused to do in their papers,

8    so we don't know what the advice was.

9        But I just want to show you what -- so these billing

10    records that they submitted are really worthless.  If we

11    can take just a brief look at Mr. Angeli's second

12    declaration, Exhibit 12, we have this bill from

13    Shawn Khastoo.  Review of -- redacted.  Legal research

14    regarding -- redacted.  Review of draft -- redacted.

15        We don't know what the advice was, so I think that

16    you have to discount the information suggested by these

17    billing records.

18        And to have a legitimate advice of counsel or

19    professional defense, you've got to tell your lawyers and

20    your accountant what's really going on.  You've got --

21    the facts have got to be clear.

22        And if we can take a brief look at tab 28, this

23    was -- this was the only legal advice that we know about

24    that was provided, because it was put up on the Child

25    Foundation's website.

Proceedings - 3/6/12

1        And if you read through this exhibit, Your Honor,

2    you'll see that the factual premise here is that there's

3    no cash going to Iran; that the donations are only used

4    to purchase food, clothing, informational materials, and

5    medicine, outside Iran.

6        Then on page 2, there's information in the lower

7    paragraph here that they've entered into memoranda of

8    understanding with other Iranian charities where they all

9    exchange food and other items and not cash.

10        That was clearly false.

11            THE COURT:  Can I ask you to wrap up in about

12    five minutes, Mr. Gorder?

13            MR. GORDER:  Sure.  Okay.  Your Honor, there's

14    a lot of exhibits in the record.

15            THE COURT:  That's what I'm -- I don't think we

16    need to go through all of them.

17            MR. GORDER:  Okay.  I want to just show one, if

18    I may, and then I'll conclude on this -- on this area.

19    And this would be tab 60, pages -- we'll start out with 7

20    or 8.

21        Now, you'll recall that there was -- you know,

22    there's a discussion of these memorandas of

23    understanding.  Well, here's a draft that was sent by --

24    from Iran to Mr. Yasrebi, and you can see that he crossed

25    out certain articles.  Well, if we go to the translation,

Proceedings - 3/6/12

1    which is on pages 2 and 3 -- and the previous page,

2    please -- in particular, article 3 was crossed out.

3    Receiving food aid sent from the Child Foundation,

4    distributing them amongst the needy families, payment of

5    financial aid to the families under the Child Foundation

6    coverage according to their needs.

7        So this was what he crossed out in this memoranda of

8    understanding that was being concocted to show to the

9    lawyers.

10        I think that is probably the best way of -- of

11    discussing the reliance on counsel advice.

12        Your Honor, you say I've only got five more minutes,

13    so let me talk briefly about two other issues.  One,

14    there was a suggestion in the defendant's reply memo that

15    we had misled the Court about the 2007 tax return that

16    was filed.  I just want to clear that up.  Child

17    Foundation was on an unusual fiscal year.  It ran from

18    June 1st to May 31st.  So any particular year would

19    encompass two calendar years.

20        The document that's in our reply brief, where they

21    talk about doing things in Afghanistan and other

22    countries, but never mention Iran, is the return that

23    covered June 2006 to May 2007.  We referred to that as

24    the 2007, 05 return.

25        The return that is in the defendant's reply brief is

Proceedings - 3/6/12

 1   actually -- covers the next year.  It wasn't prepared

 2   until November of 2008, after the search warrant was

 3   executed in this case, and, as I understand it, it was

 4   never filed with the IRS.

 5        Finally, Your Honor, turning to national security,

 6   just briefly.

 7        Counsel tries to diminish the effect, the impact, of

 8   the money that was sent to Grand Ayatollah Makarem

 9   Shirazi.  That's why I'm saying that some of it is not

10   humanitarian, Your Honor; nor is the money going to the

11   Lahiji's bank accounts and their real estate investments

12   and that sort of thing.

13        They try to diminish that by saying, "Well, it's

14   only $100,000."

15        Let's take a quick look at tab 36, page 3.  This was

16   a fax that was sent by the Lahijis to the

17   Child Foundation at one point in 2006, trying to come up

18   with some kind of accounting of the money that had been

19   sent.  And you'll notice that there's -- under paragraph

20   1(a)(3), there's $250,000 in khoms.  And then down in

21   paragraph 4 there's $200,000 in khoms where they're

22   pending receipt.  Khoms are -- I'm not quite sure exactly

23   how to translate it.  It's kind of like a tithing.  And

24   based on the conversations that were intercepted, it's

25   clear that those khoms of Mr. Lahiji's was going to

1   Makarem Shirazi.

2        I'm not sure how much more, because there's some

3   talk about --

4             THE COURT:  Well, let's not speculate, then.

5             MR. GORDER:  -- but certainly more -- and

6   there's information that they obtained specific

7   permission from him to raise khoms from other people in

8   the United States.

9        Now, this is a man who was a prime supporter of

10  Hezbollah, has bragged about that he and other clerics

11  allocated a portion of their monies to Hezbollah in

12  Lebanon, gave out condolences for the death of the person

13  who was responsible for the killing of the U.S. Marines

14  in Beirut in 1983.  And certainly a national security

15  matter, beyond just the pumping up of the Iranian economy

16  that sending $10 million over a ten-year period would do.

17       We saw in the letters that Mr. Yasrebi wrote to Iran

18  that the purpose of the Child Foundation was to educate

19  and prepare children for the Islamic Republic of Iran.

20       Now, Your Honor, there's a lot of debate today about

21  what U.S. policy should be with regard to Iran; sanctions

22  versus military actions.

23       Well, if sanctions are to work, they have to be

24  enforced.  And they have to, you know, be enforced across

25  the board.  And to diminish the national security

Proceedings - 3/6/12

1  interests in this case, I think would be -- would be

2  inappropriate.

3       One thing on the potential immigration

4  consequences -- I don't claim to be an immigration

5  attorney, but I can say that in my experience with other

6  Iranian nationals who have been convicted of charges like

7  this, they have not been deported because of it.

8       So, you know, beyond that, I can't really -- I can't

9  really speak.

10       THE COURT:  All right.  Thank you, Mr. Gorder,

11  your co-counsel wanted a short period of time.

12       I do want to limit this.

13       MR. ATKNSON:  I'm getting that message loud and

14  clear.

15       THE COURT:  I'm meeting with the judges of the

16  court of appeals at a certain time here today, at 12:00,

17  so I'm -- we need to move on, so --

18       MR. ATKNSON:  Okay.  I'm getting that message

19  loud and clear.

20       Judge King, good morning, and my remarks were

21  intended to take about a half hour or so, and I'm -- I'm

22  going to --

23       THE COURT:  Well, I've read everything you

24  submitted.  There's not much more that could be

25  submitted, that I'm aware of, at this point, but go

1  ahead.

2          MR. ATKNSON:  Well, what I'd like to focus on

3  this morning, then, in light of those limitations, is one

4  point that is relevant both to the correct sentence under

5  3553(a) and under the guidelines, and it's responsive to

6  my friend Mr. Angeli's claim that all of Mr. Yasrebi's

7  misconduct, all of his criminal activity, was backward

8  looking; that is, that it was designed to cover up

9  criminal behavior in which he previously engaged, and

10 none of it was designed to cover up ongoing or future

11 criminal activity.  That makes a difference both in the

12 guideline analysis and, more importantly, how you view

13 these crimes.  Was he simply looking back at something

14 that he committed and trying to cover it up, or was he

15 enabling and facilitating ongoing criminal behavior?

16         And there's a couple of examples from the evidence

17 that I'd like to point out, about which you may not be

18 fully aware, that should be of help to you in determining

19 where Mr. Yasrebi should be sentenced.

20         The first example has to do with this tuition

21 program that the Child Foundation was running.

22         If we could have tab 39 up, please, and let's just

23 go straight to page 1.

24         I initially had intended to show you both the Farsi

25 and the English here, because it does make a bit of a

1    difference, but this is a -- an email in which

2    Mr. Yasrebi tells his counterpart in Iran, "I made the

3    request that you not discuss these topics" -- meaning,

4    this tuition program by which the Child Foundation would

5    pay the tuition of Iranian students in London, that would

6    discharge their tuition obligations in Iran at an

7    institution known as the Azad University.

8         "I made the request for you not to discuss these

9    topics with everyone.  Announcing of these topics openly

10   could place all of us in jail in America."

11        From this, you can conclude as follows, I'd submit,

12   Judge -- and I'd be stunned if my friends at the other

13   side of the table would argue to the contrary -- you can

14   conclude that the defendant, by this point in time, had

15   gathered that the provision of services in Iran was

16   prohibited, and there can be no dispute but that tuition

17   for educational services is a service under the holding

18   in *Banki*, which is essentially providing something of

19   value to someone else, and, I might point out, whether or

20   not there's any consideration for it, contrary to what

21   counsel argues -- argued earlier.

22        Number 2, on October 8th he knows that the provision

23   of tuition in Iran is against the law and that he

24   shouldn't do it.

