S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
**CHARLES F. GORDER, JR., OSB #91287**
charles.gorder@usdoj.gov
**DAVID L. ATKINSON, OSB #75021**
david.atkinson@usdoj.gov
Assistant United States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Facsimile: (503) 717-1117
        Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 05-CR-00413-KI |
| v. | **UNITED STATES' REDACTED CONSOLIDATED REPLY TO DEFENDANTS' SENTENCING MEMORANDA** |
| **MEHRDAD YASREBI,** a.k.a Abu Torab, | |
| **CHILD FOUNDATION,** An Oregon non-profit corporation, | Sentencing date: March 6, 2012 |
| Defendants. | |

The United States of America, by S. Amanda Marshall, United States Attorney for the

District of Oregon, through Charles F. Gorder, Jr. and David L. Atkinson, Assistant United

States Attorneys, submits its consolidated reply to the sentencing memoranda filed by

defendants Yasrebi (CR 49) and Child Foundation ("CF US") (CR 41) in aid of sentencing

scheduled for March 6, 2012, at 10:00 a.m. Nothing in the defendants' sentencing memoranda

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO                    Page 1
DEFENDANTS' SENTENCING MEMORANDA**

causes the United States to alter its previous recommendation that the Court impose a 30-month

term of imprisonment and $50,000 fine for defendant Yasrebi, and a $125,000 fine coupled with

four years' supervision for defendant CF US.

**CF US's Cash Transfers Violated the Iranian Embargo.**  Defendant Yasrebi and, to a

lesser extent, defendant CF US attempt to minimize their decade-long violations of the Iranian

Embargo by suggesting that CF US was somehow the victim of OFAC inaction.  At the same

time, the defense claims that they avoided the sanctions legally (rather than evaded them

illegally) by operating only through recognized exemptions for non-commercial, donated

humanitarian articles such as food, medicine, or clothing.  *See* 31 C.F.R. §§ 560.210(b) and

560.516(a)(3).  What is noteworthy about this transparent attempt at minimization is what the

defendants neglect to discuss in their voluminous sentencing memoranda:

1.      There is little to no mention of the $1.8 million that CF US transferred to Iran on
behalf of Dr. Lahiji and his wife in violation of the embargo, or the false charitable deductions
which CF US aided the couple to take on their individual tax returns, or the back-dating of
donation receipts for the Lahijis;

2.      There is scant reference to the creation of false documents for the purpose of
hiding trade-based money laundering through Dubai – *i.e.*, false documents designed to disguise
cash transfers to Iran as "donated food articles."  Defendant Yasrebi describes this scheme
somewhat innocently as "generating documents retroactively that would show the funds and
shipments moving in a way that was represented to the auditor."  Yasrebi mem., pp 10-11.
Indeed, in the defendants' presentations there is no discussion at all of the trade-based money
laundering through Dubai;

3.      There is no mention that the CF US Form 990 returns neglected to use the word
"Iran" in describing its program services for the IRS and the public for a decade while the vast
majority of its funds went to that country, which was subject to embargo and had been
designated as a State Sponsor of Terrorism by the United States Department of State since
1984; and

4.      There is no mention that CF US provided large sums of money to radical Grand
Ayatollah Makarem Shirazi, or to Shirazi's role in the Iranian theocracy, or to his vocal support
for the terrorist group Hezbollah.

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**          **Page 2**
**DEFENDANTS' SENTENCING MEMORANDA**

Defendant Yasrebi attempts to argue that the underlying cash transfers to Iran were legal.  Leaving aside the fact that the defendant Yasrebi admitted in his plea colloquy that (1) CF US funds were "being used to facilitate cash transfers to Iran," (2) "that was in violation of the embargo ordered by President Clinton," and (3) that he "was aware at the time that what [he] was doing was improper",[1] what counsel seem to be arguing is that their clients are only guilty of a conspiracy to hide from the government things that were otherwise legal.

The Iranian embargo does not exempt the unlicensed transfer of cash to Iran.  The sanctions with Iran prohibit the exportation of "goods, technology, or services" to Iran.  *See* 31 C.F.R., § 260.204.  During all times relevant to this case, the "humanitarian aid" exception to the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. 1702(b), exempted "donations by United States persons of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering."[2]  *See also* 31 C.F.R. 560.210(b).  The donated "article" such as food must come from outside Iran; it cannot be purchased in a commercial transaction inside Iran.

Funds are not "articles."  The transfer of donated cash to Iran for the purpose of purchasing "humanitarian" articles has never been exempt from the sanctions pursuant to 50 U.S.C. § 1702(b)(2).  *Holy Land Foundation for Relief and Development v. Ashcroft*, 219 F. Supp. 2d 57, 68-69 (D. D.C. 2002), *aff'd,* 333 F.3d 156 (D.C. Cir. 2003) specifically holds that the "humanitarian aid" exception embodied in §1702(b) refers to the in-kind donation of articles

---

[1]  Transcript of Arraignment and Plea hearing, January 10, 2011, p. 26

[2]  President Obama suspended in part even this exception to the sanctions in an Executive Order issued February 5, 2012.  Executive Order 13599, Blocking Property of the Government of Iran and Iranian Financial Institutions, § 2 (February 5, 2012).