25        Counsel argues that he did the right thing after

Proceedings - 3/6/12

1     that and he stopped this tuition program.  What I want to

2     show you is evidence to the contrary.

3          Can we have tab 61, please?

4          Just three weeks later, on Halloween of that same

5     year, here's Dr. Yasrebi soliciting future tuition

6     donations.  In the second paragraph:  He needs to double

7     this amount if he wishes to pay for her tuition in the

8     next semester, as well.  Kindly contact Mr. Nagahvi and

9     let me know.

10          Can we have tab 62, please?

11          We have the translation first.  And here's an

12     indication that in December, two months after he's made

13     this statement that he knows that this tuition program

14     can land him in jail in the United States, he's talking

15     about -- he's being made aware of a donor who has just

16     donated to sponsor a loan program for 20 college students

17     in Iran to the tune of $14,000.  And there's talk about

18     him being willing to sponsor some more.

19          So his very conduct that he knows is criminal is

20     occurring two months later.

21          If we could go to page 3, please.

22          As evidence of that in November, five or six weeks

23     after he makes this statement that he knows that this

24     tuition program can provide him in jail, we have a

25     receipt for the donation of 13- or $14,000 to the Jamshid

Proceedings - 3/6/12

1    Foundation.  And if you look down at the bottom of the

2    box, you can see it's for student loans.

3         So if we can skip ahead to tab 63 -- I'm sorry.

4    Yes, tab 63.  Here we have an email in which -- a

5    translated email in 2008.  Judge, two years later.  Two

6    years after the defendant indicates he realizes that this

7    is unlawful.  And it makes it very clear that they're

8    still continuing to use U.S. funds.  And let me quote,

9    "Please see the attached detail list of the expenses paid

10   out of the monies received from the Child Foundation

11   USA."

12        And going down to the table, one can see a reference

13   to payments made to assistance seekers, payments made to

14   college students.  95 million rials, or a significant sum

15   of money translated into U.S. dollars.

16        One example of his facilitation of ongoing and

17   future criminal conduct, even after he knows that it's

18   against the law.

19        Example number two:  There's reference in the papers

20   to this what my co-counsel, Mr. Gorder, characterized as

21   an epiphany, but let's call it a bellwether event, that

22   Mr. Angeli hangs his hat on as being the point in time at

23   which there's a memo written by a Child Foundation

24   employee by the name of Kirkwood, who, according to their

25   theory of the case, makes the defendant aware that what

Proceedings - 3/6/12

1    he's doing is illegal.

2        At that point in time they're running a charity in

3    Canada, as well.  The regulations make it very clear that

4    a U.S. citizen can't, in Canada or in another foreign

5    country, do what he's prohibited from doing when in the

6    United States.

7        Counsel's memo says that far from doing the wrong

8    thing here, Mr. Yasrebi did exactly the right thing.  He

9    stopped any backroom support of this Child Foundation,

10   Canada, just as he had been advised by his employee who

11   had written a white paper, essentially, telling him that

12   any continued support to Canada would be unlawful.

13       Publicly, and to his employees, he's stating, "We're

14   out of Canada.  We're finished.  We're not going to

15   support them anymore."

16       The facts prove differently, Judge.

17       Could we have tab 77?

18       That is a conversation right during the relevant

19   time period of October 23rd, 2006.  On page 1, the

20   communicants are the defendant and his subordinate at the

21   Child Foundation, Mr. Sherafi, on page 2.

22       This is going to take just a moment, Judge.

23       The upshot of it is, as you can see, the defendant

24   points out to Mr. Sherafi that our office in Canada is

25   closed.  It's closed, because it's crystal-clear that

1    it's illegal and one of my employees, Mr. Kirkwood, is

2    about ready to blow the whistle on us, and we're about to

3    be arrested for this.

4        He's afraid of going to jail.

5        He says:  Essentially, then, with regards to Canada,

6    although it's discontinued, but I'll continue.  We worked

7    too hard for it, and I just can't discontinue it.

8        On the next page, please, page 4, he clarifies that

9    he had an employee doing exactly what counsel said that

10   he put a stop to; that is, backroom support for Canada.

11   She's continuing the work.  And about midway through the

12   page, I'll pick up and quote -- this is Dr. Yasrebi

13   speaking -- We have to continue.  If you like, with

14   regards to your salary, it's Canada.  It won't be paid

15   from our office, but you'll be paid directly from Canada.

16       But he essentially solicits his subordinate,

17   Mr. Sherafi, to continue to provide backroom secret

18   support to Canada, even though he's represented to his

19   employees and others that they've stopped doing that.

20       Judge, I can't emphasize enough how significant the

21   Lahiji evidence is in this case.  I intended to go

22   through it for you again and to cover it in some detail,

23   but I think you get it.

24       And I just want to make one point about it, because

25   it shows ongoing criminal conduct even more clearly than

1    the scheme itself, which sort of speaks for itself, the

2    provision of the secret accounts in Iran that weren't

3    really charitable donations at all enabling the Lahijis

4    to take deductions from their income tax and to

5    essentially set up a retirement fund in Iran and to

6    purchase real estate in Iran, among other things.

7        But tab 59 -- please, Ms. Rallis -- is worth looking

8    at.  And this is one in which I think we need to look at

9    the Farsi first.  So if you can go to page 3 first, you

10   see this letter in the Farsi with a different style of

11   handwriting below it -- that Ms. Rallis has just

12   highlighted for you.

13       I'd like to point to the translation on page 1.

14   Essentially, what we have here is a letter written by

15   Mr. Iranshahi to the defendant for his approval making

16   more widely known -- proposing to make more widely known

17   the fact that the Lahiji couple had this -- these two

18   certificates of deposit, as it turns out, for $700,000,

19   that the Child Foundation was prohibited from touching

20   until some point in time way off into the future, when

21   the principal was going to be used to engage in another

22   embargo violation.  That is a construction project and

23   the interest would come back to the Lahijis.

24       There's a proposed letter that Mr. Iranshahi is

25   going to disseminate more widely.  And the part of the

Proceedings - 3/6/12

1    letter in the Farsi that was handwritten down below, that

2    was different, appears on the next page.

3        What does the defendant say?  Does he say, "We need

4    to pull this investment back.  We need to stop this.  We

5    need to comply with the law here"?  He says, "Why have

6    you correlated these monies to us?  You were not supposed

7    to say that the Lahiji money was being held in the trust

8    in the bank."

9        Your Honor, he's facilitating ongoing criminal

10   conduct.  Rather than pulling it back, he's making it

11   easier and facilitating it.

12       With regard to the Madhi transactions, the

13   defendants both say that it's unfair for us to

14   characterize these transactions as trade-based money

15   laundering, because simply -- that's an overstatement, as

16   I understand their position.  But the defendant and

17   Mr. Iranshahi engaged in genuinely complicated

18   transactions that took us a significant period of time to

19   unravel.

20       If we could have 29-I, please.  The gist of the

21   conspiracy is made clear here, essentially, in May of

22   2006.  Now, Judge, this is four months before -- or

23   three-and-a-half months before this supposed epiphany

24   from the Kirkwood white paper that he wrote complaining

25   about all the illegal conduct that he was observing

1    occurring around him.  We have a situation where
2    Mr. Iranshahi reveals the essence of the commodity
3    scheme.
4         Essentially, the funds that came from the
5    United States, half of them were passed through to Iran
6    without any purchase of food, which was what the
7    defendant in Child Foundation claimed that they were
8    doing.
9         The other half would be used for the purchase of
10   food, Judge; but it would be sold commercially.  I don't
11   think there's any dispute from anybody that a regulation
12   within the Iranian sanctions regime makes it very clear
13   that commercial food transactions are prohibited absent
14   the license.  And there's a specific provision describing
15   a one-year license that someone who wants to engage in
16   those sorts of transactions can obtain.
17        So, essentially, the public stance was, "We're only
18   distributing food," and, in reality, there wasn't any
19   food that they were distributing.  Half of the money
20   coming from the United States was being funneled through
21   an Iranian trading company that was generating false
22   receipts for Child Foundation's books and records.  And
23   the other half was being siphoned off and reconsigned to
24   a commercial food vendor in Iran, but disguised as
25   transactions in which Child Foundation was the recipient

Proceedings - 3/6/12

1    of the food in Iran.  Fairly clever.  Clever enough to

2    warrant the characterization of their conduct as being

3    trade-based money laundering.

4        They tried to make it look like these were exempt

5    transactions, when, in reality, the false documents,

6    generated months before this supposed epiphany, covered

7    them to make it look as if they were lawful.  This is a

8    concealing of ongoing criminal activity.

9        The defendant claims that this was conduct stopped

10   in early 2007 -- this is the last point I want to make,

11   Judge, and then I'll sit down -- after the legal memo to

12   which my co-counsel, Mr. Gorder, referred a few minutes

13   ago, appeared on the Child Foundation website, this

14   February 2007 memo, where they claim that Child

15   Foundation is only sending food into Iran and they may

16   exchange a little bit with other charities.  But counsel

17   has drawn a bright line there and said, "It really did

18   stop.  Trade-based money laundering really did stop at

19   some point in early 2007."  Now, I'm not so sure that

20   that's true.