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**                    **Page 3**
**DEFENDANTS' SENTENCING MEMORANDA**

intended to be used to relieve human suffering, but not to the donation of money.  The holding

in *Holy Land Foundation* is fortified by the fact that the statutory language explicitly refers to

donations of food, clothing, and medicine, without any reference to monetary donations.

Further, the legislative history demonstrates that monetary contributions were not to be

encompassed by the "humanitarian aid" exception.  The rationale in *Holy Land Foundation*

drew further support from the holding in *Veterans Peace Convoy Inc. v. Schultz,* 722 F.Supp.

1425, 1431 (S.D.Tex.1988) (after review of legislative history, concluding that § 1702(b)

"authorized donations of articles, but not monetary funds, thereby 'increasing the likelihood that

the donation would be used for the intended purpose.' " (quoting testimony from Senate

hearing)).

That only makes sense because cash is fungible and could be used to purchase anything

in Iran, not just articles such as food, clothing or medicine, and such purchases would be

impossible for OFAC to monitor, regulate, or control.  Thus, a "US person" without a license

such as CF US cannot send cash to Iran and then purchase "goods, technology, or services"

(including food) from a supplier in Iran and claim the exemption under 31 C.F.R. § 560.210(b).

As the embargo regulations make clear in other provisions, the transfer of cash to Iran

from the United States is prohibited if the transaction underlying the cash transfer is prohibited.

There are extremely limited kinds of underlying transactions which are not prohibited.  In

relevant part, the sanctions provide that funds may be transferred to Iran:

> for the direct or indirect benefit of persons in Iran . . . if the transfer is covered in
> full by . . . the following conditions:
> . . .
> (3)   The transfer arises from an underlying transaction that is not prohibited by
> this part, *such as a non-commercial remittance* to or from Iran (e.g., a family
> remittance not related to a family-owned enterprise) . . .

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**                    **Page 4**
**DEFENDANTS' SENTENCING MEMORANDA**

(4) The transfer arises from an underlying transaction that is exempted from regulation pursuant to § 203(b) of the International Emergency Economic Powers Act (50 U.S.C. 1702(b)), such as . . . *the payment for the shipment of donation of articles to relieve human suffering*.

31 C.F.R. § 560.516(a)(3)-(4) (emphasis added).

Defendant Yasrebi conflates the term "non-commercial remittance" with charitable intent. He suggests that if a charity sends funds to Iran, the transfer is *ipso facto* an exempt non-commercial remittance. But that makes no sense. As *Holy Land Foundation* and the regulations themselves make clear, the "humanitarian aid" exception encompasses "in kind" donations of "articles." It does not extend to sending cash to a country which is subject to IEEPA embargo to facilitate the purchase of "articles" there. Charities engage in commercial transactions all the time. When they buy food or clothing to give to the poor, they engage in commercial transactions outside the ambit of the "non-commercial remittance" provisions of Section 560.516(a)(3).[3]

*United States v. Banki*, 660 F.3d 665 (2nd Cir. 2011), extensively cited by counsel, does not hold to the contrary. *Banki* actually dealt with allegations of the unlicensed export of banking services to Iran. The court's holding in that case was that the exemption for non-commercial family remittances applied regardless of whether those funds were transferred through US depository banks or through the hawala system. *Id.*, 660 F.3d at 675-76. But the transfers in that case were between family members for personal use. The *Banki* court specifically acknowledged that "a United States person may not remit his funds to Iran to

---

[3] OFAC has recently reiterated that "[n]on-commercial personal remittances do not include charitable donations to or for the benefit of an entity . . ." Executive Order 13599, Blocking Property of the Government of Iran and Iranian Financial Institutions, General License B, ¶ b. (February 5, 2012).

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO DEFENDANTS' SENTENCING MEMORANDA**                    **Page 5**

purchase '[g]oods or services of Iranian origin or owned or controlled by the government of Iran." *Id.*, 660 F.3d at 677  n.7.

The whole point of the Iranian Embargo is to influence the government of Iran to abandon its support for international terrorism and production of weapons of mass destruction by applying broad economic sanctions designed to "isolate Iran."  As the *Banki* court put it, the embargo is a "blunt instrument."  *Id.*, 660 F.3d at 673.  Even assuming that one has a charitable intent, the purchase of food in Iran, or for that matter the purchase of bicycles, or computers, or refrigerators, or the purchase of a building in Iran, or paying salaries and overhead for an organization, or the paying of university school tuition are all commercial transactions which positively impact the Iranian economy.  Such payments also relieve the Iranian government of the responsibility to care for its own citizens and allow it to spend its resources on more nefarious pursuits.

Defendant Yasrebi notes that in May 1997 OFAC notified another charity, the Kahrizak Foundation, that the other charity could transfer donated funds to the charity's account in Tehran.  He argues that this interpretation from OFAC, which was based upon specific information supplied by Kahrizak in 1997, somehow gave CF US *carte blanche* to do whatever it wanted.  This is as much nonsense as arguing that the fact that someone else has a driver's license allows an unlicensed driver to operate a motor vehicle.  Kahrizak obtained an approval from OFAC based upon its specific facts;  CF US did not.  It was not impossible for a charity to get a license from OFAC, as defendants were well aware.  Indeed, in 2004 CF US applied for and received a limited license.  Later in 2004, OFAC denied CF US's application to send funds

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO** **Page 6**
**DEFENDANTS' SENTENCING MEMORANDA**

into Iran.  The later license application sought approval for the very conduct – sending funds into Iran – which CF US then continued, even after its application was denied.