21       Can we have tab 61, please?

22       The following were all -- sorry.  It's tab 69.

23   Okay, yes, tab 69.

24       These are a series of invoices, Judge, that suggest

25   very strongly that the misconduct that I described a few

Proceedings - 3/6/12

1    minutes ago continued long after February of 2007 when

2    they received, by all accounts, legal guidance to stop

3    what they were doing, which they chose to ignore.  And

4    this is after they misrepresented what they were doing to

5    their counsel in the first place.

6        Note at the top that we have an invoice number

7    involving a particular quantity of food that they

8    purchased for $172,000 in U.S. currency.  The invoice

9    number is DEX 715.  It's dated August of 2007.

10       Next exhibit, please.  Next consecutive exhibit.  I

11   believe it's 70.

12       Here's its sister exhibit, Judge.  And we see this

13   time and time again in the evidence.  This one is

14   numbered the same, DEX 715, except it has the appendage C

15   added.  So this is the second set of books, if you will,

16   that Child Foundation continued to keep.

17       Down at the bottom we have the price, not in U.S.

18   dollars this time.  It involves the same amount of food

19   and is exactly the same order.  It's 1.3 million UAE

20   dirhams.  The going exchange rate at the time would make

21   that north of $350,000.

22       So they actually paid 170-plus thousand dollars, yet

23   got a phoney receipt showing that they paid $350,000.

24       If I could have the next exhibit, page 71.

25           THE COURT:  How many more exhibits do you

1  intend to cover, because I may have to make some changes

2  on my schedule here.

3          MR. ATKNSON:  Two more, and I'll sit down,

4  Judge.

5          THE COURT:  All right.

6          MR. ATKNSON:  This is a document associated

7  with the same transaction.  And what I'd like to point

8  out is the name of the consignee.  In the middle of the

9  document -- Ms. Rallis is going to highlight this for

10  you -- this isn't Child Foundation.  This is a person by

11  the name of -- if I'm not doing an injustice to the

12  pronunciation -- Mohammadian.  I can tell you that in all

13  of the investigation work we've done in this case, the

14  thousands and thousands of pages of evidence that we've

15  uncovered, this is the first time we've seen this name.

16  It appears to us to be a reconsignment to a third party.

17          But even if it isn't -- can we have 74, please.

18          This is the document that came back to Child

19  Foundation to be on its books and records about a year

20  after they claim that they had the epiphany.

21          And if you could highlight the first line.

22          This is the transaction about which we're speaking.

23  If you'll recall the very first exhibit, Judge King, show

24  that they bought this stuff for something slightly north

25  of $170,000.

Proceedings - 3/6/12

1       About midway through this column you'll see an

2   amount in U.S.  It's been ballooned up to $334,000.  So

3   what happened here is that they continue to take about

4   half the money as a pass-through, even after they've been

5   told by counsel to cut this stuff off -- out, as if it

6   wasn't obvious from the generation of the false documents

7   that they had been doing all along.

8       And it looks to us as if any food that was generated

9   by this order was siphoned off to a third-party

10  consignee, just like they were doing earlier.  But, in

11  any event, it's clear that at least they're keeping a

12  double set of books in order to make it look like they're

13  paying just slightly less than twice as much for the food

14  than they're paying in reality.

15      This is the sort of conduct, ongoing criminal

16  activity, that warrants the sentences that we recommend

17  in this case.

18      Thank you.

19          THE COURT:  All right.  Counsel?

20          MR. ANGELI:  Your Honor, I promise to keep my

21  remarks relatively brief and to keep it to the issues

22  that counsel has raised, and I won't respond to all of

23  them.  For example, I think the issue with the Lahijis is

24  covered adequately in our briefs.

25          THE COURT:  It is.

Proceedings - 3/6/12

```
 1            MR. ANGELI:  Thank you, Your Honor.
 2        I respectfully suggest that the Government has been
 3    involved in this case for so long that they've lost sight
 4    of the forest through the trees.  And we're focusing here
 5    on issues that don't go to the heart of what this case
 6    really is about.
 7        First, I want to just say, Your Honor, at the risk
 8    of beating a dead horse, on the underlying legal issue,
 9    Mr. Gorder still has not answered the underlying
10    question.  He's referred to two cases -- the Holy Land
11    case and the Veterans Peace case -- that had nothing to
12    do with the ITRs.  There weren't transactions or
13    transfers of money to Iran.  And those cases talk
14    specifically about the humanitarian aid exemption.
15        Mr. Gorder still doesn't deal with the fact that the
16    ITR regulations have a specific carve-out that says
17    noncommercial remittances are permitted.  And he still
18    hasn't told us what he thinks the words "noncommercial
19    remittance" means.
20        In our view, Judge, charitable remittances are
21    clearly permitted.  He's right.  Charities can engage in
22    commercial transactions.  He talked about the Red Cross
23    buying an ambulance.  That's a commercial transaction.
24    But when a charity gives something away and gets nothing
25    in return -- they don't get an ambulance back -- that's
```

1    not a commercial remittance.  And that's what happened

2    here.  Child Foundation gave money away and got nothing

3    in return.

4        I want to talk, Your Honor -- briefly respond to the

5    issues that Mr. Gorder and Mr. Atkinson raised.  I want

6    to start out, Judge, by pointing out that this case

7    started -- this whole legal case started 12 years ago

8    when Child Foundation, on its own initiative and at

9    Dr. Yasrebi's direction, wrote this letter to OFAC in

10   September of 2000.

11       And, Judge, Mr. Gorder has referred to this letter

12   as an application for a license.  I want to point

13   Your Honor straight to the first paragraph of this

14   letter, which makes absolutely clear that what Child

15   Foundation was seeking when it wrote to OFAC in 2000 was

16   a, quote, determination with respect to the applicability

17   of the regulations.

18       They weren't asking for a license.  They were going

19   to OFAC and they were asking for help.  "Are you going to

20   take the position, OFAC, that what we are doing is

21   illegal?"

22       And in that letter, as Your Honor pointed out, which

23   I think was a fair request to a government agency who

24   should be in the business of helping people like

25   Dr. Yasrebi and Child Foundation when they ask for

Proceedings - 3/6/12

1  help -- and in that letter, Judge, Dr. Yasrebi openly

2  disclosed basically everything that Mr. Atkinson and

3  Mr. Gorder have talked about today.  They disclosed that

4  the major part of its efforts and capital were being

5  spent in Iran.  They disclosed that they used the sister

6  charity, Refah Kudak.  They disclosed they had already

7  provided aid to a thousand kids.  And they disclosed that

8  they were paying for tuition, as Mr. Atkinson was talking

9  about today, and clothing and food for all these kids.

10  And they even, Judge, included a pie chart that showed

11  that 95 percent of all the money that Child Foundation

12  spent went to Iran.

13      It was absolutely clear right from that moment

14  forward exactly what they were doing, but they didn't get

15  an answer from OFAC.

16      And Dr. Yasrebi didn't just sit on his hands when he

17  didn't get an answer from OFAC.  He sent another letter

18  in 2001.  And OFAC never responded to those letters.  To

19  this day, Judge, OFAC has never responded to either one

20  of those two requests for help.

21      And why not?

22      In its papers, the Government says that OFAC's

23  response to the Child Foundation, quote, slipped through

24  a bureaucrat crack.  Slipped through a crack.  It was an

25  oversight, they say to the Court.  And, Judge, that is

Proceedings - 3/6/12

1   just flat-out false.

2        And how do we know that?  We know it because we have

3   this internal memorandum from OFAC that was written

4   shortly after September 11th, which is displayed up on

5   the screen.  And it's critical to note, Judge, that this

6   memo was never shared with Dr. Yasrebi.  It was never

7   sent to Child Foundation.  It was never sent to Child

8   Foundation's lawyers.

9        I want to point out a couple things about this

10  letter.  First of all, it recognizes Child Foundation's

11  request for what it really was.  Child Foundation wrote,

12  seeking a determination as to the applicability of the

13  regs.  Again, the first layer in our analysis.  Not a

14  license.  "Do you think, OFAC, that the regulations

15  apply?"

16       OFAC went on to recognize the next logical step in

17  this process.  The next logical step would have been to

18  respond to Child Foundation by asking for more

19  information.  But they didn't take that logical step.

20  And why not?  Because the U.S. Attorney's Office had

21  decided to launch a criminal investigation here.

22       An investigation into what?  At this point OFAC

23  could have written back to Dr. Yasrebi and said, "You

24  know, the regulations don't allow you to do what you're

25  doing.  Please stop."  But they didn't do that.

1          So what is it that they investigated?  Whether or

2    not Child Foundation was actually sending money to Iran

3    without a license?  Of course not.  Dr. Yasrebi had told

4    them that, in an 86-page submission, in great detail.