Several other charities have received specific licenses from OFAC to fund certain projects in Iran.[4]  In 2006, OFAC even issued a policy statement to the NGO community providing insight into the types of projects which might receive licenses, to include the provision of donated professional medical services and targeted educational exchange programs.[5]

Defendant Yasrebi further implies that Kahrizak's attorney, Shawn Khastoo, may have told CF US that since Kahrizak had received OFAC approval CF US could go ahead without a license.[6]  Defendant Yasrebi stops short of asserting that he received such advice from Mr. Khastoo, but in any event it is clear that neither CF US nor defendant Yasrebi operated under this belief.  Indeed, the very fact that CF US's attorney Fari Rezai wrote to OFAC in September 2000 requesting "permission and license" to send funds to Iran makes clear that CF US did not believe that the regulations exempted CF US personnel, including defendant Yasrebi, from obtaining advance approval for its operations in Iran.  It would, of course, have been preferable for OFAC to respond to this request by either granting or rejecting the 2000 license application.

---

[4] For example, the Omid Foundation and the Iranian Children's Rights Society applied for and received OFAC licenses for the transfer of funds to Iran.  *See* Tab 45.

[5] OFAC "Statement of Licensing Policy on Support of Democracy and Human Rights in Iran and Academic and Cultural Exchange Programs," July 17, 2006, available at http://www.treasury.gov/resource-center/sanctions/Programs/Documents/license_pol.pdf (last accessed Feb. 10, 2012).

[6] According to the California Bar website, Mr. Khastoo was suspended from practicing law for 9 months upon his conviction in 2000 for filing a false tax return.  We mention this because the year 2000 was a significant point in time in the analysis of CF US's conduct.

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**                    **Page 7**
**DEFENDANTS' SENTENCING MEMORANDA**

However, the fact that such a response slipped through a bureaucratic crack did not mislead CF US or Yasrebi into thinking they could legally send funds to Iran.[7]

As noted in the government's sentencing memorandum, as early as November 2001 defendant Yasrebi's own handwritten notes indicate that he considered the possibility of receiving permission to send "exchanged money" was "very low."  CF US also sent money to Italy in February 2001 which was used to pay for Formica laminate sheets which were shipped to a company in Tehran, Iran, hardly an example of a "charitable" donation of articles such as food intended to relieve human suffering.[8]

And it was certainly clear to all at CF US by mid-2004 that they could not legally send money to Iran without a license when its application to send $250,000 to Iran for victims of the Bam earthquake was denied by OFAC.  Tab 18, p.7.  Indeed, in order to fool prospective donors into believing that it operated legally, CF US even distributed to the public a partial copy of the one OFAC license which it did receive (limited to sending backpacks to victims of the Bam earthquake earlier in 2004), falsely implying that CF US had a more general, unlimited license

---

[7]  In footnote 14 at page 25 of defendant Yasrebi's sentencing memorandum, defense counsel "wonders" whether his meeting with the undersigned Assistant United States Attorneys in this case on November 2, 2010, caused a "dramatic" change in OFAC's position on fund transfers to Iran by the Kahrizak Foundation.  As much as we would like to take credit for affecting national policy, the Court may rest assured that our influence does not extend to setting policy for the Treasury Department in Washington.  As counsel knows from the document he cites, in 2009 the Bank of America blocked a $100,000 attempted transfer by Kahrizak to an entity designated under the Weapons of Mass Destruction Proliferators Sanctions Regulations, and OFAC was responding to a January 2010 request from Kahrizak to get its money back.

[8]  This is what the agents traveled to Italy in 2002 to investigate, a trip defendant Yasrebi characterizes as an example of excessive governmental zeal.  Yasrebi mem., p. 12.

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**          **Page 8**
**DEFENDANTS' SENTENCING MEMORANDA**

from OFAC to operate in Iran.  As noted in the Affidavit for Search Warrant filed in connection

with this matter in July, 2008:

> The FBI obtained a Child Foundation pamphlet at an Iranian Festival in Portland, Oregon in August 2005. On the cover of the pamphlet was printed "Child Foundation-Washington D.C. Cancer Division 4th Annual Fundraising Gala January 8, 2005." On page four of this pamphlet there is a copy of the first page of the March 2004 OFAC license received by the Child Foundation. However, page 2 of the OFAC license, which reveals that the license only authorizes the export of 6,000 backpacks with personal items for victims of the Bam earthquake, is not included in the booklet.  The absence of this page of the license suggests to the reader that the Child Foundation has a more general authorization to send goods and other items to Iran than the actual one-time permission to export some  children's backpacks.  There was no reference to the July 2004 denial of a license to send money to Iran.

*See*, Tab 46.