5    What they investigated and what consumed them for the

6    next eight years -- the international travel, the search

7    warrants, the FISA warrants, the secret

8    middle-of-the-night searches -- all of that was done

9    because the Government thought it had a terrorism case on

10   its hands.

11         And in their papers they say we criticized them for

12   investigating the way that they did it and using these

13   tools.  And that's not true, Judge.  In fact, in our

14   papers we expressly recognized that there were good

15   reasons for them to investigate the way they did.

16         Our criticism relates to what they did at the end of

17   that investigation, when they realized that this case was

18   not about terrorism and when they realized that, in fact,

19   Child Foundation was doing exactly what Dr. Yasrebi had

20   told them they were doing eight years before.  And

21   instead of at the conclusion of that investigation

22   finally responding to Dr. Yasrebi for help, they filed

23   criminal indictments.  They came to this Court and said,

24   "Look what we found.  Child Foundation has been sending

25   money to Iran for years without a license, and they've

Proceedings - 3/6/12

1    been hiding it for a decade."

2         And to spice it up, Your Honor, they cited some

3    language that Dr. Yasrebi used in a scholarship

4    application 30 years ago, and they threw in words like

5    "Hezbollah" and "Grand Ayatollah" in an attempt to

6    frighten this Court.

7         And adopting a classic kitchen sink approach to

8    prosecution, they try to tar Dr. Yasrebi with the

9    decision that some private donors made about how to

10   reflect their donations on their tax returns.  It's that

11   approach, Judge, that we criticize, because it isn't

12   fair.  It isn't right.

13        The truth is that the Government knew from the

14   beginning that Child Foundation was sending money to

15   Iran.  They knew it because Dr. Yasrebi told the IRS that

16   in his 501(c)(3) application in 1994.  They knew it

17   because he submitted an 86-page submission to OFAC in

18   2000 and a letter in 2001 and another letter in 2004 and

19   another one in 2007.  They knew it because Dr. Yasrebi

20   and Child Foundation literally advertised in the

21   newspaper and talked to members of the United States

22   Congress about it and to CNN.  And all the while the

23   Government sat idly by, for eight years, watching it all

24   happen, deciding secretly not to respond to Dr. Yasrebi's

25   request for help and, instead, coming into this court

1   with a criminal indictment asking you to put him in jail

2   for two-and-a-half years.  That's what we criticize,

3   Your Honor.

4        And we believe that that context is critically

5   important when Your Honor is weighing the different views

6   that the parties have presented to you about what this

7   case is actually about.

8        I also want to just spend a few minutes, Your Honor,

9   talking about these issues that Mr. Gorder raised about

10  concerns that were brought to Dr. Yasrebi's attention and

11  how he responded to them at various points in time.  The

12  first one that he raised up on the screen here is a note

13  that was seized from Dr. Yasrebi's office.  And the

14  Government believes that this is Dr. Yasrebi's notes,

15  probably after talking to counsel, and they directed the

16  Court's attention to this specific passage:  Permission

17  to send the Child Foundation exchanged money.  The

18  possibility of obtaining it, very low.

19       Now, if Dr. Yasrebi did get that advice from counsel

20  at this point in time, it's not particularly surprising

21  that he did.  His letter to OFAC had been sitting

22  unanswered for over a year.  9/11 had just happened two

23  months before.  It probably wasn't particularly likely

24  that OFAC was going to write to him and say, "Go ahead

25  and send the money."

1    The Government doesn't point, Your Honor, to the
2    very next entry of this note.  "Tell us what to do.  Tell
3    us what to do."  He was asking the people who were
4    consulting with him at the time.

5    And, Your Honor, we've provided billing records
6    showing you that at the time Dr. Yasrebi was consulting
7    with a lawyer, Mr. Khastoo.  He was consulting with
8    Mr. Panetta at KPMG.

9    The Government criticizes us for not waiving the
10    privilege.  To that, Your Honor, I'll only say this:  The
11    privilege is not Dr. Yasrebi's to waive.  It belongs to
12    the Child Foundation.  And most of the billing records
13    that we've submitted to the Court are from the firm of
14    Berliner Corcoran and Rowe, who have an ongoing
15    relationship with Child Foundation.  And obviously a
16    waiver of the privilege with respect to BCR's advice
17    could have implications well beyond this case.

18    But the important point here, Your Honor, is
19    Dr. Yasrebi asked for help, and this is what the lawyers
20    gave him.  They said to him -- or what's reflected on
21    here, with the notations of Khastoo and Panetta, is this
22    notion of sending money to Switzerland and then to Iran.

23    And as Your Honor knows, Switzerland does not have
24    an embargo against Iran.  So what this looks like is that
25    Dr. Yasrebi is being told, "This system you have now,

Proceedings - 3/6/12

1   this hawala system, don't do it; but if you send money to

2   Switzerland, they can send it to Iran."

3        Now, is this the advice that I would have given to

4   Dr. Yasrebi if I wanted to give him conservative advice

5   about how to comply with the regulations?  No, it's not.

6   And, frankly, I don't think Mr. Khastoo was a very good

7   lawyer.

8        But what these documents show is when an issue was

9   raised with Dr. Yasrebi, he consulted with professionals

10  and he changed the way Child Foundation operated.

11       And, Judge, the Government's own documents that show

12  money going through these money exchangers show that

13  those exchanges stopped right at this same period of time

14  when he was consulting with the professionals about this

15  Swiss operation.

16       He heard a concern, he consulted with professionals,

17  a solution was proposed, and he stopped what they were

18  doing.

19       There's one more example that Mr. Gorder raised.

20  And that is the letter that Dr. Yasrebi got from OFAC in

21  2004 that may have raised additional concerns about

22  this -- the way the Child Foundation was doing business.

23       First of all, I'll note that OFAC said, "You can't

24  send this $250,000 for the Bam earthquake," and

25  Dr. Yasrebi responded by not sending the $250,000 for the

1    Bam earthquake.

2          But perhaps even more important than that, at that

3    time when Dr. Yasrebi received that letter from OFAC, he

4    started to lose faith in Mr. Khastoo, and maybe this

5    advice about Switzerland is bad advice.  And we've given

6    Your Honor a note that Dr. Yasrebi sent to his board at

7    that point in time, saying, "You know, Khastoo has put us

8    in a tight spot here."

9          And the very day he sent that email to his board

10   Dr. Yasrebi picked up the phone and he hired new lawyers;

11   the Berliner Corcoran and Rowe firm.  Just one of the

12   leading law firms in the country in this area of the law.

13         And the bills we submitted to the Court show that in

14   late 2004 and early 2005 the Berliner Corcoran and Rowe

15   firm was providing advice intensely to Child Foundation.

16   And in late April 2005 they talked specifically about

17   this Swiss arrangement and about compliance efforts.

18         And the last entry, Your Honor, on this bill,

19   discussing that issue, is April 25th.  And, again, the

20   Government's own documents, which summarize the transfers

21   to Switzerland -- this is page 3 of the three-page

22   document -- show that on the very next day, after he

23   talked to his lawyers about this, that was the last time

24   they ever sent money through Switzerland.

25         So, once again, an issue is raised.  He goes out and

1    he hires new lawyers.  He talks about this program, and

2    he stops immediately and transitions to this new program

3    whereby they are buying food in Dubai and transmitting it

4    to Refah Kudak in Iran.

5         That was clearly the safest way to proceed, because,

6    even as the Government concedes, sending food is clearly

7    permitted by the regulations.

8         Now, sometimes Refah Kudak sold that food before it

9    reached Iran; sometimes after it reached Iran.  But all

10   of the money that Child Foundation donated and got

11   nothing in return went to help the children that

12   Dr. Yasrebi has spent the last 15 years of his life

13   trying to help.

14        As time went on, discussions continued at Child

15   Foundation.  Mr. Atkinson has gone through some great

16   detail showing what those discussions were.  And were

17   people raising concerns?  Yes, they were.  And what was

18   Dr. Yasrebi's response to that?  He ordered a

19   comprehensive -- in 2006, a comprehensive audit and legal

20   review of everything going on at Child Foundation.

21        And, ironically, it's that audit that he ordered

22   that ultimately led him to commit the conduct for which

23   he pled guilty here.  Because it was in the course of

24   that audit that Mr. Kirkwood raised his concerns.  And

25   when he did, Dr. Yasrebi frankly panicked.  They were in

1   the middle of this comprehensive audit, these issues came

2   up, and for a period of a few months -- and we don't

3   limit it to just October of 2006, Your Honor -- for a

4   period of a few months Dr. Yasrebi and Mr. Iranshahi

5   admittedly engaged in the conduct that he pled guilty to

6   here, trying to phoney up documents.  And we don't hide

7   from that.  He's admitted it, and he's pled guilty to it,

8   and he's here today to be sentenced for that conduct.