An additional theme running through the defendants' sentencing materials is that the

Iranian embargo is unwise and counterproductive and that CF US's activities in Iran worked to

improve the image of the United States among the Iranian people.[9]  With due respect to these

political beliefs, that is just not the defendants' or their supporters' call.  Rather, the decision to

impose the sanctions, initially made by President Clinton in 1995, and later annually confirmed

by both Presidents Bush and Obama, settles the matter.  *See, e.g., United States v. McKeeve*,

131 F.3d 1, 14 (1st Cir. 1997) (the court will not substitute its judgment for President's

judgment that embargo is necessary for national security); *United States v. Arch Trading Co.*,

987 F2d 1087, 1092-94 (4th Cir. 1993).  *See generally United States v. Bozarov*, 974 F.2d 1037,

1045-46 (9th Cir. 1992) (no judicial review of decision to control export of a product for

national security reasons); *United States v. Mandel*, 914 F.2d 1215, 1220 (9th Cir. 1990)

---

[9]  For example, defendant CF US argues that its aid has "enhanced the standing and reputation of the United States" with people in Iran.  CF US mem., p. 3.

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**  **Page 9**
**DEFENDANTS' SENTENCING MEMORANDA**

(accord); *United States v. Spawr Optical Research, Inc*., 864 F.2d 1467, 1472-73 (9th Cir. 1988) ("*Spawr II*"), *cert. denied*, 493 U.S. 809 (1989) (same).

**The government's investigation has been proportionate to defendants' misconduct.**

Defendant Yasrebi also implies that he is a victim of excessive governmental zeal. He complains variously that the United States "spent twelve years building its case," and at another point that the investigation involved "nearly eight years and millions of taxpayer dollars." Yasrebi mem., pp. 19, 28. He argues that the United States consumed resources and employed investigative techniques disproportionate to the criminal conduct which he has admitted. He asserts that the ultimate result was the discovery that he was doing no more than what was voluntarily revealed in the 2000 Fari Rezai letter to OFAC. *Id.*

While the investigation leading to defendant's guilty plea *was* lengthy, it did not consume twelve years of unceasing, active investigation, as defendant contends. And contrary to his assertion that he disclosed exactly what he was doing in Iran in the 2000 letter, by then he had already commenced a pattern of half-truths in his representations to the United States that would only grow increasingly deceptive as time passed. For example, in 1999 CF US issued a backdated donation receipt to the Lahijis for a $100,000 donation. And in 2000, CF US used $250,000 of Lahiji "donations" to purchase a building in Iran "due back" to the Lahijis on a specified future date. Even at this early stage, defendant was violating the embargo by acquiring real estate in Iran, and providing the Lahijis with cash donation receipts enabling them to exaggerate charitable income tax deductions. Unsurprisingly, none of this appears in the 2000 letter to OFAC.

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**                    **Page 10**
**DEFENDANTS' SENTENCING MEMORANDA**

The length of the investigation was attributable, not to a desire to "get" the defendants, but rather to the breadth and complexity of defendants' schemes. For example, defendants began sending millions of dollars to a Swiss affiliate's bank account in 2001, the year following the Rezai letter. As defendant Yasrebi no doubt calculated, Swiss banking secrecy provisions make it difficult for U.S. law enforcement to acquire evidence showing what happens to funds once they are deposited in Switzerland. And the unprecedented complexity of the food commodities transactions – the records for which defendant *admits* having skewed in order to deceive his CPA/auditor – required multiple layers of subpoenas and search warrants to unravel (not to mention outreach to Customs authorities in Dubai, with whom the U.S. shares no legal assistance treaty).

The sheer volume and complexity of evidence seized by traditional Rule 41 criminal search warrant was similarly extraordinary. Analysis of 45 computer hard drives containing many terrabytes of information, coupled with 125 boxes of physical evidence, much of which contained Farsi documents which needed to be translated and analyzed, simply could not be accomplished overnight. Having intentionally engaged in behavior designed to *obscure* what he was doing, defendant Yasrebi cannot be heard to complain that the government spent too long sorting it all out. To attempt to lay the blame for investigative delay at the feet of the United States is unfair, and the Court should see it for what it is.

A fine balance must be drawn in weighing timeliness considerations versus ensuring that seized evidence has been sufficiently analyzed to enable prosecutors to reach responsible charging decisions. The prosecutor is owed a fair degree of deference when delay is attributable to the necessities of the case, rather than negligence, or an attempt to gain a tactical advantage.

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**                     **Page 11**
**DEFENDANTS' SENTENCING MEMORANDA**

While it might be easy to armchair quarterback such decisions, the reality is that proceeding any more quickly in this case could have caused an unjust result – *i.e.* either over- or under-charging the defendants.

**FISA-derived evidence.**  Defendant Yasrebi is also critical of the United States for employing what he claims were excessively intrusive investigative techniques under the Foreign Intelligence Surveillance Act ("FISA") 50 U.S.C. § 1801, *et seq.*  As counsel well knows, the United States is prohibited from disclosing in a setting such as this memorandum the facts that form the basis for any FISA application, including any application leading to evidence used in this prosecution.  Suffice it to say that an Article III judge of the Foreign Intelligence Surveillance Court ("FISC") found probable cause *inter alia* that the target of the FISA application(s) was an "agent of a foreign power,"as that term is defined at 50 U.S.C. § 1801(b)(1) and/or (b)(2).[10]  And in the final analysis, in this case the communications intercepted pursuant to FISA provide some of the most persuasive evidence of the wilfulness of defendant's behavior.