9        I think, Your Honor, at the end of the day what does

10  this all add up to?  And how do you judge a man and the

11  things he did?  Dr. Yasrebi committed a crime.  That's

12  true.  But Dr. Yasrebi also had the courage, the energy,

13  and the commitment to do something that few of us will

14  never do.  He recognized inequality and suffering in the

15  world and he did something about it.  He really did

16  something about it.

17       And if a man is judged by the totality of his

18  actions, Your Honor, Mehrdad Yasrebi should be favorably

19  judged.  Sending him to prison, taking him away from his

20  family and his community would serve no useful purpose in

21  this case, Judge, and that's why we respectfully request

22  that the Court impose a sentence of probation with

23  whatever conditions you deem appropriate.

24            THE COURT:  All right.  I've cancelled my

25  appointment at noon, and we're going to go through and

Proceedings - 3/6/12

```
1    complete the sentencings today.
2        I want to take about a ten-minute recess at this
3    point and come back at ten minutes of, and we'll
4    continue -- now, do you have any further presentation you
5    wish to make other than Dr. Yasrebi?
6            MR. ANGELI:  Only to answer any questions that
7    Your Honor has.
8            THE COURT:  Okay.  Government?  I don't want
9    additional argument.  I just want to know if you have
10   anything else you want to present.
11           MR. GORDER:  No, Your Honor.
12           THE COURT:  We'll be in recess, then, until ten
13   of.
14           THE LAW CLERK:  The Child Foundation?
15           THE COURT:  Oh, I'm sorry.  I kind of missed
16   you over here.  You've been quiet.
17           MR. CALO:  We've been very quiet, Your Honor.
18   We have, in the time that has passed, scaled down our
19   arguments and we do want to say a few brief comments.
20           THE COURT:  You'll make it short, I hope.
21           MR. CALO:  I've got that hint, Your Honor.
22           THE COURT:  Okay.  Thank you.
23                   (Recess taken.)
24           THE CLERK:  All rise.
25           THE COURT:  I apologize for keeping you
```

Proceedings - 3/6/12

1  waiting.  At this point we'll hear from Mr. Calo.

2          MR. CALO:  Thank you, Your Honor.

3      Again, following the Court's dictates, I'll try to

4  be very, very brief.  I know the Court has read all our

5  papers and have studied the exhibits.  I just have one

6  point to make on each separate area we're contesting

7  here.  The fine and the probation for the Foundation.

8      My first point relates to what the Court said at the

9  commencement of the hearing.  The Court had indicated

10 that it was going to go with the guideline of 2M5.1,

11 which, of course, would carry over from the individual to

12 the Foundation itself.  And then the Court indicated,

13 correctly that probation is recommending a $60,000 fine

14 and the Government is recommending a $125,000 fine.  But

15 the Court went on to say, as I recall, that those are

16 both departures from the guideline.  When, in fact, as

17 probation, in the presentence report, makes clear, and as

18 our papers make clear, once you go to the 2M5.1, it's not

19 listed under chapter 8 of the guidelines.  So the Court

20 is right back into 3553 and 3572, which means that it's a

21 clean slate.

22     There is no guideline number that begins the

23 analysis.  And maybe perhaps the Court meant that.  I

24 just wanted to clarify that one point.

25          THE COURT:  I agree with you.  At this point

1     the Court has discretion to order a fine within the

2     statutory amount.

3          MR. CALO:  Right.  From zero right up to the

4     statutory maximum.

5          THE COURT:  That's my understanding.

6          MR. CALO:  There's no guideline recommending --

7          THE COURT:  That's my understanding.

8          MR. CALO:  Okay.  And that's all I wanted to

9     say.

10         The second point I wanted to make, Your Honor, is

11    just on the probation.  It's a point we didn't make in

12    our papers, but I will be very brief about it.  I wanted

13    the Court to realize that there's a very different

14    feeling for probation between a charity and a

15    corporation.  I'm sure corporations have appeared for

16    sentencing in front of this Court.  I've represented

17    corporations from environmental crimes, financial fraud

18    committed by executives of the corporation, and what is

19    important is even when those corporations are placed on

20    probation, their customers do not flee; their suppliers

21    do not flee.  They may have a momentary dip in their

22    stock price, but it doesn't affect them.  Citicorp,

23    Goldman Sachs has had misconduct.  There's been no run on

24    those banks.  They continue as always.

25         But charities are a much different animal,

Proceedings - 3/6/12

1   Your Honor.  Charities -- the goodwill is very, very

2   fragile.  Donor dollars are very scarce.  People can go

3   elsewhere.  And so what it is is can be more of a

4   death-knell to a charity than it can be for a private

5   corporation.  And so for this -- for this organization,

6   to put it on probation is sending a message to the

7   general public that something is still amiss, something

8   needs to be guided by the Court and by the probation

9   office, when, in fact, this foundation has policed

10  itself, rehabilitated itself, set up internal and

11  external procedures to keep it in line, and it has OFAC

12  and IRS oversight continuously.

13      So if you weigh the -- the benefit of probation is

14  very, very marginal.  It's not necessary.  Every

15  condition that the probation office has, every suggested

16  condition that the guidelines has, we have satisfied.

17      So I just wanted the Court to be aware that it's

18  much different to place a charity on probation.  It has

19  major consequences that a corporation will not suffer.

20      And, on that, I'll submit it, unless the Court has

21  any questions.

22          THE COURT:  Thank you.

23      Mr. Angeli, your client wishes to be heard, I

24  understand.

25          MR. ANGELI:  He does, Your Honor.

Proceedings - 3/6/12

1      THE COURT:  Thank you.  I'll get your name

2  right.  Yasrebi?

3      THE DEFENDANT:  Yes.

4      THE COURT:  Have you had an opportunity to

5  review the presentence reports that were prepared by

6  probation for both the Child Foundation and for yourself?

7      THE DEFENDANT:  Yes, Your Honor.

8      THE COURT:  All right.  Do you wish to make any

9  statement to the Court at this time regarding the charges

10 against you and your sentence?

11     THE DEFENDANT:  Yes, Your Honor.

12     THE COURT:  All right.  If you would, please.

13     THE DEFENDANT:  Thank you for giving me the

14 time to speak.

15     Your Honor, I have broken the law.  I accept

16 complete responsibility for what I did.  I stand here

17 ready to accept whatever sentence you decide is

18 appropriate.  I'd like to take this time to tell you how

19 I feel about what I have done.  Child Foundation was my

20 passion for many years.  My work with Child Foundation

21 was always for the purpose of helping the struggling

22 children in Iran.  I've never used any of the

23 Foundation's money to enrich myself.  I'm deeply hurt by

24 any accusation that I did so.

25     For most of my time with Child Foundation we

Proceedings - 3/6/12

1    honestly tried to do things in what we thought was the

2    right way.  As you know, however, during one period of

3    time I did not do what I thought was right; but, instead,

4    obstruct people about how Child Foundation was operating.

5    I have no excuse for that.

6        I did what I did because I was trying to help Child

7    Foundation, but that does not make it right.

8        By doing what I did, I not only broke the law, but I

9    jeopardized the Foundation and its mission and caused a

10   lot of pain and difficulty for many innocent people.

11       Your Honor, I am proud of what I did for Child

12   Foundation and its children over the years.  I certainly

13   am not proud of the conduct that I admitted to this

14   Court.  By doing what I did, I brought shame on myself.

15       I can't change what I have done, but I can do my

16   best to live the remainder of my life with honor, and I

17   intend to do so.

18       Your Honor, I thank you for taking the time to

19   listen to me.

20           THE COURT:  All right.  You may be seated.

21   This will probably take a little while.  I want to go

22   through the factors that the Court has considered in

23   writing a sentence.

24           MR. CALO:  Your Honor, I didn't realize we were

25   moving into this part.  The president of the Foundation

1  would like to make a statement as part of the allocution

2  if it's okay.

3      Thank you very much.

4          THE COURT:  Would you introduce him?

5          MR. CALO:  This is Mr. Navid Seyedali.

6      All right.

7          MR. SEYEDALI:  Your Honor, my name is

8  Navid Seyedali.  I'm president and a board member of

9  Child Foundation, a nonpolitical and nonreligious and

10  nonprofit organization.

11     At the outset, I want the Court to know that we

12  accept responsibility for the misconduct to which our

13  former president pled guilty and fully accept to be

14  penalized in some way.

15     I'm here to give the Court additional information to

16  show that a minimal fine and no probation is a fair

17  sentence for CF.

18     Your Honor, Dr. Mehrdad Yasrebi founded Child

19  Foundation over 17 years ago, which, up to date, has

20  successfully graduated over 500 young men and women from

21  universities and over 11,000 teenagers from high school.

22     We considered this a worthwhile achievement and

23  increasing these numbers is our goal.

24     We understand that mistakes have been made in the

25  past.  We have taken responsibility for that.  As any

1    responsible entity, we have made genuine effort and

2    implemented processes to safeguard and circumvent future

3    mistakes.