For example, one conversation intercepted pursuant to an order of the FISC was quite probative, but not included in the United States' initial memorandum in favor of brevity.  The interception involved a conversation between defendant Yasrebi and his cousin Ahmad Iranshahi on October 12, 2006.  The two discussed a draft report for CF US's auditor that Iranshahi had prepared purporting to account for funds sent by CF US for food commodities. Knowing full well that CF US was sending cash from Dubai to Iran by utilizing the

---

[10]    *See* generally 50 U.S.C. §§ 1804, 1805, 1823 and 1824 (defining the requirements for an application for electronic surveillance and physical search under FISA; establishing the findings necessary by a judge of the FISC to issue a FISA order).

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**                    **Page 12**
**DEFENDANTS' SENTENCING MEMORANDA**

commodities broker as a "pass through," defendant Yasrebi instructed Iranshahi that "we cannot say that we helped you with money [cash]. . .  you wrote list of the funds distributed in dollar and [cut off] . . . . this problem ... will cause problem for us.  You only need to say food supplies. . . . this is a problem for us ... it will be bad. . . ." Tab 47, p. 2.

Later in the same conversation, he warned Iranshahi,  "You want to say we sell these things! . . . .don't even talk about that we only bring these things when the price is comparable in Iran, because they can . . . argue that you buy and sell [conduct business].  Never . . . say . . . even say these things.  The thing you have to say is that we bring things that are permitted by OFAC regulations into the country. . ." *Id.*, 4-5.  Without such intercepted communications, defendant Yasrebi may well have been successful in his deceptions.

By way of further example, defendant Yasrebi conversed with Iranshahi again on November 26, 2006, instructing him to delete certain computer files because they were too incriminating.  Defendant told Iranshahi to "get rid of it.  Since easily...it means people definitely notice that we are giving money.  It is not helping at all . . .in my opinion, its is like a poison to us." Tab 48, p 2.

Later, defendant Yasrebi further observed that Refah Kudak's website

does not help us, it is severely damaging us; because we are doing everything to demonstrate that we are not sending money to Iran, while your system is one-hundred percent contradicting our statement. . . . . I think this information we are sharing with people is unnecessary. . . . it is poison to us [it destroys us].  These things...people should not know about these things.  They must give us money every month, and know that their children are being helped, that much...we can also prepare and send them a report, a vague one ... it [the situation] is getting worse day by day, and they are getting [arresting] people here and there; and then, people are scared and do not wish to help us anymore.

*Id.*, p. 4.  It is not surprising that defendant Yasrebi attempts to shift the blame to the United States by claiming that it employed overly-intrusive investigative techniques.  The intercepted communications produced irrefutable evidence of his wilfulness.

**Mishandling of donated funds.**  Defendant Yasrebi argues that his activities were all driven by an overarching charitable intent.  He buttresses this argument by appending numerous letters attesting to his good character.  Defendant overstates his charitable motive.  For example, in December 2000, defendant Yasrebi drew a $20,000 check payable to his wife.  Tab 49A.  He did so on a CF US account consisting largely of donors' contributions.  The check noted that the payment was a "loan." *Id.*; Tab 49C.  A few days later $8,000 of those funds were deposited into an investment account at Charles Schwab jointly held by defendant and his wife – in response to a margin call on the account!  Tabs 49B and C.  The remaining $12,000 was invested in another jointly-held E-Trade account that was also "under water."  Tabs 49D and E.

No independent Board of Directors approved this "loan" – Yasrebi simply took it. Investigators found evidence that defendant's wife repaid $4,180 to CF US during 2001 (Tab 49F) but were unable to locate evidence of additional repayment.  Defendant maintains through counsel that the remaining outstanding balance was also repaid, with interest.  But even assuming the loan were repaid, defendant's misappropriation of CF US's donated funds for personal use runs counter to his assertions about his purely charitable intent.

Similarly, between 1999 and 2001, in seven separate transactions defendant Yasrebi deposited about $167,000 of CF US's funds – primarily contributions – into private accounts in various relatives' names.  Investigators examined these accounts and discovered that defendant controlled virtually all of the activity in them.  Through counsel, defendant has asserted that

these deposits were hawala transactions in which the funds ultimately reached Iran for charitable purposes when someone there deposited comparable amounts for the benefit of Refah Kudak.

Curiously, in most of the seven transactions identified by investigators, defendant Yasrebi engaged in multiple, circular financial transactions with CF US funds before finally depositing the funds into the relative's account. For example, in one transaction occurring on a single day in May 2001, the following occurred:

- Defendant first drew a $42,000 check on CF US's checking account, payable to "cash." Tab 50, pp. 1-4.

- He then used the CF US check to purchase a cashier's check for $42,000 payable to himself. *Id.*

- He then deposited the $42,000 cashier's check into an account in his parents' names, on which he controlled virtually all activity. *Id.*, p. 5-6.

By contrast, when sending funds to Iran through money transmitters, he did not engage in such machinations. He would generally write a CF US check payable to the money transmitter, or wire transfer funds directly into the transmitter's account.