4        We detailed those processes in my briefing to this

5    Court.  We ask the Court to take the full view into

6    account as it considers the fair and just sentence for

7    this charity.  Child Foundation has made genuine effort

8    to identify and correct areas that have brought us here

9    and designed and initiated processes of procedures that

10   will protect us from experiencing what we've gone through

11   for the past three years.  Child Foundation has already

12   suffered tremendously as a result of the conviction.

13   We've lost some of our donors, we've lost the

14   accreditations of rating agencies, financial institutions

15   have closed the doors to us, and our morale has been

16   hampered, but we're -- we're resolved to carry out our

17   mission.

18       We respectfully request what this Court considers

19   trusting the reputable members of the present board of

20   directors to continue running this organization without

21   hinderance of any probationary mechanism or any

22   significant fine.

23       These individuals have done nothing to warrant

24   mistrust and are worthy of being trusted.

25       A harsh sentence, Your Honor, with the burdens of

1   hefty fines and/or the terms of probation, will undermine

2   our creditability within our donor base and,

3   consequently, it will adversely affect our abilities to

4   serve children who are underprivileged.

5       We respectfully submit that we do not see any added

6   value in a position of any terms of probation.  We

7   believe probationary terms would be a waste of government

8   resources and impose undue hinderance on our humanitarian

9   work.  Therefore, we respectfully request this Court

10  consider allowing us to operate without probation.

11      We recognize that the Court must see that some

12  punishment is necessary, but we respectfully request that

13  the Court take into consideration the harm the Foundation

14  has already suffered.  For this reason we ask the Court

15  to order a minimal fine.  The fine will be a severe

16  financial hardship, since the source of funds is publicly

17  donated money, which would be better used supporting

18  children in need.

19      At the end, Your Honor, please consider the fate of

20  the 3,000 voiceless children that we support.  And this -

21  a harsh sentence for Dr. Yasrebi and the organization

22  will have the same negative effect for the organization.

23      On behalf of Child Foundation, we appreciate the

24  time you've provided to hear this statement.

25      Thank you.

1          THE COURT:  You're welcome.

2      You may take your seat.

3          MR. SEYEDALI:  Thank you.

4          THE COURT:  We heard a great deal about

5  Child Foundation and the activities of Defendant Yasrebi.

6  Probation has interviewed Defendant Yasrebi.  Probation

7  has received the information regarding this case.  I'm

8  going to quote from the presentence report prepared by

9  probation regarding the activities generally of the Child

10  Foundation.

11      They report, quote, the Child Foundation was

12  established in 1994 by co-defendant Mehrdad Yasrebi.  He

13  served as CEO until his resignation in 2010.  The Child

14  Foundation was established to provide basic necessities

15  to children living in poverty through sponsorships.

16  Sponsors pay a minimum of $20 per month.  Children

17  receive aid for their entire academic career and, for

18  some, through their college years.  Children may have

19  more than one sponsor.  The sponsor's donations provide

20  relief to the children in the form of food, clothing,

21  medical assistance, and educational needs, and, outside

22  Iran, shelter and emergency funding.

23      The Child Foundation is currently providing aid to

24  approximately 3,000 children worldwide.

25      In recent years, the Child Foundation conducted

1      fundraisers for earthquake victims in Haiti, Japan, and

2      Turkey and has raised funds for Pakistan flood victims.

3          Outside of Iran, the Child Foundation collaborates

4      with numerous universities to provide funds for

5      economically disadvantaged students and also collaborates

6      with Habitat for Humanity, the American Cancer Society,

7      and Boys and Girls Aid Club.

8          Now, the background of Mr. Yasrebi is set forth at

9      page 10 and 11 of the presentence report. I'll summarize

10     that. He is 54, was born and raised in Iran. He entered

11     the United States in 1976, at age 19, for education

12     purposes. Since 1992, he's had permanent residence alien

13     status. He obtained a master's degree from UCLA and a

14     Ph.D in ceramic engineering from the University of

15     Washington. From August of 1991 until September of 2011,

16     he worked for Precision Castparts as an engineer working

17     in research.

18         He has a wife and two children. The children are

19     attending college. Both have plans to attend medical

20     school. He's been described as a devoted husband and

21     father. He took a major role in raising the children.

22     He has been dedicated to his humanitarian activities.

23         With regard to the charge in the case, the original

24     indictment was filed in October of 2005. It alleges that

25     the Child Foundation was required to file a tax return

Proceedings - 3/6/12

1    identifying its substantial contributors and compensation

2    information, but failed to do so.  A superseding

3    indictment was filed by the Government on February 2nd,

4    2006, adding further failures to identify and alleging a

5    violation of the Iranian transaction regulations in

6    connection with an Italian company.

7        Those counts will be dismissed by reason of the

8    charge in the superseding information which was filed in

9    January of 2011.  Just over a year ago.  That charge

10   alleges improper transfer of funds, in violation of the

11   Iranian embargo.  The charge is basically that cash

12   transfers were made which were illegal under the embargo.

13       Defendant Yasrebi pled guilty in January of 2011,

14   stating as follows -- and I read this statement, because

15   it is a factor in some of the decisions that the Court

16   has made.  With respect to the charge to which I am

17   pleading guilty, I represent that I did the following

18   acts and that the following facts are true:  From the

19   middle of 2006 through early 2007, as president of the

20   Child Foundation, I was aware that Child Foundation funds

21   were being used to violate cash transfers to Iran for

22   charitable purposes, but, nevertheless, in violation of

23   an embargo ordered by President Clinton.

24       The term "in violation of an embargo" is the

25   defendant's term that's used in the petition and in the

1    colloquy with the Court at the time of the guilty plea.

2        He says:  It was within my power to stop those

3    transfers, but I failed to do so.  Furthermore, I did not

4    disclose those transfers to the IRS, OFAC, or Child

5    Foundation's auditors, and encouraged several individuals

6    to refrain from volunteering any information suggesting

7    the cash transfers had ever been made.

8        Now, at the same time Child Foundation pled guilty,

9    acknowledging that Mr. Yasrebi was president of the

10   Foundation, acknowledging that the facts to which he

11   admitted to in his plea petition were done on behalf of

12   Child Foundation, with the intent to benefit Child

13   Foundation and for which Child Foundation is vicariously

14   liable.

15       The Foundation admitted that Child Foundation funds

16   were being used to facilitate cash transfers to Iran in

17   violation of the embargo.  The charge to which the

18   defendants pled guilty is basically the defendants

19   participated in a cover-up of the fact that cash

20   transfers were made to entities in Iran in furtherance of

21   their humanitarian activities, which they understood

22   violated the embargo.

23       Now, the defendants argue that, in fact, the embargo

24   does not prohibit the transfer of cash for humanitarian

25   purposes.  Both parties had submitted lengthy briefs on

1    the subject, and there have been, and still are,

2    differing opinions on the subject.

3        For example, a letter written by Richard Newcomb,

4    who was the director of the Office of Foreign Assets

5    Control, to a lawyer inquiring for the -- for a company

6    engaged in similar humanitarian activities in May 1997,

7    advice that the Foundation could transfer donated cash

8    funds to the Foundation in Iran for humanitarian

9    purposes.

10       Mr. Newcomb testified in a later case in New York,

11   at length, supporting this proposition.  That's set forth

12   in the transcript, I believe, of his testimony -- is set

13   forth in Exhibit 11 of the declaration of David Angeli.

14       In the year 2000, Child Foundation's attorneys sent

15   a letter to the Office of Foreign Asset Control raising

16   the issue and asking for advice.  They submitted roughly

17   86 pages of background information, including a report of

18   the Foundation's activities in Iran.  The Government

19   acknowledged receipt of the letter but did not respond to

20   the questions posed by Child.

21       Instead, the correspondence was reassigned

22   internally to the enforcement division for review and

23   possible investigation.

24       Receiving no response, Child Foundation wrote again

25   in August of 2001, posing the same questions and giving

Proceedings - 3/6/12

1    information.  The Government records -- at least that's

2    my understanding.  The Government records indicate the

3    letter was received, but the Government could not locate

4    the letter within OFAC.  Apparently -- and it's clear --

5    the Government investigation continued from that point

6    forward.

7        Now, both parties cite legal authority for their

8    positions.  The Court has looked at this.  The issue is a

9    close call, even considering the possibility of

10   Mr. Yasrebi's good faith efforts to comply with the law,

11   his potential reliance on professional advice, and the

12   fact that at least some individuals within OFAC read the

13   regulation differently.  But there is sufficient support

14   in the record where a conclusion that Yasrebi's

15   activities regarding transfers were in violation of the

16   embargo.

17       And I note in his plea, to the charge set forth in

18   the plea petition, he states:  I was aware that Child

19   Foundation's funds were being used to facilitate cash

20   transfers to Iran for charitable purposes, but,

21   nevertheless, in violation of an embargo ordered by

22   President Clinton.

23       The language there does indicate to the Court that,

24   at the least, Mr. Yasrebi had the understanding that the

25   embargo prohibited the use of cash transfers to Iran.