**Interview of defendant.** Defendant is critical of the United States for the circumstances under which agents interviewed him. He alleges "[i]n 2008, in connection with the execution of the search warrants . . . agents interviewed Dr. Yasrebi but—almost certainly in violation of his Sixth Amendment right to counsel—did not inform him of the existing indictment prior to interviewing him. Eventually, Dr. Yasrebi retained counsel ...." Yasrebi mem., p. 15.

By pleading guilty, defendant Yasrebi waived his right to object to this interview, but in any case his criticism is misplaced. There is no question but that post-indictment questioning of a defendant by law enforcement is a "critical stage" of a prosecution, and that the right to

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**        **Page 15**
**DEFENDANTS' SENTENCING MEMORANDA**

counsel constitutionally attaches. *Michigan v. Jackson*, 475 U.S. 625, 629-30 (1986). *See also, Patterson v. Illinois*, 487 U.S. 285, 290, 295-96 & n. 8 (1988) (holding that *Miranda* warnings suffice for an enforceable waiver of the Sixth Amendment right to counsel during post-indictment questioning, but leaving open the question whether a defendant must be informed of a pending indictment). Since *Patterson* was decided in 1988:

> [e]very circuit to have considered this issue … has held that the authorities need not inform the accused that he has been indicted before seeking a postindictment [*Miranda*] waiver. *See United States v. Charria,* 919 F.2d 842, 848 (2d Cir.1990), *cert. denied,* 502 U.S. 813, 112 S.Ct. 62, 116 L.Ed.2d 38 (1991); *Riddick v. Edmiston*, 894 F.2d 586, 590-91 (3rd Cir.1990); *United States v. Muca,* 945 F.2d 88, 90-91 (4th Cir.1991), *cert. denied,* 502 U.S. 1078, 112 S.Ct. 983, 117 L.Ed.2d 145 (1992); *Quadrini v. Clusen,* 864 F.2d 577, 585-87 (7th Cir.1989); *Norman v. Ducharme*, 871 F.2d 1483, 1487 (9th Cir.1989), *cert. denied,* 494 U.S. 1031, 110 S.Ct. 1483, 108 L.Ed.2d 619 (1990).

*United States v. Chadwick*, 999 F.2d 1282, 1284 (8th Cir. 1993). "[D]uring questioning by law enforcement officials, an indicted defendant need not be advised of the Government's pending charges against him, provided that he is advised of his *Miranda* rights." *United States v. Noorzai*, 545 F.Supp.2d 346, 356 (S.D.N.Y., 2008). (citing *Patterson*, 487 U.S. at 293–94).

Here, the agents who interviewed defendant advised him of his *Miranda* rights, even though he was not in custody. *See* Tab 26, p. 1. Defendant waived his rights. *Id.* When he later stated that he "would like to get an attorney," the agents promptly ceased questioning. *Id.*, p. 4. Defendant's accusation that the agents improperly questioned him is simply wrong on the law.

**Defendant Yasrebi's receipt of Presidential Service Award.** In mitigation, defendant Yasrebi cites the Court to his receipt of the "President's Call to Service Award, which is the

highest award for volunteer service given by the President's Council on Service and Civic Participation."  Yasrebi mem., p. 5.

The undersigned are advised that the U.S. government contracts with a non-profit known as Points of Light Institute (POLI) to administer the President's Volunteer Service Award (PVSA) program.  More than 150,000 PVSAs are provided annually by POLI.  The White House is not involved in such awards before or after they are provided.

An employee of Child Foundation responsible for marketing applied online for this certificate on February 22, 2011, *after* defendant Yasrebi's guilty plea.  Child Foundation served as the required "certifying organization" for the application after it, too, had pled guilty.  The employee who filed the application recently reported to interviewing agents that the Executive Director for CF US asked her to apply for the certificate for defendant Yasrebi "because he thought it would help the court case."  *See* Tab 54.  The employee stated that the application paperwork for the certificate did not include a question about pending criminal cases.  The Executive Director provided her with the CF US credit card to pay the fee for the application.  POLI issued the award only a few days later, on February 25, 2011.  Defendant Yasrebi's reliance upon his receipt of this award should be accorded the deference that it is due, given the facts set forth above.

**Response to sentencing recommendations of defendant Child Foundation.**  CF US urges the Court to impose a minimal fine of $10,000 with no supervision.  They argue that defendant Yasrebi and Ahmad Iranshahi of Refah Kudak have both resigned and been replaced.  CF US asserts that the compliance plan it has submitted will guarantee that there will be no further embargo violations, and that CF US has already been punished by its loss of revenue,

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO DEFENDANTS' SENTENCING MEMORANDA** **Page 17**

loss of accreditation by ratings agencies, difficulties with its banking relationships, and diminished employee morale.

**Purported loss of revenues.**  In its sentencing memo, CF US argues that "when negative news about Child Foundation was released by the government in mid-December 2010, Child Foundation experienced a 27% decrease in donations . . . it has taken Child Foundation months of dedicated effort to begin to gain back the public's trust."  CF mem., p. 20, citing Seyedali declaration, ¶ 13.