1    Now, the Court finds that the cash transfers were

2   made for humanitarian purposes.  The cash transfers made

3   in 2006 through early 2007 did violate the embargo in

4   effect at that time.  I believe that defendant is bound

5   by his admission in the plea colloquy.  My finding in

6   this case is for the purposes of this case.  I do find

7   that the cash transfers at issue were prohibited by the

8   embargo.

9    Now, the Court is required to find the advisory

10  guideline applies to the case.  Again, there's

11  substantial dispute and extensive briefing on the

12  guidelines to be applied.  Each party has argued for a

13  different offense level which has a substantial effect --

14  the offense level has a substantial effect on the

15  advisory guideline range.  The parties read the same

16  language but come to different conclusions.  This is a

17  substantial issue.  This is an issue that the Court could

18  go either way.

19    I note while the Government and probation argue for

20  the highest possible offense level, both recommend the

21  sentence below the resulting guideline range.  The Court

22  feels that the advisory guidelines argued by the

23  Government are very high for this case and that there are

24  many factors to consider in arriving at a just,

25  reasonable, and necessary sentence; a sentence which I

Proceedings - 3/6/12

1    will discuss.

2         However, the Court finds that the base offense level

3    is 26 and the guideline 2M5.1(a)(1), which covers evasion

4    of expert controls, the Court is going to adopt the

5    guideline findings of probation and those argued by the

6    Government.

7         As I say, I have some serious reservations about it,

8    but I think, on balance, that guideline range is the

9    guideline range that the Court will accept.

10        Now, based on the adoption of the offense level of

11   26 and the probation recommendation on the guidelines, I

12   find that the appropriate offense level, before

13   adjustment, is 26, which results in an advisory guideline

14   range of 46 to 57 months.

15        As I've indicated, there are many mitigating factors

16   under § 3553, which I will consider in determining the

17   sentence in this case.

18        Now, the Court is charged with imposing a sentence

19   which is sufficient, but not greater than necessary, to

20   comply with the purpose as set forth in 18 U.S.C. § 3553.

21   Sentencing courts are to treat the guidelines only as one

22   factor among the 3553(a) factors that are to be taken

23   into account in arriving at the sentence.

24        As I've indicated, I have found that an advisory

25   guideline range of 46 to 57 months is appropriate; but,

1    given the nature of the charge and the many mitigating

2    factors, frankly, the guideline range is not particularly

3    helpful in arriving at a just and reasonable sentence in

4    this case.

5        Now, the Court has considered a number of factors.

6    I'm going to go through these.  Participating in or

7    covering up activities that violate an embargo is a

8    serious charge.  While the record is clear that the

9    activities and motivation on the part of defendants were

10    fairness and humanitarian assistance to children,

11    including Iranian children, the evidence is that

12    defendants knew at some point in time, or believed, or

13    supposed, that there was an issue as to whether cash

14    transactions could be made without violating the embargo.

15        As I've indicated, I find that -- I've already found

16    that cash transactions violate the embargo.

17        The record reflects that Defendant Yasrebi, rather

18    than resolving the issue within the terms of the embargo,

19    embarked on several methods of hiding and failing to

20    disclose these cash transfers.  This was, at the least,

21    very poor judgment, and, in fact, constitutes and was a

22    felony offense.  He continued to seek methods of

23    continuing to include cash transfers in support of the

24    children even after he arrived at the understanding or

25    belief that it was prohibited.

1          Now, balanced against those facts are the following
2     factors:  Neither defendant has ever been involved in any
3     criminal activity other than these charges relating to
4     the transfer of cash to Iran to pursue their humanitarian
5     project.  Defendant Yasrebi's history indicates that he
6     has many accomplishments.  He's a good family man, a hard
7     worker, and has been involved in humanitarian work for
8     over 15 years.  He has substantial support from the
9     community.
10         Now, both defendants are not likely to reoffend.
11    There's no question in the Court's mind about that.
12    There is no substantive evidence of -- that defendants
13    were in any way assisting the Government of Iran or any
14    terrorist organization.  There are activities and
15    suppositions which the Government has reported, but the
16    Court notes that after, roughly, over eight years of
17    investigation, no substantive evidence was developed.
18    Other than that, Mr. Yasrebi and Child Foundation were
19    engaged in furnishing humanitarian assistance to children
20    and were not supporting any regime or terrorist activity.
21         The Court finds there is nothing to support any such
22    charge, and, in fact, no such charge has been formally
23    made by the Government.
24         The defendant has been substantially punished at
25    this point by reason of the charges and his conviction of

1  those charges.  For a number of years this litigation has

2  been a cloud over the heads of the defendant and his

3  family.  In addition, there have been large financial

4  costs to him because of the charges and the defense.

5      He is a permanent resident alien, and his

6  long-pending citizen application has recently been

7  denied.  Undoubtedly, this litigation was a factor.  He

8  will face immigration issues by reason of this

9  conviction.

10     Now, his intentions were entirely charitable.

11 There's no evidence, that the Court can see, of any

12 specific harm to national security.

13     With regard to the request for a fine, Dr. Yasrebi

14 is unemployed at the present time, has substantial family

15 obligations, and is not wealthy.  The Court intends to

16 impose a fine, but it will be less than that recommended

17 by the Government.

18     As I previously discussed, there are substantial

19 issues both as to the offense level that's appropriate in

20 this case, which substantially raises the advisory

21 guidelines, and there are also legal issues regarding the

22 Iranian transfer regulations which the Court has resolved

23 in favor of the Government.

24     These are factors that the Court is also considering

25 under 3553.

1          Now, the defendant, as I've indicated, attempted to

2     obtain information on this subject in 2000 and 2001, but

3     the Government did not respond to them and, instead,

4     opened an investigation file.

5          As counsel has argued, and it can be argued, that if

6     the Government had responded on the merits of the

7     question, we might not be here today.  Dr. Yasrebi will

8     have the stigma and the limitations that come with a

9     felony conviction.

10         I note that there is substantial disparity between

11    the sentences imposed for this type of conduct and the

12    sentence requested by the Government.  At page 21 and 22

13    of the Child Foundation reply memorandum, there are a

14    number of cases listed by the defendant.  These are cases

15    involving the same type of conduct.  They may not be

16    exactly the same, but the same type of conduct.  In all

17    but one case the defendant was given a noncustodial

18    sentence, often with the consent of the Government.

19         I would note specifically the case of *USA v. Groos*.

20    That's discussed at page 22 of the Child's reply

21    memorandum.  In that case, the defendant was sentenced

22    based upon his attempt to distribute fire suppression

23    equipment to Iran without a license.  The company was not

24    charged criminally and the individual defendant's

25    guideline range was 24 to 30 months.  The Court departed

1    downward to 60 days imprisonment.  And, in pronouncing

2    the sentence, the district court judge noted the

3    amendment history of § 2M1.5 lends evidence to the

4    defendant's argument that the harshest punishment should

5    be reserved for cases where weapons or military

6    technologies are at issue and where the threat to

7    national security is apparent.

8        As I indicate, the defendant has cited cases on the

9    issue of disparity, which indicate there is a disparity

10    between the request of the Government and sentences in

11    this type of case.

12        The probation department in the presentence report

13    states, quote, The threat to national security was less

14    than average.  In fact, the Court feels it was basically

15    nonexistent.

16        With regard to the request for a fine against

17    Child's, consideration should be given to the fact that

18    the source of the funds, which are mostly donations

19    received from innocent donors, reducing the funds would

20    adversely affect the children for whom the funds were

21    raised.

22        Motive is a major factor in these cases, and in this

23    case the motive was solely humanitarianism --

24    humanitarianism.  There's lack of financial consideration

25    to the defendants.  The entry of a guilty plea will save

1    a tremendous amount of money in prosecuting this case.

2    Defendant's conduct caused little, if any, harm to U.S.

3    sanctions.  We're not really aware of any harm to the

4    sanctions, other the fact that there is a violation here

5    as discussed.  It has conferred no benefit, in the

6    Court's view, on the government of Iran.

7         The overriding fact is that the Government

8    investigated and surveyed and obtained warrants to search

9    his facilities and looked at computers for about ten

10   years and found no evidence that he's in any way

11   supporting terrorist activities or is a supporter of the

12   Iran regime.

13        In fact, the evidence is to the contrary.  It seems,

14   to the Court, with the extensive investigation made by

15   the Government, if there was something there, it would

16   have been found and it would have been in this record and

17   in the record at this point.

18        Now, I will note that regarding the Child Foundation

19   they've completely revamped their operation, they've met

20   all of the conditions required by the Government as part

21   of the plea agreement.  The list was substantial.  They

22   have a negative net worth, according to the presentence

23   of this report.  They undoubtedly lost donations as a

24   result.

25        I mention that he has support in the community.

Proceedings - 3/6/12

1  There were numerous letters from the Iranian children who

2  were part of the program over the years.