By contrast, the Executive Manager for CF US reports in its January, 2012 newsletter that "[d]espite a poor economy and many other challenges, our donations *increased by 12%* in the last fiscal year."  *See* Tab 51, p. 1 (emphasis added).  And CF US's most recent "Year in Review," written by Mr. Seyedali and linked to the same January 2012 newsletter, reports that "we enjoy a solid and dedicated sponsor base worldwide, growing at an average yearly rate of 9%.  Amid numerous challenges we face, accented by the economic downturn and renewed sanctions on Iran, we managed a *modest growth of 12% in the last fiscal year*."  *Id.* p. 4 (emphasis added).  CF US's most recent Form 990 Return with the IRS, signed by Mr. Seyedali and filed November 17, 2011 for the fiscal year ending May 31, 2011, reports $2.246 million in revenue, up from $2.02 million in the previous year.  *See* Tab 52.  Indeed, CF's revenues for its most recent fiscal year (ending about five months *after* its guilty plea) *are* up about 12%, as reported, and are the highest it has enjoyed since 2004/05.  *Compare,* Tab 44B.[11]

---

[11]  Revenues as reported on CF US's Form 990 returns were $1.612 million for the fiscal years ending May 31, 2008, before the execution of the search warrant.  Reported revenues rose to $1.776 million in fiscal 2009, $2.02 million in fiscal 2010, and $2.246 million last year.  *See* Tab 44B.

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**                    **Page 18**
**DEFENDANTS' SENTENCING MEMORANDA**

Further evidence of CF US's distortion of the facts is contained in an interview of its then-public relations and fundraising officer in a *Willamette Week* article printed in November 2008, following the execution of the search warrants in July 2008.  Tab 51, p. 6.  The article reports that "[a] federal raid on a Portland-based Iranian charity last summer has had a curious effect:  tripling its membership."  It cites the CF US officer as having reported that "the number of new people signing up with the non-profit to help children in Iran, Iraq and elsewhere has jumped from about 30 to 90 a month since *WW* reported on an FBI raid at its downtown office . . ."  *Id.*

**Loss of rating agency accreditation.**  Defendant Child Foundation argues that its guilty plea has caused it to unfairly lose favorable ratings by accreditation agencies, such as the Better Business Bureau ("BBB").  CF mem., p. 20-21.  Closer analysis reveals that CF US's loss of its accreditation from the BBB is better explained by the fact that defendant Yasrebi orchestrated the provision of false answers and doctored documents to the BBB in CF US's application for accreditation.

The BBB Wise Giving Alliance assists charitable donors in the United States "in making sound giving decisions and to foster public confidence in charitable organizations."  It  has developed a comprehensive set of twenty standards -- or "Standards for Charity Accountability" -- under which it evaluates charitable organizations.  The results are posted to the BBB Wise Giving Alliance's website, which lists over 1,200 charities and is visited millions of times annually by the public.  Failure to achieve accreditation may harm the ability of an organization to raise revenues.  CF US sought BBB certification in 2007.

One of the standards by which the BBB Wise Giving Alliance evaluates an organization requires that the organization's governing board review the performance of its Chief Executive Officer or equivalent at least once every two years. In 2007, the BBB initially declined to extend its highest rating to CF US due in part to the fact that CF US reported that there were no biannual CEO ratings. *See* Tabs 53A and B. Upon learning of the rejection, defendants created backdated minutes of board of directors meetings for 2004-2006, documenting favorable evaluations of defendant Yasrebi as president of CF US. The evidence of the creation and backdating of this material for BBB is exhibited at Tab 53 for the Court to consider. Pages 2 through 4 of Tab 53B include a draft letter to BBB which claims, *inter alia*, that contrary to what had originally been reported in its application for accreditation, evaluations for defendant Yasrebi *had* been timely conducted by the CF US Board and were attached.

The email contained in Tab 53C, created by current Compliance Director and Board Member Asad Azemi, purports to be a 3-year evaluation for 2004-06 for defendant Yasrebi in the text of a single email. In the email and attachments set out in Tab 53D, Mr. Azemi's initial purported evaluation has morphed into three separate evaluations, all dated August 1st of their respective years. Note that the 2004 evaluation is dated "2005" in the body. The purported length of the discussion regarding the evaluation in each instance is 30 minutes. The day of the week on which the evaluation discussion was purportedly held is not present in any of the three attachments.

Note that the evaluations in Tab 53E have been doctored yet again. They are now dated differently than the similar documents in 53D, and the day of the week has been added in an apparent attempt to make the evaluations appear to be more credible. The length of the

purported discussions regarding the evaluations now vary from 30 to 40 minutes. Note that defendant Yasrebi is instrumental in approving the creation of these documents, commenting that the final product "looks very good." *See* Tab 53F.

Investigators have combed the *genuine* minutes for the CF US Board acquired by search warrant and have not found any CEO evaluations (except in the file associated with its BBB correspondence). The actual Board Meeting dates for August, 2005-06 differ from those represented in Tabs 53D and E.

CF US ultimately forwarded the newly-created, backdated evaluations to the BBB Wise Giving Alliance via UPS on May 2, 2007, in order to make it appear that CF US met the criteria for accreditation. *See* Tab 53G (UPS shipping receipt). As a consequence, the BBB Wise Giving Alliance *did* accredit CF US for a period of time. When the backdated documents came to light, coupled with CF's guilty plea, the BBB rescinded CF US's accreditation. The United States submits that the BBB can hardly be faulted for having done so, and that CF US has nothing to blame but its own misconduct.