3      Pretrial Services reports that he has met all of the

4  conditions of release.

5      On the record before this Court, there's no evidence

6  that defendant committed this crime through any violent

7  or threatening behavior.  There's no evidence that

8  defendant's conduct facilitated or encouraged any

9  violence in Iran.  The Government's evidence does not

10  support any conclusion that defendant's conduct posed a

11  national security threat to the United States, nor is

12  there evidence suggesting that any such threat, in fact,

13  was created.

14      After reviewing all of the material and hearing the

15  arguments, it's the Court's feeling that while this is a

16  serious crime, after reviewing all of the factors, which

17  I am required to consider under § 3553, the positive

18  factors in favor of the defendants outweighed the

19  negative aspects of the case.

20      With regard to the Child Foundation, would you

21  stand, please, Mr. Calo.

22      Would you like to present any further information at

23  this time before the Court passes sentence?

24          MR. CALO:  No, Your Honor.  We'll submit it.

25          THE COURT:  Okay.  Well, I've considered the

Proceedings - 3/6/12

1     advisory sentencing guideline range.  I've considered all

2     the factors that I've set forth here.  I'm going to

3     impose sentence of what I feel reflects the seriousness

4     of the offense, that will provide just punishment for the

5     offense, that will afford adequate deterrence to criminal

6     conduct.  It will be the judgment of the Court that the

7     defendant, Child Foundation, pay a fine in the amount of

8     $50,000, due immediately in full.  Interest will be

9     waived.

10         Now, if the defendant has not paid that fine within

11    a reasonable period of time, they shall commence payments

12    of not less than $2,000 per month.

13         Now, the defendant argues against probation.  I

14    don't know that they need probation, but there are a

15    number of conditions they have to fulfill.  I'm going to

16    place the defendant on probation for a period of two

17    years or until the fine has been paid, but no less than

18    two years.  I feel that the probation is appropriate in

19    this case because of the numerous conditions of

20    supervision that have -- well, numerous conditions that

21    have been made a part of the plea agreement.  During the

22    period of probation, the probation officer can make

23    certain that these conditions are being obeyed.

24         The Court does receive requests to terminate

25    probation when there's no -- showing that there's no need

1    for probation.

2         That will be the judgment of the Court.  The period

3    of probation is two years.  They'll pay the fine of

4    $50,000 during that time.

5         All transactions conducted with Iran by the

6    Foundation shall receive approval from the Department of

7    Treasury, Office of Foreign Assets Control.

8         Now, there's to be notice to the donors and

9    contributors for the past five years in writing of the

10   behavior in a form to be approved by the Government.  The

11   Government and the defendant have not been able to agree

12   on the form.  It's been submitted to the Court.  I'll

13   furnish you with a formal notice when I've completed this

14   sentence.

15        Now, the further condition is that the defendant

16   develop and submit a compliance program to be approved by

17   the Government and the probation office.  They shall

18   authorize release of the probation office of any and all

19   financial information by execution and release of the

20   financial information form.

21        Prior to sentencing, the defendant agrees to

22   terminate the employment of its current office manager.

23        Have these conditions all been met, Mr. Gorder?

24            MR. GORDER:  It's my understanding they have,

25   Your Honor, with the exception of the donor letter.

Proceedings - 3/6/12

1       THE COURT:  Okay.  All right.  Prior to --
2  excuse me, the defendant shall pay a fee assessment in
3  the amount of $400, due immediately in full.
4       Is there a waiver of appeal rights as part of the
5  agreement?
6            MR. GORDER:  Yes, Your Honor.
7            THE COURT:  Okay.  You have waived some or all
8  of your appeal rights as part of the plea agreement.
9  These waivers are generally enforceable.  If you believe
10  the plea agreement allows you to appeal, you must file an
11  appeal within 14 days of the entry of judgment.  If you
12  are unable to pay the cost of an appeal, you may apply
13  for leave to appeal in forma pauperis.  And if you
14  request, the clerk of the court will prepare and file a
15  notice of appeal on your behalf.
16       Do you have charges to dismiss, Mr. Gorder?
17            MR. GORDER:  Yes, Your Honor.  We move to
18  dismiss the underlying indictment and superseding
19  indictment.
20            THE COURT:  There's two underlying indictments.
21  The one in 2005 and the one in 2006, they both will be
22  dismissed?
23            MR. GORDER:  That's correct.
24            THE COURT:  All right.  Any questions, Counsel,
25  about the judgment?

Proceedings - 3/6/12

1          MR. CALO:  No, Your Honor.

2          THE COURT:  Any questions from the Government

3    with regard to the Child Foundation?

4          MR. GORDER:  No, Your Honor.

5          MR. ATKNSON:  No, sir.

6          THE COURT:  All right.  That completes the

7    sentencing process for Child Foundation.

8       Mr. Yasrebi, would you stand, please.

9       All right.  I've considered all the factors that

10   I've discussed with you, the advisory sentencing

11   guideline range, the factors required under 3553, and

12   I've selected a sentence that I believe appropriately

13   addresses the nature and circumstances of the offense,

14   the history and characteristics of this defendant, that

15   will reflect, also, the seriousness of the offense and

16   promote respect for the law and provide just punishment.

17      It will be the judgment of the Court that the

18   defendant shall pay a fine in the amount of $50,000, due

19   immediately in full.  Interest will be waived.

20         The defendant shall be placed on probation for a

21   period of five years, subject to the standard conditions

22   of supervision adopted by this Court and the following

23   special conditions:  He shall cooperate in the collection

24   of DNA, as directed by the probation officer, if required

25   by law.  His employment shall be subject to approval by

1    the probation officer.  The defendant shall authorize

2    release to the probation officer of any and all financial

3    information by execution of a release of financial

4    information form or by any other appropriate means as

5    directed by the probation officer.

6         He shall pay this fine in the amount of $50,000.  If

7    there's any unpaid balance or inability to pay the full

8    balance, it shall be paid at the maximum installment

9    possible, and not less than $1,500 per month.

10        I believe this is an appropriate case for a

11   noncustodial sentence for an alternative sentence to a

12   prison sentence.  Accordingly, I'll require that he

13   adhere to a home detention schedule, as prescribed by the

14   probation officer, for a period of 12 months, which may

15   include radio frequency, global positioning surveillance,

16   or other means of location monitoring as directed by the

17   probation officer.

18        The defendant's employer or other third parties may

19   be contacted, at the probation officer's discretion, to

20   confirm the defendant's compliance with the home

21   detention program.  He shall pay all or part of the cost

22   of home detention, as determined by the probation

23   officer, and may be held responsible for any damage to

24   the monitoring equipment.

25        The drug testing condition is suspended based on the

Proceedings - 3/6/12

1   Court's determination that the defendant poses a low risk

2   of future substance abuse.  He shall pay a fee assessment

3   in the amount of $100.  That's due immediately.

4      Now, you have waived some or all of your appeal

5   rights as part of the appeal agreement.  These waivers

6   are generally enforceable.  If you believe the plea

7   agreement allows you to appeal, you must file a notice of

8   appeal within 14 days of the entry of judgment.  If you

9   can't pay the cost of an appeal, you may apply to appeal

10   in forma pauperis.

11      If you so request, the clerk of the court will

12   prepare it and file a notice of appeal on your behalf.

13      Now, are there pending charges -- I guess there are,

14   as well, Mr. Gorder, as to Mr. Yasrebi?

15         MR. GORDER:  Yes, Your Honor.  The same two

16   indictments should be dismissed.

17         THE COURT:  Any issues regarding the form of

18   judgment that we need to discuss?

19         MR. GORDER:  No, Your Honor.

20         THE COURT:  Do you have any issues regarding

21   the form of judgment, Mr. Angeli?

22         MR. ANGELI:  No, Your Honor.

23         THE COURT:  We're going to have a long period

24   of home confinement here.  I talked to the probation

25   officer.  I've conveyed to him the fact that this will

Proceedings - 3/6/12

1    allow Mr. Yasrebi to be -- the home confinement

2    conditions will allow him to work and go to places

3    approved by the probation officer.  I believe that that

4    alternative to imprisonment is very appropriate and very

5    fair and reasonable in this case.

6         Anything further we need to discuss?

7              MR. ANGELI:  Nothing from us, Your Honor.

8              MR. GORDER:  No, Your Honor.  Thank you.

9              THE COURT:  Good luck to everyone connected

10   with the case.  Thank you.

11             MR. ANGELI:  Thank you, Judge.

12             THE CLERK:  Court is adjourned.

13                   (Hearing concluded .)

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings - 3/6/12

1          C E R T I F I C A T E

2          I certify, by signing below, that the foregoing

3   is a true and correct transcript of the record of

4   proceedings in the above-entitled cause.  A transcript

5   without an original signature, conformed signature, or

6   digitally signed signature is not certified.

7

8   /s/Jill L. Erwin
    _____
9   Jill L. Erwin                    Date: March 14, 2012
    Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25