**Analysis of CF US's sentencing recommendation.** CF US's compliance plan appears to be well-thought-out, and the United States has few problems with it.[12] As of the filing of this memorandum, the parties intend to discuss the plan and any changes that may be needed, and hope to reach an agreement by the time of sentencing. The true test of the compliance plan will be in its execution as promised, given CF US's track record.

---

[12] We do question whether the current Compliance Director should continue in that function, given his role in the doctoring of the CEO evaluations for the BBB.

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO DEFENDANTS' SENTENCING MEMORANDA**                    **Page 21**

The United States disagrees with CF US's argument that supervision is unnecessary. Supervision by U.S. Probation for a period of 4 years is appropriate to ensure that CF US diligently complies with its plan.  For example, several of the letters attached to CF US's sentencing memorandum suggest that U.S.-sourced funds, not food, continue to be passed to benefit recipients in Iran.  *See, e.g.* CF US mem., Exh. G (donor had "learned that the money that is donated, minus their minor administrative costs, is in fact given to . . . the same boy I recently personally met [in Iran]"); *id.*, Exh. P (donor attesting that "the money I had been paying for years was properly used for . . . education").

Moreover, a condition of supervision should require that any business CF US conducts in Iran be conducted pursuant to an OFAC license, or be fully and specifically reported to OFAC if CF US believes that a license is unnecessary.  This is particularly crucial in light of the fact that effective February 6, 2012,  President Obama signed new Executive Order 13599, further tightening U.S. sanctions on Iran.  *See generally* http://www.treasury.gov/press-center/press-releases/Pages/tg1409.aspx (last visited 2/10/2012). Section 2 of the new Order suspends exemptions from the Iranian embargo for food and other humanitarian relief in certain circumstances.  From a practical standpoint the new Executive Order may make it difficult for CF US to continue to operate at all in Iran without a specific license, even if it follows its compliance plan to the letter.  Concurrently with the issuance of the new Presidential Order, OFAC issued General License B clarifying *inter alia* that "[c]haritable donations of funds to or for the benefit of an entity in Iran require a specific license."  *See*, Exec. Order No. 13599, OFAC General License B.  The United States submits

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**       **Page 22**
**DEFENDANTS' SENTENCING MEMORANDA**

that periodic supervision by a probation officer, coupled with the added incentive to CF US of ensuring that it avoids a probation violation, would be of significant value going forward.

CF US argues that because it has re-vamped its leadership, and because its revenues consist almost exclusively of contributions from innocent donors, the fine amount should be a token sum of $10,000.  As noted in the government's initial sentencing memorandum, CF US is to be applauded for its leadership changes, but the guidelines fine range applied by analogy is $3.7 million to $7.4 million.  The government's recommended fine of $125,000 is an *extraordinary* deviation – about 3% of the guideline fine amount.  In reaching this recommendation, the United States credits many of the arguments posited by CF US.  Further deviation would be a disservice to the principles of 18 U.S.C. § 3553(a)(2), mandating that the sentence "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence to criminal conduct."  The $125,000 amount recommended by the United States is indeed the minimum necessary to accomplish statutory sentencing mandates.

**Response to sentencing recommendations of defendant Yasrebi.**  In support of his request for leniency, defendant Yasrebi quotes former Supreme Court Justice Robert Jackson, asserting that during a lengthy investigation, "a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone."  Yasrebi mem., p. 27.  In the government's view, criminality as blatant as the Lahiji scheme, as complex as the food commodities schemes, as inappropriate as his partnership with Grand Ayatollah Makarem Shirazi, and as fraudulent as his production of counterfeit documents to pervade his company's books and records, is more than a mere "technical violation."  Defendant Yasrebi's lengthy memorandum largely ignores much of the most significant evidence.  The United States

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO     Page 23
DEFENDANTS' SENTENCING MEMORANDA**

requests that the Court find from the evidence that defendant's unlawful conduct was lengthy, wilful and multi-faceted. It surpassed mere "technical violations."

Imposition of the probationary sentence that defendant Yasrebi seeks would denigrate the seriousness of the crimes. Such a sentence would fail to serve the statutorily-required sentencing goals of deterrence, respect for the law, and the provision of just punishment. The government's recommendation of 30 months' imprisonment deviates below the low-end guideline range by 16 months, or more than one-third – well below the sentence the Court might impose on a defendant who lacked some of the positive achievements of defendant Yasrebi. It recognizes the various arguments for lenience advanced by defendant by foregoing a greater, within-guideline sentence. The $50,000 fine proposed by the United States is in the middle of the guideline range, and is an amount which defendant Yasrebi can well afford. The sentence proposed by the United States is just, humane, generous, and the minimum necessary to accomplish statutory sentencing mandates.

Dated this 16th day of February 2012.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney

/s/ *David L. Atkinson*
David L. Atkinson, OSB #75021

/s/ *Charles F. Gorder, Jr.*
Charles F. Gorder, Jr., OSB # 91287
Assistant United States Attorneys
(503) 727-1000

**UNITED STATES' REDACTED CONSOLIDATED REPLY TO**
**DEFENDANTS' SENTENCING MEMORANDA**

**Page 24**